# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| Atlantic Pinstriping, LLC, and <br> Michael Montemurro, <br><br>          Plaintiffs, <br><br> v. <br><br> Atlantic Pinstriping Triad, LLC, <br> Atlantic Dealer Services Coastal, LLC, <br> Tony Horne, <br> William E. Horne, and <br> Jerry W. Parker, <br><br>          Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 3:16-CV-547-GCM |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER AND
## MOTION FOR PRELIMINARY INJUNCTION

**BRADLEY ARANT BOULT CUMMINGS LLP**
Corby C. Anderson (N.C. Bar No. 20829)
Matthew S. DeAntonio (N.C. Bar No. 39625)
100 N. Tryon Street, Suite 2690
Charlotte, North Carolina 28202
Telephone: (704) 338-6043
canderson@bradley.com
mdeantonio@bradley.com

*Counsel for Plaintiffs*

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and LCvR 7.1, Plaintiffs Atlantic Pinstriping, LLC ("Atlantic") and Michael Montemurro (collectively "Plaintiffs") submit this Memorandum of Law in Support of their Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction (the "Motion," Doc. 5).

## I.  NATURE OF THE CASE

This lawsuit arises from three franchisees' breaches of their franchise agreements. After Atlantic, the franchisor, terminated the franchise agreements, the Defendants have continued to operate as holdover franchisees. Their refusal to comply with their post-termination obligations and their infringing use of Atlantic's trademarks are causing Plaintiffs to suffer irreparable harm, which will continue unless this Court enters an injunction.

## II.  FACTS

### A.  The Atlantic Pinstriping® System.

Atlantic, based in Indian Trail, North Carolina, franchises locally owned Atlantic Pinstriping® businesses. (Compl. ¶¶ 2, 18). Each franchisee provides painted pin striping services (and related services such as painted lettering) for motor vehicles. (Id. ¶ 18; Doc. 1-1). Atlantic and its franchisees enter into franchise agreements that require the franchisees to implement the Atlantic Pinstriping® System, a proprietary and distinctive way of doing business. (Compl. ¶ 33).

Through its franchise agreements, Atlantic grants its franchisees limited, non-exclusive licenses to use its trademarks to identify their businesses and their goods and services. (Id. ¶¶ 22, 26). Atlantic has current registrations for the following marks (collectively, the "Atlantic Marks"):

- ATLANTIC PINSTRIPING®, U.S. Reg. No. 2,981,763, for use in connection with custom hand-painted pinstriping of vehicles. (Id. ¶ 21; Doc. 1-2). This registration is incontestable pursuant to 15 U.S.C. § 1065. (Compl. ¶ 23; Doc. 1-3). Atlantic has used this mark continuously since at least August 2003. (Compl. ¶ 24).

- ATLANTIC DEALER SERVICES®, U.S. Reg. No. 4,789,279, for use in connection with custom hand-painted Pinstriping of vehicles and application of protective coatings and graphics to vehicles. (Compl. ¶ 25; Doc. 1-4). Atlantic has used this mark

continuously since at least November 18, 2014. (Compl. ¶ 27).

Another part of the Atlantic Pinstriping® System is the use of a patented pin striping method and applicator. (*Id.* ¶ 42). Michael Montemurro, Atlantic's founder, obtained the following patents for the method and applicator:

- U.S. Patent No. 6,866,716 (the "'716 Patent"), entitled "Method for Striping a Surface with Paint and Apparatus Therefor." (*Id.* ¶¶ 43–47; Doc. 1-5).

- U.S. Patent No. 7,427,427 (the "'427 Patent"), entitled "Method for Striping a Surface With Paint and Apparatus Therefor." (Compl. ¶¶ 48–51; Doc. 1-6).

Montemurro licenses these patents to Atlantic Pinstriping, which in turn sub-licenses the patents to its franchisees through franchise and lease agreements. (Compl. ¶¶ 53–54).

Atlantic also loans an operations manual ("Manual") to its franchisees. (*Id.* ¶ 37). The Manual contains confidential, proprietary information about how to operate an Atlantic Pinstriping® franchise. (*Id.* ¶ 38).

### B. **Atlantic's Franchise Agreements and Other Contracts with Defendants.**

#### 1. The Charleston Franchise.

On April 14, 2011, Atlantic entered into a franchise agreement establishing an Atlantic Pinstriping® franchise for five years in a territory near Charleston, South Carolina ("Charleston Franchise Agreement") (Doc. 1-7 § 2.04; Doc. 1-8). Defendants Norman Anthony Horne ("Tony") and William E. Horne ("Ernie") signed for the franchisee as "members" of an unnamed entity. (Doc. 1-7, at 46). The parties renewed the agreement, extending the term through September 1, 2020. (Compl. ¶ 59; Montemurro Decl. ¶ 5 & Ex. 1). Defendant Atlantic Pinstriping Triad, LLC ("APT") acted as the franchisee. For example, APT submitted financial reports (Montemurro Decl. ¶ 7 & Ex. 2) and paid royalties to Atlantic (*id.* ¶ 8 & Ex. 3).

Atlantic also entered into an equipment lease to provide patented pin striping applicators

and "heads"[1] to the Charleston franchisee ("Charleston Lease") (Doc. 1-9). Tony and Ernie signed the Charleston Lease as "members" of an unnamed entity. (*Id.* at 7). APT acted as the lessee. APT paid rental fees (Montemurro Decl. ¶ 9) and used the equipment, as evidenced by the revenue it earned for pin striping cars (*id.* ¶ 13 & Ex. 4). Atlantic ultimately delivered five pin striping applicators and 40 heads to APT, Tony, and Ernie for the Charleston franchise. (*Id.* ¶ 12).

Tony and Ernie executed an owners agreement ("Charleston Owners Agreement") in which they guaranteed, among other things, both payment and performance of the Charleston Franchise Agreement and the Charleston Lease (Doc. 1-7, at pp. 50–51).

2.    The Columbia Franchise.

On November 13, 2012, Atlantic entered into a franchise agreement establishing an Atlantic Pinstriping® franchise for five years in a territory near Columbia, South Carolina ("Columbia Franchise Agreement") (Doc. 1-10 § 2.04; Doc. 1-11). Tony and Ernie signed for the franchisee as "members" of an unnamed entity. APT also acted as the franchisee under this agreement, submitting financial reports (Montemurro Decl. ¶ 16 & Ex. 2) and paying royalties based on the Columbia franchisee's sales (*id.* ¶ 17 & Ex. 5).

Atlantic also entered into an equipment lease to provide patented pin striping applicators and heads to the Columbia franchisee ("Columbia Lease") (Doc. 1-12). Tony and Ernie signed the Columbia Lease as "members" of an unnamed entity (*id.* at 7), but APT acted as the lessee under this agreement, paying the rental fees (Montemurro Decl. ¶ 18) and earning revenue by using the equipment (*id.* ¶ 20 & Ex. 6). Atlantic ultimately delivered two pin striping applicators and 16 heads to APT, Tony, and Ernie for the Columbia franchise. (*Id.* ¶ 19).

Tony and Ernie executed a second owners agreement in which they guaranteed, among

---

[1]   A "head" is an attachment to the pin striping applicator that is necessary for its operation. (Montemurro Decl. ¶ 11).

other things, both payment and performance of the Columbia Franchise Agreement and the Columbia Lease ("Columbia Owners Agreement") (Doc. 1-10, at pp. 50–51).

### 3. The Coastal Franchise.

On January 22, 2015, Atlantic entered into a franchise agreement establishing an Atlantic Pinstriping® franchise for five years in a territory near Myrtle Beach, South Carolina ("Coastal Franchise Agreement") (Doc. 1-10 § 2.04). Tony, Ernie, and Defendant Jerry Parker ("Jerry") signed the Coastal Franchise Agreement as franchisees in their individual capacities. (*Id.* at 46). Defendant Atlantic Dealer Services Coastal, LLC ("ADSC") has also acted as the franchisee. The Coastal franchisee made purchases in the name of ADSC. (Montemurro Decl. ¶ 49 & Ex. 18). ADSC also submitted quarterly financial reports as required by the Coastal Franchise Agreement. (*Id.* ¶ 24 & Ex. 7).

Tony, Ernie, and Jerry executed a third owners agreement in which they guaranteed, among other things, both payment and performance of the Coastal Franchise Agreement ("Coastal Owners Agreement") (Doc. 1-14, at 49–51, §§ 3–4).[2]

Atlantic has temporarily authorized the Charleston, Columbia, and Coastal franchisees to conduct business in Savannah, Georgia, Greenville, South Carolina, and Venice, Florida. (Montemurro Decl. ¶¶ 50, 52 & Exs. 18, 20).

### 4. Contractual Terms Common to Each Franchise.

The Charleston Franchise Agreement, the Columbia Franchise Agreement, and the Coastal Franchise Agreement each provide, in relevant part, that the franchisees must:

- Operate the business "in a manner which is consistent with sound business practices," maintain working capital sufficient to fulfill all obligations under the franchise agreement, and pay all debts when due. (Docs. 1-7, 1-10, 1-13 § 4.06).

---

[2] Atlantic also entered into an equipment lease in connection with the Coastal Franchise Agreement, but Atlantic does not allege that Defendants are in breach of that lease.

- Pay all taxes when due. (*Id.* § 4.08).

- Notify Atlantic within 5 business days of the commencement of any action, suit, or proceeding of which the franchisee becomes aware that "may adversely affect the operation or financial condition of the" franchised business. (*Id.* § 4.23).

- Refrain from engaging in, assisting, acquiring, advising, consulting with, being employed by, owning, or becoming associated in any way with, any business whose methods of operation, trade dress, or business concept is the same as or similar to that of the System or the Atlantic Marks, or which offers vehicle pin striping services, other than the franchised business. (*Id.* § 4.24).

- Average $4,000 in gross revenues for each calendar month after the franchise had been in operation for six months (*Id.* § 4.26).

- Affix warranty stickers to all vehicles on which the franchisee performed pin striping, lettering, or stenciling jobs. (*Id.* § 4.27).

- Pay Atlantic a monthly royalty fee of 7% of each calendar month's revenues and income in any way related to the franchised business (*Id.* § 7.02).

- Pay Atlantic a marketing fee equal to 1% of each calendar month's gross revenues. (*Id.* § 7.03).

- Provide to Atlantic quarterly financial statements and certain periodic reports from which its royalties and marketing fees could be calculated. (*Id.* §§ 7.10, 7.11).

- Permit Atlantic to inspect the franchised business during regular business hours, with or without notice of the inspection (*Id.* § 11.01).

Pursuant to § 15.01 of the each franchise agreement, any of the following would constitute a material, non-curable default entitling Atlantic to terminate the agreement "immediately upon delivery of notice of termination" to the franchisee:

- The franchisee is unable to pay its debts as they become due. (*Id.* § 15.01(a)).

- The franchisee understates its gross revenues in any report or financial statement on two or more occasions. (*Id.* § 15.01(f)).

- The franchisee commits two or more defaults within any 12-month period, regardless of whether the defaults are cured. (*Id.* § 15.01(g)).

Termination of a franchise agreement necessarily resulted in termination of the corresponding lease. (Docs. 1-9, 1-12 §§ 3, 11).

Upon termination, each franchisee agreed to comply with the following requirements ("Post-Termination Obligations") in the franchise agreements, leases, and owners agreements:

- Ceasing use of the Atlantic Marks. (Docs. 1-7, 1-10, 1-13 § 16.01).

- Ceasing use of the Atlantic Pinstriping® System. (*Id.*).

- Returning the Manual and all other confidential information to Atlantic. (*Id.* § 16.03).

- Disassociating itself from the Atlantic Pinstriping® System. (Id. § 16.04).

- Providing Atlantic all customer lists, contact information, and vendor numbers in the franchisee's possession or control. (*Id.* § 16.05).

- Transferring to Atlantic any telephone numbers or advertisements related to the Atlantic Marks. (*Id.* § 16.06).

- Cancelling any assumed name that incorporates the Atlantic Marks. (*Id.* § 16.07).

- Ceasing use of all leased equipment and returning it to Atlantic. This is required by the franchise agreements (*id.* § 16.01) and the leases (Docs. 1-9, 1-12 § 12).

- Complying with the post-term non-competition and non-solicitation covenants (the "Non-Compete") in the franchise agreements (Docs. 1-7, 1-10, 1-13 § 16.08) and in the owners agreements (*id.* at pp. 49–50). In relevant part, the Non-Compete prevents the franchisees and their owners, for two years after termination, from:

  o Becoming involved with any business that offers vehicle pin striping services within 25 miles of the franchisee's territory or any other Atlantic Pinstriping® franchisee's territory;

  o Soliciting any of the franchisee's former customers, or any customers of other Atlantic franchisees; and

  o Interfering with Atlantic's relationships with its vendors.

Each franchise agreement (*id.* § 17.05), owners agreement (*id.* at pp. 51), and lease (Docs. 1-9, 1-12 § 14) contain North Carolina choice of law and forum selection clauses.

## C. Defendants' Breaches of their Franchise Agreements, Leases, and Owners Agreements.

### 1. Charleston Defaults.

APT, Tony, and Ernie defaulted under the Charleston Franchise Agreement at least 21 times in the past year. In violation of § 15.01 of the Charleston Franchise Agreement, APT, Tony,

and Ernie underreported the Charleston franchisee's gross revenues at least five times. Fender Mender of West Ashley, Inc. ("Fender Mender"), one of the Charleston franchisee's clients, sent a report to Atlantic setting forth its payments to APT. Comparing that reports to APT's monthly revenue reports reveals the following underreporting:

| Fender Mender | | | |
|---|---|---|---|
| Month | Amount Received[3] | Amount Reported[4] | Amount Underreported |
| January 2016 | $1,310.01 | $0.00 | ($1,310.01) |
| February 2016 | $200.00 | $0.00 | ($200.00) |
| March 2016 | $830.00 | $0.00 | ($830.00) |
| April 2016 | $1,010.00 | $0.00 | ($1,010.00) |
| May 2016 | $660.00 | $0.00 | ($660.00) |

In all likelihood, APT, Tony, and Ernie have underreported other revenues that Atlantic has not yet discovered. Because royalty fees and marketing fees are calculated as a percentage of gross revenue (*see* Doc. 1-7 §§ 7.02, 7.03), APT's underreporting has caused APT to underpay those fees owed to Atlantic, resulting in 10 additional defaults (i.e., breaches of § 7.02 and § 7.03 for each month with underreporting).

In violation of § 4.27 of the Charleston Franchise Agreement, APT, Tony, and Ernie failed to affix warranty stickers to all vehicles on which they performed pin striping. (Doc. 1-7 § 4.27). From January 2015 to June 2016, APT ordered only 300 stickers for the Charleston franchisee, which is insufficient to cover the approximately 5,480 new vehicles APT pin striped in Charleston during that time. (Montemurro Decl. ¶ 31).[5]

On April 11, 2016, APT, Tony, Ernie, and Jerry were sued in the Charleston County, South Carolina Court of Common Pleas for, among other things, failing to pay for services rendered to

---

[3]  Montemurro Decl. ¶ 26 & Ex. 8.

[4]  *Id.* ¶ 13 & Ex. 4.

[5]  Arguably, each failure to affix a warranty sticker constitutes a separate default under the franchise agreement. However, to be conservative, Atlantic only counts this default one time for purposes of this Motion.

Dentworks Auto Reconditioning, LLC (the "Dentworks Lawsuit"). (DeAntonio Decl. ¶ 4 & Ex. 1). Neither APT, Tony, nor Ernie notified Atlantic of this lawsuit within five days of its commencement, which is a violation of § 4.23 of the Charleston Franchise Agreement.[6]

Despite the Charleston franchisee's obligation to pay its taxes when due (Doc. 1.7 § 4.08), the Internal Revenue Service has filed at least two tax liens against APT demanding payment of unpaid liabilities of $6,867.33 and $303.73. (DeAntonio Decl. ¶¶ 5–6, Exs. 2–3).

The profit and loss statement for April 2016 provided by APT shows a net income of negative $20,437.56. (Montemurro Decl. ¶ 7 & Ex. 2). APT has also received complaints from APT vendors regarding APT's failure to pay its debts. (*Id.* ¶¶ 28–29, 39 & Exs. 9, 12). The Dentworks Lawsuit, the tax liens, the negative net income, and the failure to pay vendors violate § 4.06 of the Charleston Franchise Agreement, which requires the franchisee to operate the business "in a manner which is consistent with sound business practices," maintain working capital sufficient to fulfill all obligations under the franchise agreement, and pay all debts when due.

In violation of § 4.24 of the Charleston Franchise Agreement, Tony participated in the operation of a competing business, Partners Detail & Dent Removal, LLC ("PDDR"), which provides full service automobile reconditioning, including pin striping, to car dealers. (DeAntonio Decl. Ex. 1, at ¶ 8). Tony signed an IRS Form W-9 on behalf of PDDR (Montemurro Decl. ¶ 34 & Ex. 10) and wrote checks on behalf of PDDR (*id.* ¶ 35 & Ex. 11).

On June 11, 2016, Atlantic notified APT, Tony, Ernie, and Jerry that Montemurro would conduct an inspection of the Charleston franchise on June 13, 2016. (*Id.* ¶ 38). In violation of § 11.01, APT, Tony, and Ernie refused to make two trucks available for the inspection (*id.*).

2.      Columbia Defaults.

---

[6]   Defendants' attorney first notified Atlantic's former counsel of this lawsuit on June 16, 2016, when he stated that Defendants had asserted a third-party complaint against Atlantic. (Doc. 1-15, at 2). Atlantic has never been served with this lawsuit.

APT, Tony, and Ernie have also defaulted under the Columbia Franchise Agreement at least 21 times in the past year. Five of the defaults described above are also defaults under the Columbia Franchise Agreement. The failure to notify Atlantic of the Dentworks Lawsuit violates § 4.23; APT's failure to pay taxes violates § 4.08; the Dentworks Lawsuit, the tax liens, APT's negative net income, and APT's failure to pay vendors violate § 4.06; Tony Horne's participation in PDDR violates § 4.24; and APT, Tony, and Ernie's refusal to make their trucks available for inspection violates §11.01.

APT has also underreported its gross revenue at least five times for the Columbia franchise, in violation of § 15.01. One of the Columbia franchisee's clients, Mark Williams Collision Center, disclosed to Atlantic that it had paid APT the following amounts from February through June 2016, none of which APT disclosed in its monthly revenue reports:

| Mark Williams Collision Center | | | |
|---|---|---|---|
| Month | Amount Received[7] | Amount Reported[8] | Amount Underreported |
| February 2016 | $315.00 | $0.00 | ($315.00) |
| March 2016 | $85.00 | $0.00 | ($85.00) |
| April 2016 | $190.00 | $0.00 | ($190.00) |
| May 2016 | $105.00 | $0.00 | ($105.00) |
| June 2016 | $355.00 | $0.00 | ($355.00) |

There are likely other examples of underreporting that Atlantic has not yet discovered. This underreporting has caused APT to underpay royalty fees and marketing fees, which are calculated as a percentage of gross revenues, resulting in two more defaults per month of underreported income, for a total of ten more defaults. (*See* Doc. 1-7 §§ 7.02, 7.03).

APT also violated § 4.27 of the Columbia Franchise Agreement by refusing to affix warranty stickers to all vehicles it pin striped. (*See* Doc. 1-7 § 4.27). From January 2015 to June

---

[7]   Montemurro Decl. ¶ 30.
[8]   *Id.* ¶ 13 & Ex. 4.

2016, APT ordered only 700 stickers for the Columbia franchisee, which is insufficient to cover the approximately 7,500 new vehicles it pin striped in Columbia during that time. (Montemurro Decl. ¶ 32).

        3.    <u>Coastal Defaults.</u>

ADSC, Tony, Ernie, and Jerry have committed at least 6 defaults of the Coastal Franchise Agreement in the past year. First, they did not submit monthly gross revenue reports for May or June of 2016 (Montemurro Decl. ¶ 24), which constitutes 2 separate violations of § 7.11. This means ADSC is likely underreporting its revenue and underpaying royalties and marketing fees for those months as well.

ADSC's profit and loss statement shows a net income of negative $43,052.63 for January through March 2016. (*Id.* ¶ 24 & Ex. 7). One of the Coastal franchisee's vendors, Solar Control Films, Inc., refuses to do business with the Coastal franchisee due concerns about payment of invoices. (Montemurro Decl. ¶ 39 & Ex. 12). These facts and the Dentworks Lawsuit violate § 4.06 of the Coastal Franchise Agreement, as the Coastal franchisee has not operated its business diligently and consistent with sound business practices, has not maintained sufficient working capital, and has not paid its debts and obligations as they become due.

ADSC violated § 4.27 of the Coastal Franchise Agreement by not affixing warranty stickers to pin striped vehicles. (*See* Doc. 1-7 § 4.27). From January 2015 to June 2016, ADSC never ordered any stickers, but it pin striped approximately 1,659 new vehicles during that time. (Montemurro Decl. ¶ 33).

Tony's participation in PDDR also violates § 4.24 of the Coastal Franchise Agreement. Likewise, Tony, Ernie, and Jerry's failure to notify Atlantic of the Dentworks Lawsuit constitutes a violation of § 4.23 of the Coastal Franchise Agreement.

    **D.**    **<u>Termination of the Franchise Agreements and Defendants' Breaches of Their Post-Termination Obligations.</u>**

On June 13, 2016, Atlantic terminated the Charleston, Columbia, and Coastal franchises. (*Id.* ¶ 40 & Ex. 13). In the letter providing notice of this termination ("Termination Notice"), Atlantic requested that the franchisees immediately comply with the Post-Termination Obligations. (*Id.*). On June 16, 2016, the franchisees responded through counsel, stating they "will not be complying with [Atlantic's] requests or demands." (Doc. 1-15). Since that time, Defendants have breached their Post-Termination Obligations in the following ways:

- In violation of §§ 16.01 and 16.04 of each franchise agreement, the franchisees continue to use the Atlantic Marks and refuse to disassociate themselves with the Atlantic Pinstriping® System. Specifically:

  o Defendants sent letters to their clients stating that they continue to operate Atlantic Pinstriping® franchises. (Montemurro Decl. ¶ 43 & Ex. 14). Tony described himself as the "new owner of ALL Atlantic Pinstriping stores" to Atlantic's software provider, Film and Vinyl Designs ("FVD"). Tony instructed FVD not to renew Atlantic's software license. (*Id.* ¶¶ 47–48 & Ex. 16).

  o ADSC is purchasing equipment and conducting business while using the Atlantic Marks, as evidenced by two invoices from its vendor, Star Shield Solutions. (*Id.* ¶ 49 & Ex. 17).

  o Defendants' counsel stated that his "clients intend to continue to operate pursuant to the franchise agreement." (Doc. 1-15).

- In violation of § 16.03 of each franchise agreement, none of the franchisees has returned the Manual to Atlantic. (Compl. ¶ 157(c)).

- In violation of § 16.07 of each franchise agreement, neither APT nor ADSC has changed its entity name to remove the portions containing the Atlantic Marks, as confirmed by the North Carolina and Secretary of State's business entity database. (DeAntonio Decl. ¶¶ 7–8 & Exs. 4–5).

- In violation of the Non-Compete, the franchisees have contacted the general manager of Venice Toyota and Venice Honda, in Venice, Florida, to solicit pin striping business. Those entities are the franchisees' former clients. (Montemurro Decl. ¶ 50 & Exs. 18–19).

- In violation of each lease agreement, the Defendants have refused to return pin striping applicators bearing serial numbers 1959, 1960, 1963, 1978, 1998, and 1999 as well as 56 heads. (Compl. ¶ 154).

- In violation of § 16.05 of each franchise agreement, none of the franchisees has provided Atlantic with its customer lists, contact information, or vendor numbers.

(Compl. ¶ 157(e)).

- In violation of § 16.06 of the Charleston Franchise Agreement, none of the franchisees has transferred to Atlantic its telephone numbers, white and yellow page references, and advertisements used in connection with the franchised businesses. (*Id.* ¶ 157(f)).

E.     **Atlantic Files This Lawsuit, Defendants Evade Service, and Atlantic Continues to Suffer Irreparable Harm.**

On July 7, 2016, as required by § 17.01 of each franchise agreement, Montemurro met with Tony, Ernie, and Jerry in an attempt to resolve this dispute short of litigation. (Montemurro Decl. ¶ 44). That meeting was unsuccessful. (*Id.*). Thus, on July 13, 2016, Atlantic and Montemurro filed this lawsuit to protect their rights and the rights of other Atlantic Pinstriping® franchisees.

Defendants have attempted to evade service. Despite the fact that Tony instructed Montemurro to contact him only through counsel (Montemurro Decl. ¶ 45 & Ex. 15), Defendants' counsel refuses to accept service of this lawsuit or even correspond with Atlantic's counsel (DeAntonio Decl. ¶ 9 & Ex. 6).[9] Plaintiffs attempted to serve Defendants via certified mail, but to date, Plaintiffs' counsel has not received notification that Defendants have accepted delivery of the Summonses and Complaint. (*Id.* ¶ 11). Tony, who is supposed to be APT's and ADSC's registered agent in North Carolina, has apparently moved out of state. (Fallaw Aff., Doc. 9). On August 11, 2016, Plaintiff's process server finally served Tony by leaving a copy of the Summonses and Complaint at his dwelling. (*Id.*).

Meanwhile, Defendants' conduct continues to irreparably harm Atlantic. Since the lawsuit was filed, FVD cancelled Atlantic's software license based on Tony's statement that he was the "new owner of ALL Atlantic Pinstriping stores." (Montemurro Decl. ¶ 48 & Ex. 16). Defendants solicited business from their former clients (*id.* ¶ 50) and continue to operate competing businesses

---

[9]   Defendants' refusal to authorize their counsel to accept service is curious given that this same counsel accepted service of the Dentworks Lawsuit on behalf of Tony, Ernie, Jerry, and APT. (*Id.* ¶ 10 & Ex. 7).

in their current territories (*id.* ¶ 43 & Ex. 14). This conduct is consistent with Tony's statement to Montemurro that "You have no idea what I am capable of, but you're about to find out." (*Id.* ¶ 51).

### F. Atlantic Files this Motion and Provides Notice to Defendants.

Based on this continuing harm, Atlantic filed this Motion for a TRO and preliminary injunction. Pursuant to LCvR 7.1(B), Atlantic's counsel attempted to confer with Defendants' counsel prior to filing this Motion, but Defendants' counsel refuses to communicate with Atlantic's counsel. (DeAntonio Decl. ¶ 9 & Ex. 6). Upon filing this Motion, Atlantic will immediately notify Defendants' counsel via e-mail and U.S. Mail. Upon receiving a hearing date and time, Atlantic's counsel will immediately notify Defendants' counsel via e-mail and U.S. Mail. Prior to the hearing, Atlantic's counsel will file a declaration setting forth all efforts to serve Defendants with process and to notify Defendants of this Motion.

## III. ARGUMENT

### A. Legal Standard

The purpose of a preliminary injunction is to prevent irreparable harm during the pendency of a lawsuit. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). A party seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). The purpose of a TRO is to preserve the status quo until a preliminary injunction hearing can be held. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). The standard for granting a TRO is the same as the standard for granting a preliminary injunction. *Telesis Cmty. Credit Union v. Mantiff 1215 Statesville Hosp. LLC*, No. 5:09-CV-118, 2010 WL 309040, at *2 (W.D.N.C. Jan. 25, 2010).

### B. Atlantic has satisfied the notice requirements of Rule 65(a).

A plaintiff moving for a preliminary injunction must serve the defendant with process. *3M Co. v. Christian Investments LLC*, 1:11-CV-627, 2011 WL 3678144 (E.D. Va. Aug. 19, 2011). The movant must also give notice of the motion to the opposing party. Fed. R. Civ. P. 65(a)(1). The notice requirement "implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 433 (1974).

A TRO does not require service of process, *Internatio-Rotterdam, Inc. v. Thomsen*, 218 F.2d 514, 516 (4th Cir. 1955), and may be entered with or without notice, Fed. R. Civ. P. 65(b)(b). Any notice given may be informal and may be given on the same day. *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000). If no notice is given, the Court may grant the TRO only if:

> (A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

Prior to any hearing, Atlantic's counsel will submit a declaration describing all efforts to serve Defendants and provide notice of this Motion. If Atlantic provides sufficient notice, Atlantic requests that the Court treat this Motion as one for a preliminary injunction. If the Court determines sufficient notice has not been established, Atlantic requests that the Court enter a TRO, as the requirements of Fed. R. Civ. P. 65(b)(1) have been (or will be) satisfied.

### C.   The Court should enjoin Defendants from further breaching their Post-Termination Obligations.

In return for becoming Atlantic Pinstriping® franchisees, Defendants agreed to comply with the Post-Termination Obligations in the franchise agreements, leases, and owners agreements. Defendants also agreed that Atlantic could seek "temporary restraining orders or preliminary

injunctions" to enforce these Post-Termination Obligations. (Docs. 1-7, 1-10, 1-13 at § 17.03). Courts in this circuit often grant injunctive relief requiring franchisees to comply with post-termination obligations. *See, e.g.*, *Am. Dairy Queen Corp. v. YS & J Enters., Inc.*, No. 5:14-CV-151-BR, 2014 WL 1327017, at *5 (E.D.N.C. Apr. 2, 2014) (granting a preliminary injunction); *Meineke Car Care Ctrs., Inc. v. Quinones*, No. CIV.A. 3:06CV87-MU, 2006 WL 1549708, at *4 (W.D.N.C. June 1, 2006) (same). Here, the Court should enjoin Defendants' continued breaches of their post-termination obligations, which are irreparably harming Atlantic.

1. Atlantic is likely to succeed on the merits of its claim to enforce the Post-Termination Obligations.

To prevail on its breach of contract claims (Doc. 1, Claims 1–8), Atlantic must show "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). The validity of the franchise agreements, lease agreements, and owners agreements are self-evident, as the parties performed under those agreements until this dispute arose in June 2016. Indeed, Defendants contended the franchise agreements were valid even after Atlantic sent the Termination Notice. (*See* Doc. 1-15; Montemurro Decl. ¶ 43 & Ex. 14).[10]

Regarding the second element, in order to establish that the Defendants must comply with their Post-Termination Obligations, Atlantic must show that those obligations were triggered by the "expiration or termination of [the franchise agreements] by any means or for any reason." (Docs. 1-7, 1-10, 1-13 §§ 16-01 to 16.11). As stated above (*see* Part II.B.4), Atlantic had the right

---

[10] Given that it performed under the Charleston and Columbia Franchise Agreements, APT is a party to those agreements under an implied contract theory. *See Whicker v. Compass Grp. USA, Inc.*, 784 S.E.2d 564, 570 (N.C. Ct. App. 2016) ("An implied contract refers to an actual contract inferred from the circumstances, conduct, acts or relations of the parties, showing a tacit understanding."); *see also Bridger v. Mangum*, 35 N.C. App. 569, 570, 241 S.E.2d 726, 727 (1978) ("For defendant to remove himself from the contract and substitute his corporation as a party to the contract requires the consent of plaintiff, who is the other party to the contract."). For the same reason, ADSC is a party to the Coastal Franchise Agreement.

to immediately terminate the franchise agreements if the franchisees committed two underreporting defaults. (Docs. 1-7, 1-10, 1-13 § 15.01(f)). Here, both the Charleston franchisee and the Columbia franchisee underreported their gross revenues for five consecutive months at the beginning of 2016, easily satisfying this test.[11]

Atlantic could also terminate if the franchisees committed any two defaults over a 12-month period. (*Id.* § 15.01(g)). In the year preceding June 13, 2016, the Charleston, Columbia, and Coastal franchisees committed 21, 21, and 6 defaults respectively. Based on this large number of defaults and the documented evidence that Defendants have failed to comply with their Post-Termination Obligations (*see* Part II.D), Atlantic is likely to succeed on the merits of its claims that Defendants have breached the franchise agreements, leases, and owners agreements.

One of the Post-Termination Obligations Atlantic seeks to enforce is a covenant not to compete, and Atlantic has the burden to show that the Non-Compete is enforceable. *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994). In North Carolina, a covenant not to compete is enforceable if it is "(1) in writing, (2) based upon valuable consideration, (3) reasonably necessary for the protection of legitimate business interests, (4) reasonable as to time and territory, and (5) not otherwise against public policy." *Kennedy v. Kennedy*, 160 N.C. App. 1, 9, 584 S.E.2d 328, 333 (2003).

Here, the Non-Compete is in writing in the franchise agreements (Docs. 1-7, 1-10, 1-13 § 16.08) and owners agreements (*Id.* at p. 49). Defendants received valuable consideration for the Non-Compete, namely, use of the Atlantic Marks, the Manual, the patented tools, and the right to operate three Atlantic Pinstriping® franchises.

---

[11] Given the Dentworks Lawsuit, tax liens, failure to pay vendors, and negative net income, Atlantic is also likely to succeed on the merits of its argument that termination was proper because Defendants were unable to pay their debts as they became due. (*Id.* § 15.01(a)).

The Non-Compete is reasonably necessary to protect Atlantic Pinstriping's legitimate business interests. As this Court recognized in *Quinones*, the Non-Compete is necessary to ensure that Atlantic does not lose its customers in Defendants' market and that Atlantic has a fair opportunity to refranchise in the Charleston, Columbia, and Coastal markets:

> Such competition may deprive Meineke of the customers and market it has established over the course of the franchise relationship with Defendants and would make it difficult for Meineke to re-establish an authorized Meineke franchise in the area.

*Quinones*, 2006 WL 1549708, at *3.

The Non-Compete is reasonable as to time and territory. A two-year restriction is "within the range that the North Carolina courts have deemed reasonable." *Lockhart v. Home-Grown Indus. of Georgia, Inc.*, 3:07-CV-297, 2007 WL 2688551 (W.D.N.C. Sept. 10, 2007); *see also Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 665, 158 S.E.2d 840, 844 (1968) (upholding a 10-year covenant). Other courts have routinely upheld covenants of two or more years in franchise agreements. *See, e.g.*, *Grease Monkey Int'l, Inc. v. Watkins*, 808 F. Supp. 111, 120 (D. Conn. 1992) (upholding a two-year covenant); *Carvel Corp. v. Eisenberg*, 692 F. Supp. 182, 186 (S.D.N.Y. 1988) (upholding a three-year covenant).

The geographic scope of the Non-Compete—25 miles from any Atlantic Pinstriping® location—is also within the range held valid by North Carolina Courts. *See, e.g.*, *Forrest Paschal Mach. Co. v. Milholen*, 27 N.C. App. 678, 687, 220 S.E.2d 190, 196--97 (1975) (upholding 350-mile covenant); *Robins & Weill, Inc. v. Mason*, 70 N.C. App. 537, 696-97, 320 S.E.2d 693, 541 (enjoining a violation of a two-county wide covenant); *Keith v. Day*, 81 N.C. App. 185, 195, 343 S.E.2d 562, 568 (1986) (upholding a covenant covering the greater Raleigh area).

Finally, enforcement of the Non-Compete is not against public policy. To the contrary, the public is helped by the enforcement of these provisions. *See Lockhart*, 2007 WL 2688551, at *5 ("[T]he overriding public interest is in the honoring and enforcement of reasonable non-compete

agreements.") (quotations and citations omitted). Atlantic has established a likelihood of success in showing that it properly terminated the franchise agreements, leases, and owners agreements and that the Non-Compete is valid and enforceable.

2.     <u>Atlantic is likely to suffer irreparable harm without an injunction.</u>

Defendants' failure to comply with their Post-Termination Obligations gives them an unfair advantage over authorized Atlantic Pinstriping® franchisees, because the Defendants are reaping the benefits of using the Atlantic Marks and the Atlantic Pinstriping® System without paying for them. In *Quinones*, this Court issued a preliminary injunction for that precise reason:

> Additionally, allowing Defendants to ignore the Franchise Agreement gives them an unfair competitive advantage over legitimate Meineke franchisees in the area because they are able to offer their services for a lower price than the franchisees since they do not have to pay Meineke's royalty or advertising contributions.

2006 WL 1549708, at *3.

In *Lockhart*, the Court entered a preliminary injunction to prevent damage to a franchisor's goodwill and reputation caused by the public's association of the former franchisee with the franchisor. 2007 WL 2688551, at *4. Here, Defendants' own actions have exacerbated that harm, in that they have falsely told clients that they are still operating Atlantic Pinstriping® franchises (Montemurro Decl. ¶ 43 & Ex. 14), and Tony has falsely described himself as the "new owner of ALL Atlantic Pinstriping stores" (*Id.* ¶¶ 47–48 & Ex. 16). An injunction is necessary to prevent this ongoing irreparable harm.

3.     <u>The balance of hardships tips in Atlantic's favor.</u>

In balancing the harms to both sides, "the real issue . . . is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied." *Lockhart*, 2007 WL 2688551, at *4. Given the significant number of defaults that Defendants have committed, there is a low likelihood that any injunction will have been improperly granted.

Furthermore, multiple courts have held that the harm to the franchisor outweighs any self-inflicted harm that may be suffered by a holdover franchisee. *See, e.g.*, *YS & J*, 2014 WL 1327017, at *4 ("It is not unjust to hold defendants to these mutually agreed upon obligations, particularly when weighed against the harm plaintiff is suffering from the continued, unauthorized operation of the Store with its trademarks . . . ."); *Quinones*, 2006 WL 1549708, at *3 ("[A]ny harm that Defendants may suffer would be a result of their own conduct in failing to pay their royalty fees and advertising contributions.").

4. An injunction is in the public interest.

The public interest in the enforcement of mutually agreed-upon contractual obligations supports the issuance of injunctive relief in this case. *Great Am. Ins. Co. v. C. G. Tate Canst. Co.*, 303 N.C. 387, 391, 279 S.E.2d 769, 772 (1981) ("Freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, must be enforced as written."). This is particularly true in the context of the Non-Compete. *See Lockhart*, 2007 WL 2688551, at *6 ("It is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones.").

The public derives substantial benefit from franchisors like Atlantic who train entrepreneurs and develop new businesses. Communities derive substantial benefit from the variety, competition, and quality of services made available to them through franchisors such as Atlantic. Franchisees derive substantial benefit from the brand recognition, training, information, and other assistance that franchisors such as Atlantic provide—all at a fraction of the cost of starting a business from scratch. For this system to survive, however, franchisors and franchisees must be able to count on consistent enforcement of contracting parties' obligations by the courts.

**D.** **The Court should enjoin Defendants' infringement of the Atlantic Marks.**

An essential element of the franchise relationship is a trademark license. 16 C.F.R. §

436.1(h)(1) (defining "franchise"). "Once a franchise . . . contract is terminated, there is no doubt that the former franchisee . . . has no authorization or consent to continue use of the mark." 4 *McCarthy on Trademarks and Unfair Competition* § 25:31 (4th ed.). Here, despite termination of the Charleston, Columbia, and Coastal Franchise Agreements, Defendants continue to use the Atlantic Marks. Both the Lanham Act, *see* 15 U.S.C. § 1116, and the franchise agreements (*see* Docs. 1-7, 1-10, 1-13, at § 17.03) authorize Atlantic to seek injunctive relief to prevent further infringement of the Atlantic Marks. The Court should enjoin Defendants' continued infringement.

      1.     <u>Atlantic is likely to succeed on the merits of its Lanham Act claims.</u>

Claims for trademark infringement in violation of 15 U.S.C. § 1114 and unfair competition in violation of 15 U.S.C. § 1125 require proof of the same five elements: (1) the plaintiff owns a valid, protectable mark; (2) the defendant used the mark without authorization; (3) this use was "in commerce;" (4) this use was "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) this use creates a likelihood of confusion. *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005).[12] Atlantic proves all five elements.

The first element—ownership, validity, and protectability—is satisfied by Atlantic Pinstriping's registration of the Atlantic Marks with the USPTO. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002). Registration is *prima facie* evidence of validity, ownership, and Atlantic's exclusive right to use the marks in connection with the services specified in the registrations.[13] *Id.* Defendants also agreed in § 9.02 of each franchise agreement

---

[12] The Fourth Circuit has articulated this test in several ways. *See, e.g.*, *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (four elements); *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263 (4th Cir. 2006) (two elements). This five-element test includes all the elements in the *Rosetta Stone* and *CareFirst* tests.

[13] Moreover, the ATLANTIC PINSTRIPING® mark is incontestable pursuant to 15 U.S.C. § 1065. (Compl. ¶ 23; Doc. 1-3). Incontestability is "conclusive evidence of the validity of the registered mark" and of the registrant's ownership and exclusive right to use the mark in commerce. 15 U.S.C. § 1115(b).

not to contest the registration status of the Atlantic Marks. Thus, the first element is satisfied.

The second element—Defendants' use of the Atlantic Marks—is shown by the following:

- The letters Defendants sent to their clients stating that they continue to operate Atlantic Pinstriping® franchises. (Montemurro Decl. ¶ 43 & Ex. 14).

- Tony's statement that he is the "new owner of ALL Atlantic Pinstriping stores." (Id. ¶ 48 & Ex. 16).

- Post-termination invoices sent to "Atlantic Dealer Services Coastal, LLC." (Id. ¶ 49 & Ex. 17).

- Defendants' counsel's statement that his "clients intend to continue to operate pursuant to the franchise agreement." (Doc. 1-15).

The third element—use in commerce—is satisfied by the fact that Defendants have continued the same uses of the Atlantic Marks that the USPTO declared to be use "in commerce." (Docs. 1-2, 1-4). Moreover, the interstate impact of a franchisee's infringement of the franchisor's trademarks is well recognized. *See, e.g.*, *In Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 670 (2d Cir. 1968) (finding that a franchisee's sale of unauthorized products at individual Carvel stores in New York had "a potentially adverse effect on the entire Carvel chain"). In this case, as in *Winter*, Defendants' unauthorized use of the Atlantic Marks affects all Atlantic Pinstriping® franchisees. Thus, the third element is satisfied.

The fourth element—use in connection with the sale, offering for sale, distribution, or advertising of goods or services—is satisfied by Defendants' use of the Atlantic Marks to provide pin striping services. Indeed, in their letter to their clients, Defendants stated that "We will continue to provide the business and <u>service</u> to you that we have always done." (Montemurro Decl. ¶ 43 & Ex. 14) (emphasis added). Thus, the fourth element is satisfied.

Regarding the fifth element—likelihood of confusion —it is well settled that "continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement." *Burger King Corp. v. Mason*, 710 F.2d

1480, 1493 (11th Cir. 1983); *see also YS & J*, 2014 WL 1327017, at *2 (same). For this reason, courts routinely grant injunctions to restrain a holdover franchisee's continued use of a franchisor's trademarks. *See, e.g.*, *Quinones*, 2006 WL 1549708, at *4 (granting a preliminary injunction); *Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 445 (D. Md. 1998) (same).

In this case, Defendants continue to use the Atlantic Marks and to hold themselves out as Atlantic Pinstriping® franchisees. All who are exposed to Defendants' unauthorized and deceptive uses of the Atlantic Marks cannot help but mistakenly believe that Defendants are affiliated with or sponsored by Atlantic. Indeed, Atlantic's software vendor has already been confused, causing it to cancel Atlantic's license at Tony's request. (Montemurro Decl. ¶ 48 & Ex. 16). Thus, there is a strong likelihood that Atlantic will prevail on the merits of its infringement and unfair competition claims.

## 2. Atlantic is likely to suffer irreparable harm without an injunction.

Confusion resulting from trademark infringement constitutes irreparable harm as a matter of law. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) (affirming the grant of a preliminary injunction, noting "irreparable injury regularly follows from trademark infringement"); *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) ("[A] licensor who establishes a likelihood of confusion as to product source in a trademark infringement suit simultaneously demonstrates the requisite irreparable harm essential to obtaining a preliminary injunction.").

Here, the record also demonstrates actual, ongoing irreparable harm. Defendants have solicited former customers (Montemurro Decl. ¶ 50), interfered with Atlantic's software vendor (*id.* ¶¶ 47–48 & Ex. 16) and continued to operate as Atlantic Pinstriping® franchisees (*id.* ¶ 43 & Ex. 14). Because Defendants are using the Atlantic Marks to offer the same services they previously offered, from the same location, using the same tools and methods, customers and

vendors cannot help but confuse Defendants with Atlantic—even though Atlantic no longer has control over the quality of Defendants' services—threatening Atlantic's goodwill and reputation. Defendants' continued infringement also causes irreparable harm because it prevents Atlantic from refranchising its Charleston, Columbia, and Coastal territories. *See Quinones*, 2006 WL 1549708, at \*3 (finding irreparable harm where the former franchisees' conduct would "make it difficult for Meineke to re-establish an authorized Meineke franchise in the area").

### 3. The balance of hardships tips in Atlantic's favor.

Because the risk that an injunction would be improper is so low here, the irreparable harm balancing test weighs heavily in favor of Atlantic. *See Scotts*, 315 F.3d 264 (questioning "the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied"). As shown above, the harm to Atlantic from Defendants' continued infringement is immediate and irreparable. Although Defendants could suffer harm if the injunction were not legally justified, the chance of that is minimal, given that Atlantic's proof of infringement is incontrovertible: Defendants are using the Atlantic Marks with no authority to do so, and they acknowledged in the franchise agreements that Atlantic is entitled to obtain an injunction to protect against such unauthorized use in precisely these circumstances. Thus, the high likelihood that Atlantic Pinstriping will prevail on its infringement claims negates any concern that Defendants could be harmed if an injunction were improvidently entered.

### 4. An injunction is in the public interest.

The public interest favors enjoining Defendants' infringement and unfair competition because it is the public that is likely to be deceived and confused by Defendants' illegal acts. "In a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused. . . .Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." *S & R*, 968 F.2d at 379.

The public interest is especially served by enjoining a former licensee's use of a trademark because the licensee's status increases the probability of consumer confusion:

> A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party . . . loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public.

*Church of Scientology*, 794 F.2d at 44. Without an injunction, the public will continue to suffer deception and confusion from Defendants' unauthorized and unlawful uses of the Atlantic Marks. For these reasons, the public interest favors granting an injunction.

**IV.   <u>CONCLUSION</u>**

Defendants are violating with impunity their Post- Termination Obligations, infringing the Atlantic Marks, and misappropriating Atlantic Pinstriping's trade secrets. These acts are causing irreparable harm to Atlantic Pinstriping, its franchisees, and the public. Atlantic Pinstriping respectfully prays that the Court enter an order enjoining this unlawful conduct.

Respectfully submitted this 12th day of August, 2016.

**BRADLEY ARANT BOULT CUMMINGS LLP**

/s/ Matthew S. DeAntonio
Corby C. Anderson (N.C. Bar No. 20829)
Matthew S. DeAntonio (N.C. Bar No. 39625)
100 N. Tryon Street, Suite 2690
Charlotte, North Carolina 28202
Telephone: (704) 338-6043
canderson@bradley.com
mdeantonio@bradley.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing document on all parties of record by U.S. Mail, addressed as follows:

**Tony Horne**
4775 Marshwood Drive
Hollywood, SC 29449

**Ernie Horne**
3224 Michelle Drive
Matthews, NC 28104

**Jerry Parker**
5037 Cressingham Drive
Ft. Mill, SC 29707

**Atlantic Pinstriping Triad, LLC**
273 Liberty Hall Ct
Waxhaw, NC 28173

**Atlantic Dealer Services Coastal, LLC**
3224 Michelle Dr.
Matthews, NC 28104

**P. Brandt Shelbourne**
Shelbourne Law Firm
131 E. Richardson Ave.
Summerville, SC 29483
*Attorney for Defendants*

/s/ Matthew S. DeAntonio
Counsel for Plaintiffs