# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| Atlantic Pinstriping, LLC, and | ) | Case No. 3:16-CV-547-GCM |
| Michael Montemurro, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Atlantic Pinstriping Triad, LLC, | ) | |
| Atlantic Dealer Services Coastal, LLC, | ) | |
| Tony Horne, | ) | |
| William E. Horne, and | ) | |
| Jerry W. Parker, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

**BRADLEY ARANT BOULT CUMMINGS LLP**
Corby C. Anderson (N.C. Bar No. 20829)
Matthew S. DeAntonio (N.C. Bar No. 39625)
214 N. Tryon St., Suite 3700
Charlotte, North Carolina 28202
Telephone: (704) 338-6043
canderson@bradley.com
mdeantonio@bradley.com

*Counsel for Plaintiffs*

Plaintiffs Atlantic Pinstriping, LLC ("Atlantic") and Michael Montemurro (collectively, "Plaintiffs") respectfully submit the following Reply Brief in further support of their Motion for Preliminary Injunction (the "Motion"). Plaintiffs request that the Motion be granted in full.

## I. <u>INTRODUCTION</u>

The common thread in Defendants' Opposition (Doc. 21) is complete avoidance of the parties' contracts. Whether asking for the Court to ignore the franchise agreements' cure provision, excuse their multitude of defaults, or invalidate the Non-Compete, Defendants repeatedly ask this Court to refuse to enforce the parties' agreement as written. The reason for this strategy is obvious—Defendants' conduct, under the express terms of the franchise agreements, entitles Plaintiffs to a preliminary injunction.

## II. <u>DEFENDANTS HAVE MISSTATED THE STANDARD FOR OBTAINING INJUNCTIVE RELIEF.</u>

Defendants' arguments against injunctive relief should be rejected because they are based on law that was reversed years ago, and on a "Threshold Burden" test that never existed even before that law was reversed. (Doc. 21, at 2–3). Instead, the Court should apply the current, valid standard for obtaining a preliminary injunction, which entitles Plaintiffs to the relief they seek. (*See* Doc. 6, at 14).

Specifically, Defendants rely on *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977) and *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 524, 526 (4th Cir. 2003) (relying on *Blackwelder*), to argue that Plaintiffs must meet a "Threshold Burden" of showing "a need to protect the status quo and to prevent irreparable harm during the pendency of the litigation" before the court may even consider the specific elements required for obtaining injunctive relief. (Doc. 21, at 2–3). As an initial matter, neither *Blackwelder* nor *In re Microsoft* use the term "threshold burden" or make any mention of the need to meet a threshold burden. Nor do any of the other cases cited by Defendants in their brief. *See, e.g., Direx Israel, Ltd. v.*

*Breakthrough Medical Corp.*, 952 F.2d 802, 813–14 (4th Cir. 1991); *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1445 (M.D.N.C. 1996). Defendants appear to have created a threshold burden where none exists in the case law.

More significantly, neither *Blackwelder* nor *In re Microsoft* are good law. As the Fourth Circuit has stated "Our *Blackwelder* standard in several respects now stands in fatal tension with the Supreme Court's 2008 decision in *Winter.*" *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)), *vacated on other grounds*, 559 U.S. 1089 (2010), *reissued in pertinent part*, 607 F.3d 355 (4th Cir. 2010). The *Real Truth About Obama* court listed at least four ways in which *Blackwelder* differed with the Supreme Court's test articulated in *Winter*. *Id.* at 346–47. Most notably, the Fourth Circuit explained that under the defunct *Blackwelder* test, "the likelihood-of-success requirement be considered, if at all, only after a balancing of hardships is conducted. *Id.* at 346.

This Court, in *Meineke Car Care Centers, Inc. v. Bica,* No. 3:11-CV-369, 2011 WL 4829420 (W.D. N.C. Oct. 12, 2011), recognized the overruling of *Blackwelder*:

> The most recent Supreme Court test [*Winter*] was adopted by the Fourth Circuit in *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), vacated on other grounds, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010) (memorandum opinion), reissued in pertinent part, 607 F.3d 355 (4th Cir. 2010), overruling *Blackwelder Furniture Co. v. Selig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977).

*Bica*, 2011 WL 4829420, at *2; *see also MicroAire v. Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp.2d 604, 615 (W.D. Va. 2010) (same). Defendants completely failed to acknowledge that these cases are no longer good law.[1]

---

[1]   *In re Microsoft* has also been abrogated on additional grounds by *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388 (2006). *See Bethesda Softworks, L.L.C. v. Interplay Entm't*

As recognized by this Court in *Bica*, under the new standard, a party seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm; (3) the balance of equities tips in its favor, and (4) the injunction is in the public interest. 2011 WL 4829420, at *2; *see also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). This is precisely the test advocated by Plaintiffs in their brief. (Doc. 6, at 14).

Quite simply, Defendants urged this Court to apply a bright line "threshold burden" rule where no such rule exists. *See eBay*, 547 U.S. at 393 (rejecting "categorical rule[s]" with respect to the issuance of injunctions). Defendants also urged this Court to apply a standard for injunctive relief that is no longer good law. *See Real Truth About Obama*, 575 F.3d at 346.

This Court should decline to create and apply the bright-line "Threshold Burden" rule advocated by Defendants. Instead, the Court should apply the standard established in *Winter*, 555 U.S. at 20, and applied by the Fourth Circuit in *Metro. Reg'l Info. Sys.*, 722 F.3d at 595, and by this Court in *Bica*, 2011 WL 4829420, at *2. Under those rules, Plaintiffs are entitled to a preliminary injunction.

## III. <u>DEFENDANTS HAVE MISREPRESENTED THE LAW AND THE FACTS REGARDING PLAINTIFFS' SHOWING OF IRREPARABLE HARM.</u>

Defendants' argument that Plaintiffs will suffer no irreparable harm absent a preliminary injunction misstates both the law and the facts.

Defendants in their Opposition rely heavily on *Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, 3:08-cv-532, 2009 WL 275779 (W.D. N.C. Feb. 3, 2009), but they mischaracterize the holding in that case as "denying [a] motion for preliminary injunction where [a] former employer failed to identify any lost customers." (Doc. 21, at 4). Defendants neglect to

_____

*Corp.*, 452 F. App'x 351, 354 (4th Cir. 2011) (recognizing abrogation). Defendants did not disclose this abrogation either.

mention that although the court denied "injunctive relief related to issues other than [plaintiff's] trademarks and service marks" for insufficient evidence of irreparable harm, the court granted a preliminary injunction against unauthorized future use of plaintiff's trademarks, finding that plaintiff "made a clear showing of both irreparable harm and a likelihood of success on the merits of its trademark related claims." *Olympus*, 2009 WL 275779, at *5.

Defendants likewise rely on *SouthTech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 412 (E.D. N.C. 2006), to argue that Plaintiffs cannot show irreparable harm that warrants preliminary injunctive relief. (Doc. 21, at 3–4). But *SouthTech Orthopedics* cannot support their argument, for several reasons. First, *SouthTech Orthopedics* was decided based on the overruled balance-of-hardships test of *Blackwelder* and *Direx*. *See SouthTech Orthopedics,* 428 F. Supp. 2d at 416 ("The Fourth Circuit applies the familiar analytical framework first established in *Blackwelder* . . ., and more recently outlined in *Direx* . . ., in determining whether to grant preliminary injunctive relief pursuant to Fed. R. Civ. P. 65."). Second, *SouthTech Orthopedics* involves a non-compete in the individual employment context, not in the franchisee context, which results in more lenient scrutiny being applied to the covenant. *See infra*, Part III.C.1 (citing, among other cases, *Keith v. Day*, 81 N.C. App. 185, 193, 343 S.E.2d 562, 567 (1986), which holds that a franchise agreement "does not fit neatly into" the category of covenants that receive the most stringent scrutiny). Moreover, the holding of *SouthTech Orthopedics* regarding the sufficiency of evidence to show irreparable harm was based on *Turnage v. United States*, 639 F. Supp. 228, 231–32 (E.D.N.C. 1986), which did not involve non-competes at all, but instead involved a retailer seeking a preliminary injunction to avoid being terminated from the food stamp program.

Defendants fail to consider cases describing the type of irreparable harm that can occur in franchise cases. Indeed, this Court has granted preliminary injunctions enforcing covenants not to compete where necessary to protect a franchisor's legitimate business interests. *See, e.g., Outdoor*

*Lighting Perspectives Franchising, Inc. v. Home Amenities, Inc.*, No. 3:11-CV-0567, 2012 WL 137808 at *2 (W.D. N.C. Jan. 18, 2012). Specifically, a franchisor:

> has a legitimate interest in preserving the integrity of its franchise system. If its noncompete provisions are not enforced, the entire . . . franchise system is placed in jeopardy as franchisees may ignore their agreements and begin operating as a competing business knowing that the noncompete provisions may be disregarded and will and provide no protection to other franchisees.

*Id.* at *3.

In *Home Amenities*, this Court found that irreparable harm was occurring where "a terminated franchise continued to operate a directly-competitive business in the same location (or market)" because such a violation of a covenant not to compete left the franchisor "unable to reenter the market serviced" and made it "very difficult . . . to place a new franchisee in the . . . former territory." *Id.* at *2; *see also Lockhart v. Home-Grown Indus. of Ga., Inc.*, No. 3:07-CV-297, 2007 WL 2688551, at *4 (W.D. N.C. Sept. 10, 2007) ("[A]s a result of [the former franchisees'] breach of the non-compete agreement, [franchisor] Mellow Mushroom has had trouble attracting another franchisee to the area . . . and its relationships with other franchisees has been damaged. Such harms are clearly irreparable."); *Meineke Car Care Centers, Inc. v. Quinones*, No. 3:06-CV-87, 2006 WL 1549708, at *3 (W.D. N.C. Jun. 1, 2006) ("[A]llowing Defendants to ignore the Franchise Agreement gives them an unfair competitive advantage over legitimate Meineke franchisees in the area because they are able to offer their services for a lower price than the franchisees since they do not have to pay Meineke's royalty or advertising contributions. In sum, if the Court does not enter a preliminary injunction, Defendants' infringement on Meineke's trademarks and their breach of the covenant not to compete will result in irreparable harm to Meineke.").

In *Bica*, 2011 WL 4829420, at *5, this Court found that Meineke had made "a clear

showing that it will likely suffer actual, imminent, and irreparable harm irreparable harm"

justifying the grant of a preliminary injunction in circumstances precisely on point with this case.

The evidence of irreparable harm was as follows:

> Meineke's goodwill and reputation with customers will be damaged if Defendants continue to violate the covenant not to compete and to use Meineke's proprietary information. Additionally, Meineke will also be harmed if Defendants use the knowledge, manner, and training obtained through the former Franchise Agreement relationship to gain customers within the restricted area. Defendants will be able to draw customers away from other Meineke franchises by offering services at lower prices because Defendants are no longer paying franchise fees. This will unfairly burden other Meineke franchisees with unfair competition. Furthermore, if Defendants were permitted to continue violating the non-compete agreement, it would undermine the value of all of the non-compete agreements Meineke has with other franchisees.

*Id.*

In this case, Plaintiffs have shown a likelihood of irreparable harm with precisely the type

of evidence cited above. Specifically, Plaintiffs have alleged and have produced evidence that:

- Defendants since their termination have continued to operate in their former franchised territories and have operated or actively explored operating in the territories of other Atlantic Pinstriping franchisees, both before and after their termination. (*See* Doc. 24, ¶¶ 157, 174, 188; Doc. 7 ¶¶ 34-37, 42, 49, 50; Doc. 22, ¶¶ 5, 7, 10).

- Defendants have continued to use Plaintiffs' trademarks, telephone listings, and business names following their termination. (*See* Doc. 24, ¶¶ 157, 174, 188; Doc. 7, ¶¶ 42, 49; Rough Transcript of Hearing on Motion for Preliminary Injunction on August 26, 2016 ("Tr.") at p. 34:3–15).

- Defendants have continued to use Plaintiffs' patented pinstriping method and leased equipment following their termination, and have reverse engineered and copied the equipment.[2] (*See* Doc. 24, ¶¶ 157, 174, 188; Doc. 22, ¶¶ 4, 6, 8–10; Tr. at pp. 34:16-35:11).

---

[2]   Defendants claim they "have voluntarily ceased using the patented applicators and the trademarks." (Doc. 21, at 5). But the only evidence Defendants have provided in support of this claim is the self-serving declaration of Defendant Tony Horne. (Doc. 20 ¶¶ 17–19). This evidence is refuted by, among other things, the declaration of third-party Wayne Powell, who stated under oath that Defendants have reverse engineered and copied Plaintiffs' patented pinstriping tool in order to continue operating in violation of their non-competes, and have continued operating under the Atlantic Dealer Services trade name since being terminated. (Doc. 22, ¶¶ 5–10).

- Defendants have interfered with Atlantic Pinstriping's relationship with its vendors. For example, Defendants posed as franchisor Atlantic Pinstriping to get the franchisor's software license terminated. (Doc. 7, ¶¶ 47–48).

- Defendants even used Atlantic Pinstriping's (the franchisor's) name to make an entirely unauthorized offer to sell a new franchise territory to a prospect in the Southeast. (Tr. at p. 20:23-21:15).

- Defendants, under the Atlantic Dealer Services trade name, have provided such poor service that they have soured the Atlantic Pinstriping system's reputation with customers and vendors alike. (Tr. at pp. 32:1-33:14).

- Defendants, under the Atlantic Dealer Services trade name, have operated their franchises in contravention of sound business practices, resulting in tax liens and in lawsuits being filed against them for failure to pay their debts. *See* Verified Amended Complaint, ¶¶ 145, 147; Docs. 8-1, 8-2, 8-3; Tr. at pp. 20:20-22; 21:20-22:22; 33:15-34:2).

Because Plaintiffs have provided evidence of multiple types of ongoing irreparable harm that is virtually certain to continue without the Court's intervention, the Court should grant Plaintiffs' motion for a preliminary injunction.

## IV.   CONTRARY TO DEFENDANTS' ARGUMENTS, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

In their argument that Plaintiffs cannot succeed on the merits of the claims that support their motion for injunctive relief, Defendants ignore all of Plaintiffs' claims except those for breach of contract. Defendants do not—and cannot—dispute Plaintiffs' arguments that they are likely to prevail on their claims for trademark infringement and unfair competition and false advertising under the Lanham Act. *See* Plaintiffs' Memorandum at 20-23. Accordingly, based on the unchallenged arguments and evidence that Plaintiffs have set forth, there should be no question Plaintiffs have demonstrated likelihood of success on the merits of their infringement and unfair competition claims.

Defendants' arguments that Plaintiffs cannot succeed on the merits of their breach of contract claims are unavailing as a matter of fact and as a matter of law, for the reasons shown below. As a preface to the discussion of those reasons, Plaintiffs note that Defendants' Opposition

relies heavily on South Carolina law, even though the law applicable to this case is North Carolina law. Specifically, § 18.04 of each Franchise Agreement, § 6.01 of each Owners' Agreement, and Paragraph 14 of each equipment lease state that the agreements are governed by the law of North Carolina. "Where the parties to a contract have agreed that a given jurisdiction's substantive law will govern the interpretation of the contract, then a North Carolina court will give effect to that provision." *See Movement Mortg., LLC v. Ward*, No. 3:14-cv-23, 2014 WL 880748, at *3 (W.D. N.C. Mar. 6, 2014) (citing *Tanglewood Land Co., Inc. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). Here, once again, Defendants urge this Court to apply the wrong law in deciding this motion.

A.    **Defendants' argument that Plaintiffs cannot prevail because individuals rather than entities are named in the Franchise Agreements is without merit.**

The best evidence to refute Defendants' argument that Atlantic Pinstriping Triad, LLC ("APT") and Atlantic Dealer Services Coastal, LLC ("ADSC") are not parties to the Franchise Agreements comes from Defendants themselves, in their response to an action filed against Tony Horne, Jerry Parker, William E. Horne, and Atlantic Pinstriping Triad, LLC for breach of contract, fraud, misrepresentation, and quantum meruit, among other claims, in the South Carolina Court of Common Pleas, *Williamson et al. v. Horne et al.*, No. 2016-CP-10-1841 (Doc. 20-1). In *Williamson*, Tony Horne, Jerry Parker, William E. Horne, and Atlantic Pinstriping Triad filed an Answer, Counterclaim and Third-Party Complaint against Atlantic Pinstriping, LLC and Mike Montemurro (the same Plaintiffs in the case pending before this Court), in which they alleged that "Defendant and Third-Party Plaintiff Atlantic Pinstriping Triad, LLC has a franchise agreement with Third-Party Defendant Atlantic Pinstriping, LLC" and breached that franchise agreement, thereby damaging Atlantic Pinstriping Triad "in an amount to be determined by the trier of fact." (*Id.* ¶¶ 50, 54). As Defendants have acknowledged, the Franchise Agreement in *Williamson* is the same Franchise Agreement at issue in the case pending before this Court. Yet, in the case pending

before this Court, Defendants argue that APT is <u>not</u> a party to the agreement. (Doc. 21, at 5–6).[3]

Defendants should be judicially estopped from claiming APT is not a party to the Franchise

Agreements in this case after alleging in *Williamson* that APT <u>is</u> a party to one of those same

agreements. *See Dedlack v. Braswell Services Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998)

("Judicial estoppel precludes a party from adopting a [factual] position that is inconsistent with a

stance taken in prior litigation . . . and is designed to prevent a party from 'playing fast and loose'

with the courts and 'protect the essential integrity of the judicial process.'" (citations omitted)).

Moreover, given that they performed under the Charleston, Columbia, and Coastal

Franchise Agreements,[4] APT and ADSC are parties to those agreements under an implied contract

theory. *See Whicker v. Compass Grp. USA, Inc.*, 784 S.E.2d 564, 570 (N.C. Ct. App. 2016) ("An

implied contract refers to an actual contract inferred from the circumstances, conduct, acts or

relations of the parties, showing a tacit understanding."). *Cf. Son-Shine Grading, Inc. v. ADC

Const. Co.*, 68 N.C. App. 417, 422, 315 S.E.2d 346, 349 (1984) ("It is well established under our

law that: The provisions of a written contract may be modified . . . by conduct which naturally and

justly leads the other party to believe the provisions of the contract have been modified . . . even

though the instrument involved provides that only written modifications shall be binding.").

---

[3]    Defendants also argue in this case that APT and ADSC are not a parties to any Franchise Agreement with Atlantic Pinstriping. Because only one Franchise Agreement was at issue in the South Carolina action, thus there was no reason for Defendants to identify the parties to their other Franchise Agreements with Atlantic Pinstriping. Nevertheless, all three Franchise Agreements, their provisions, and the circumstances related to their execution and performance, are virtually the same. Thus, for the same reasons that APT is correctly identified as a party to Defendants' Franchise Agreement in *Williamson*, APT and ADSC are parties to the other Franchise Agreements.

[4]    For example, the record makes clear that APT and ADSC – not the individual Defendants, Tony Horne, Jerry Parker, William E. Horne – submitted financial reports and paid royalties to Atlantic as required by the franchise agreements. (Doc. 6, at 3; Tr. at pp. 7:23–9:4; 9:9–12:15; Docs. 7-2 to 7-7). If the individual Defendants were the only parties to the franchise agreements, they would not have ever performed under the agreements.

Even if ATP and ADSC were not parties to the Franchise Agreements, the individual Defendants could not rely on ATP and ADSC to help them avoid complying with their obligations under the agreements, including their non-competes. The individual Defendants also signed Owners Agreements, in which they guaranteed, among other things, performance of the Franchise Agreements and Leases. Thus, the individual Defendants cannot do indirectly through ATP and ADSC what they cannot do directly – including failing to perform the post-termination obligations of the Franchise Agreements and Leases. *See Home Amenities*, 2012 WL 137808, at *4 (stating that guarantors may not use another entity to avoid non-compete obligations of franchise agreement); *see also Tanfran, Inc. v. Aron Alan, LLC*, No. 1:06-CV-830, 2007 WL 1796235, at *6-8 (W.D. Mich. Jun. 20, 2007) (extending previously granted preliminary injunction to other entities held to have "conspire[d]" with the franchisee to avoid the effect of the non-competition agreement).

B.     **Well-established North Carolina law holds that there can be no breach of the implied duty of good faith and fair dealing where conduct is permitted under the express provisions of a contract.**

Defendants allege that Plaintiffs cannot demonstrate a likelihood of success on the merits of their breach of contract claim, because "the circumstances surrounding the termination . . . smacks of unfairness." (Doc. 21, at 7). Defendants submit that their termination was unfair, because Plaintiffs did not give Defendants additional time, beyond the mandates of the Franchise Agreement, "to seek a substitute arrangement." (*Id.*). But unsubstantiated allegations that a duly-negotiated, valid, and express contractual provision "smacks of unfairness" will not prevent the enforcement of that contract between professional businesses and businesspeople such as Plaintiffs and Defendants. *See Beam v. Rutledge*, 217 N.C. 670, 9 S.E.2d 476, 478 (1940) (holding that professionals, dealing with an associate on equal terms, will be deemed competent to "adequately

guard [their] own interests," and a court will not refuse to enforce a contract simply because one professional later regrets his acquiescence).

Defendants cite two cases from the Supreme Court of South Carolina and the Eastern District of South Carolina as standing for the premise that termination, even when pursuant to the express terms of a contract, must be carried out in a manner that is "not contrary to equity and good conscience." (Defendants' Opposition, p. 7). Otherwise, Defendants allege, the terminating party will have "commit[ed] an actionable wrong." (*Id.*). Defendants have submitted no North Carolina authority in support of their argument, and a review of case law does not reveal support for Defendants' position.[5]

As an initial matter, there is nothing contrary to equity and good conscience about the manner by which the franchise relationship was terminated. "[T]he public has an interest in seeing that agreements are enforced." *Movement Mortg., LLC v. Ward*, No. 3:14-CV-23, 2014 WL 880748, at *3 (W.D.N.C. Mar. 6, 2014) (citing *UBS Painewebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002)). As explained *supra* and in Plaintiffs' Memorandum in Support, Section 15.01 of the Franchise Agreements provided for termination without right to cure for the violations committed by Defendants. (Doc. 6, at 16–17).

Further, in North Carolina, "[t]here cannot be an express and an implied contract for the same thing existing at the same time . . . No agreement can be implied where there is an express one existing." *Campbell v. Blount*, 24 N.C. App. 368, 371, 210 S.E.2d 513, 515 (1975); *see also Rezapour v. Earthlog Equity Grp., Inc.*, No. 5:12-CV-105, 2013 WL 3326026, at *4 (W.D.N.C.

---

[5] No authority interpreting North Carolina law has ever substantively relied on the two opinions cited by Defendants. Only one case originally arising out of North Carolina has ever cited to either of the opinions, and then, only as a procedural reference to the district court's right to reject a proposed pleading amendment offered at or after the close of evidence. *See Am. Hot Rod Ass'n, Inc. v. Carrier*, 500 F.2d 1269, 1276 (4th Cir. 1974) (citing *Gaines W. Harrison & Sons, Inc. v. J. I. Case Co.*, 180 F. Supp. 243, 248 (E.D.S.C. 1960)).

Jul. 1, 2013).  Where allegations of breach of the implied duty of good faith are "part and parcel" of a claim for breach of an express contractual provision, the implied duty of good faith claim "will rise and fall" with the breach of contract allegations.  *Rezapour*, 2013 WL 3326026, at *4.

The record establishes that Plaintiffs worked long and hard with Defendants to try to bring them into compliance and help them work through their defaults.  (*See, e.g.,* Tr. at pp. 12:16–24:12; 81:11–82:7).  But Defendants continued their course of repeated breaches of their Franchise Agreements, and those breaches were increasingly harmful to the Atlantic Pinstriping system, as Defendants became subject to multiple tax liens and lawsuits over their failure to meet their obligations to third-parties, as well as to the franchisor.

Plaintiffs were not under any obligation to announce to Defendants that Mike Montemurro intended to terminate their franchise agreements when he visited them, or to provide any opportunity to cure or any more notice than the notice of termination hand-delivered to Defendants. (*See* Franchise Agreements § 15.01 (stating under "Termination by Us without Right to Cure," that termination pursuant to the section is "effective immediately upon delivery of notice of termination to you")).  Defendants' argument that the Court should impose an extra-contractual duty on Plaintiffs to handle Defendants' termination with kid-gloves when Plaintiffs provided Defendants with more than a sufficient opportunity to rectify their breaches and where the contract expressly refutes such a duty, should be rejected by the Court.

In *Rich Food Service, Inc. v. Rich Plan Corporation*, the Fourth Circuit applied North Carolina law when addressing an implied covenant of good faith and fair dealing claim arising out of a franchise agreement.  98 F. App'x 206, 211 (4th Cir. 2004) (unpublished).  Specifically, the Court affirmed the district court's holding that the plaintiffs' implied covenant allegations had no basis where the alleged implied covenant of good faith and fair dealing ran afoul of the plain, express language of the contract.  *Id.* ("[T]here could be no such implied covenant here because it

would conflict with the express contractual terms") (citing *Campbell*, 24 N.C. App. at 371, 210 S.E.2d at 515). In sum, the *Rich Food Service* Court declined to impose any extra-contractual duty upon franchisors to franchisees simply as a result of their franchise relationship. *Id.*

Here, Defendants urge the Court to find that Plaintiffs owed Defendants a duty <u>not</u> to exercise the terms of a valid termination provision, negotiated and agreed to by capable businesses and businesspeople. Defendants' argument fails to show why Plaintiffs, for the reasons more specifically articulated in their Memorandum in Support, have not established a likelihood of success on the merits of Plaintiffs' breach of contract claims.

    **C.**       **The Non-Compete is valid and enforceable.**

In requesting that the Court strike the Non-Compete, Defendants largely rely on a few inapplicable cases while ignoring that courts in this district have repeatedly enforced covenants not to compete that are similar to the Non-Compete at issue here.

        1.      <u>Defendants advocate for the wrong legal standard.</u>

Under North Carolina law, there is a "distinction between covenants not to compete in connection with the sale of a business and covenants not to compete in connection with a contract of employment. The latter are more closely scrutinized than the former." *Keith*, 81 N.C. App. at 193, 343 S.E.2d at 567 (1986). Defendants wrongly argue that covenants not to compete in the franchise context should be analyzed under the "most stringent level of review." (Doc. 21, at 9).[6] To the contrary, North Carolina courts have directly addressed that question and rejected the argument that Defendants advocate.

In *Keith*, the North Carolina Court of Appeals held that a covenant in a franchise agreement "does not fit neatly into either category." *Keith*, 81 N.C. App. at 194, 343 S.E.2d at 567; *see also*

---

[6] None of the cases Defendants cited for this proposition involved covenants contained within a franchise agreement.

*Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 228 N.C. App. 613, 621, 747 S.E.2d 256, 263 (2013) (finding that a covenant in a franchise agreement presented a "hybrid situation which does not fit neatly within either of the categories"). Thus, franchise agreements occupy a middle ground. And, as the *Keith* court held, such covenants should be analyzed in light of the fact that franchise agreements are entered into between "professional businessmen" who are "dealing with an associate on equal terms." 81 N.C. App. At 194, 343 S.E.2d at 568. Accordingly, the Court should analyze the Non-Compete in this case in accordance with the standard set forth in *Keith*, and not under the "most stringent level of review" advocated by Defendants.

2. <u>The Non-Compete protects Atlantic's legitimate business interest.</u>

Defendants argue that the Non-Compete is invalid because it prohibits Defendants from "working for 'any business that offers pinstriping,' no matter in what capacity." (Doc. 21, at 10–12). However, contrary to Defendants' assertion that "North Carolina courts have consistently refused to enforce similar language in non-compete covenants," (*id.* at 10), this Court has consistently entered preliminary injunctions <u>enforcing</u> nearly identical language against former franchisees. *See, e.g.*, *Bica*, 2011 WL 4829420, at *6 (enjoining former franchisee from "directly or indirectly (such as through corporations or other entities owned or controlled by them), owning a legal or beneficial interest in, managing, operating or consulting with" a business that "repairs or replaces exhaust system components, brake system components, or shocks and struts");[7] *Lockhart*, 2007 WL 2688551, at *1 (enjoining former franchisee from having "any direct or indirect interest" in any restaurant or food service business featuring pizza as its primary product).

Defendants' two cases are readily distinguishable. Rather than specifically identifying the

---

[7] *See also Quinones*, 2006 WL 1549708, at *4 (same); *Meineke Car Care Centers, Inc. v. Vroeginday*, No. 3:12-CV-139-RJC-DCK, 2012 WL 1395626, at *3 (W.D.N.C. Apr. 23, 2012) (same); *Meineke Car Care Centers, Inc. v. Catton*, No. 3:10-CV-000234-RLV-DSC, 2010 WL 2572875, at *5 (W.D.N.C. June 24, 2010) (same).

competing business, the covenants in both cases broadly prevented the defendant from participating in "any business similar to" the plaintiff's business. *See VisionAIR, Inc. v. James*,[8] 167 N.C. App. 504, 505, 606 S.E.2d 359, 362 (2004) ("James may not 'own, manage, be employed by or otherwise participate in, directly or indirectly, <u>any business similar to</u> Employer's.'" (emphasis added)); *Outdoor Lighting Perspectives Franchising, Inc. v. Harders*,[9] 228 N.C. App. 613, 628, 747 S.E.2d 256, 267 (2013) ("Section 14.2(b) of the franchise agreement specifically prohibits Defendants from having an involvement "for two (2) years, in . . . <u>any business similar to</u> the [franchised business]." (emphasis added)).

Here, by contrast, the Non-Compete only restricts Defendants from participating in the operation of a "business that offers vehicle pin striping services," which is the precise, narrow line of business in which Atlantic operates. (Franchise Agreements, § 16.08). It is hard to imagine a narrower description of the prohibited business. The Non-Compete is more similar to the covenants in the *Meineke* cases and in *Lockhart*, which identified the prohibited business with specificity. *See, e.g.*, *Bica*, 2011 WL 4829420, at *6 (restricting the former franchisees' participation in businesses that "repairs or replaces exhaust system components, brake system components, or shocks and struts"); *Lockhart*, 2007 WL 2688551, at *1 (covering restaurants or food service businesses serving pizza as their primary products).

More importantly, the Non-Compete language is necessary to protect Atlantic's legitimate business interest. "Without the "employed by, associated with, or in any manner connected with"

---

    [8]    *VisionAIR* is also distinguishable because it involved a covenant in connection with an employment contract, thereby requiring stricter scrutiny than what is applied to covenants contained within franchise agreements.

    [9]    Defendants fail to disclose that this Court enforced the exact same language (subject to blue penciling of the geographic scope). *Outdoor Lighting Perspectives Franchising, Inc. v. OLP-Pittsburgh, Inc.*, No. 3:11-CV-584-GCM-DSC, 2012 WL 1313251, at *6 (W.D.N.C. Apr. 17, 2012).

language, the Defendants would be free to create a new entity to shield themselves from the Non-Compete. And that is exactly what they are attempting to do in this case. The Defendants have argued that APT and ADSC were not parties to the franchise agreements, and are therefore not governed by the Non-Compete. (Doc. 21, at 5–6). According to the Defendants' theory, they should be allowed to carry on their pin striping business through APT and ADSC.

Defendants have grossly exaggerated the scope of the Non-Compete by arguing, among other things, that it would restrict their ability to do everything from working as a custodian to owning a mutual fund that invests in a pin striping company. (Doc. 21, at 10–11). To begin with, those same arguments could have been made against the covenants in the *Meineke* cases or in *Lockhart*, but those covenants were nevertheless upheld. Furthermore, there is no indication that the consequences suggested by the Defendants would or could ever happen in real life.

The Non-Compete is designed to stop the Defendants from using the benefits of the Atlantic Pinstriping® System to unfairly compete with Defendants and their franchisees. It goes no further than that legitimate business purpose.

3.     The Non-Compete is reasonable in its geographic scope.[10]

Despite having previously acknowledged in writing that the "covenants not to compete contained in this agreement are fair and reasonable and will not impose any undue hardship on you or your owners." *See* Franchise Agreements, § 19. Defendants now take the opposite position. Defendants claim that the Non-Compete is invalid because it extends 25 miles outside their former territories and 25 miles outside "any business owned or operated by us or any of our affiliates or franchisees." (Doc. 21, at 12–14).

Tellingly, the Defendants do not cite a single case in which a 25-mile radius was held to

---

[10]     Defendants do not challenge the reasonableness of the duration of the Non-Compete, which is two years.

be unenforceable. On the other hand, Atlantic's opening brief cited at least three cases in which similar geographic scopes were enforced. (Doc. 6, at 18). Multiple courts in other jurisdictions have upheld restrictions involving a 25-mile radius in the franchise context. *See, e.g., Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 539, 54–50 (6th Cir. 2007); *JTH Tax, Inc. v. Daniel Olivo*, No. 2:15CV345, 2016 WL 595297, at *1, 5 (E.D. Va. Feb. 12, 2016); *Tanfran*, 2007 WL 1796235, at *4, 9 (W.D. Mich. Jun. 20, 2007). The one case cited by Defendants involved a restriction with a 150-mile radius, which is six times larger than the Non-Compete at issue in this case. (Doc. 21, at 13 (citing *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 668 (M.D.N.C. 2009)).

In evaluating the reasonableness of a geographic restriction, the key question is whether the geographic scope is reasonably necessary to protect the legitimate interest of the franchisor in maintaining its customers. *Manpower of Guilford Cty., Inc. v. Hedgecock*, 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979). Here, the 25-mile radius is necessary to protect Atlantic and its franchisees' customers, especially given that Atlantic routinely grants its franchisees permission to service customers outside their territories to explore possible expansion opportunities. Doc. 7, ¶ 52. Indeed, the Defendants have benefitted from this practice. Defendants were granted permission to serve customers in Savannah, Georgia, which is within a 25-mile radius of the Charleston Franchisee's territory. (*Compare* Doc. 1-8, *with* Doc. 7-20). Defendants were also granted permission to operate outside their territory in Greenville, South Carolina. (Doc. 7-20). Ed Vogler, owner of the Cary, North Carolina territory, also testified that his franchisee was granted permission to operate outside its territory in Fayetteville, North Carolina.

Because a 25-mile radius is well within the range of geographic restrictions that North Carolina courts have previously found to be reasonable, and because Atlantic has a legitimate business interest within that territory, the entire restriction is reasonable as it relates to geographic

scope.

4.    <u>Although no blue penciling is needed, Defendants have not accurately recited the law on blue penciling.</u>

As described above, the Non-Compete is fully enforceable as written, and does not need to be "blue penciled." However, just in case the Court nonetheless considered blue-penciling, Atlantic is compelled to point out that Defendants have misapplied the law on blue penciling.

Under the blue pencil doctrine, "a court 'may choose not to enforce a <u>distinctly separable</u> part of a covenant in order to render the provision reasonable.'" *RLM Commc'ns, Inc. v. Tuschen*, --- F.3d ---, ----, 2016 WL 4039679, at *4 (4th Cir. July 28, 2016) (emphasis added). The contract is separable if it "sets out both reasonable and unreasonable restricted territories," and, if after the unreasonable territories are stricken, there is still a reasonable territory to be enforced. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, --- N.C. ---, ----, 784 S.E.2d 457, 461 (2016). The Defendants do not dispute this rule. (*See* Doc. 21, at 14 (citing *Beverage Sys.*, 784 S.E.2d at 461).

After stating this rule, however, Defendants offer the conclusory statement that "there is no vehicle for permissible blue-penciling." (*Id.*). This argument ignores both the franchise agreements and decisions from this Court.

As an initial matter, the franchise agreement sets forth at least seven separable provisions:

(1) The prohibition on competing in the franchisee's former territory, (Franchise Agreements, § 16.08(a));

(2) The prohibition on competing within in the 25-mile radius surrounding the franchisee's former territory, (*id.*);

(3) The prohibition on competing in any other franchisee's territory (*id.* § 16.08(b));

(4) The prohibition on competing within the 25-mile radius surrounding any other franchisee's territory, (*id.*);

(5) The prohibition on soliciting any current or former customers of Atlantic or its franchisees (*id.* § 16.08(c));

(6) The prohibition on soliciting any employees or independent contractors of Atlantic or its franchisees (*id.* § 16.08(d));

(7) The prohibition on interfering with Atlantic's relationship with any person who was an employee, contractor, supplier, or customer of Atlantic or Defendants, (*id.* § 16.08(e)).

Defendants are only contesting the validity of items (1)–(4) above. Even if one or more of those items were unreasonable—and they are not—there is nothing that would prevent the Court from enforcing the remaining provisions.

Indeed, this Court has performed precisely that type of blue penciling. In *OLP-Pittsburgh*, this Court found that a 100-mile radius surrounding the franchisee's territory or any other franchisee's territory was unreasonable. 2012 WL 1313251, at *4. Accordingly, the Court simply struck the words, "100 miles of," out of the covenant. *Id.* (rewriting the covenant to read: for 2 years, in any Competitive Business within ~~100 miles of~~ the Territory or any other franchisee's territory").[11]

D. **Plaintiffs have committed no breach of contract that would bar issuance of a preliminary injunction.**

Without even identifying the contractual provision on which they rely, Defendants make the conclusory statement that "Atlantic initially breached the franchise agreements by refusing to provided [sic] needed supplies." (Doc. 21, at 15). Tony Horne claims this breach was the result of Atlantic failing to fill eight of Defendants' paint orders. (Doc. 20, ¶ 8). Beyond the fact that this

---

[11]   Additionally, in § 16.08 of the franchise agreements, the Defendants agreed that the Non-Compete was separable: "The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Section 16.08 is held unenforceable . . . you expressly agree to be bound by any lesser covenant imposing the maximum duty permitted by law that is subsumed within the terms of the covenant, as if the resulting covenant were separately stated in and made a part of this Section 16.08."

allegation is untrue,[12] the failure to fill paint orders is not a violation under any provision of the franchise agreements. Here, again, Defendants fail to cite the relevant portions of the contract. Specifically, § 6.03 states, "We will sell to you an <u>initial supply</u> of certain items and supplies" (emphasis added). In addition, § 6.04 states, "[Y]ou are responsible for purchasing or procuring items and services for use in connection with the Franchised Business" (emphasis added). Both of these provision make clear that after providing the "initial supply" of materials, Atlantic was not required to sell any materials to the Defendants. Defendants were free to directly purchase paint from their approved outside vendor.[13]

Defendants' other allegation of a breach by Atlantic—that Atlantic did not offer Defendants an opportunity to cure—ignores the fact that Atlantic terminated the franchise agreements pursuant to § 15.01, which allows termination "immediately upon delivery of notice of termination" and "without right to cure." The question for the Court is whether Defendants' conduct satisfied the requirements for termination under that provision. As previously argued, (*see* Doc. 6, at 7–13), Defendants' numerous defaults easily satisfy § 15.01(g).

Furthermore, even if Atlantic did breach the franchise agreements—which it did not— Defendants would not be entitled to walk away from its Post-Termination Obligations. As an initial matter, the purported breaches addressed above occurred well after Defendant's repeated breaches. The Defendants cannot use this unverified allegation to excuse their serial defaults. Furthermore, the franchise agreements contain a survival clause under which Post-Termination Obligations

---

[12]   Montemurro testified at the August 26, 2016 hearing that Atlantic had sold Defendants enough paint to last them an entire year.
[13]   To be sure, Atlantic did have the ability to name itself as the sole authorized seller of certain materials. (Franchise Agreements, § 6.04). Despite initially declaring itself as the only authorized dealer of paint, Atlantic later permitted the franchisees to purchase paint directly from an outside vendor. As such, pursuant to § 6.04, it was the franchisee's responsibility to procure paint. And pursuant to § 6.03, Atlantic had no obligation to sell paint to the franchisee.

survive regardless of how the franchise agreements are terminated. (*See* Franchise Agreements § 16.11 (stating that the Post-Termination Obligations "survive termination or expiration of this Agreement (regardless of which party initiates termination or whether termination is wrongful)"; *see also* § 16.09).[14] Thus, the parties expressly agreed that the Post-Termination Obligations would apply no matter how the parties' business relationship ended.

Accordingly, the Court should reject Defendants' argument that any purported breach by Atlantic precludes enforcement of the franchise agreements, including the Post-Termination Obligations.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs Atlantic Pinstriping, LLC and Michael Montemurro respectfully request that the Court grant their Motion for Preliminary Injunction.

Respectfully submitted this 7th day of September, 2016.

**BRADLEY ARANT BOULT CUMMINGS LLP**

/s/ Matthew S. DeAntonio
Corby C. Anderson (N.C. Bar No. 20829)
Matthew S. DeAntonio (N.C. Bar No. 39625)
214 N. Tryon Street, Suite 3700
Charlotte, North Carolina 28202
Telephone: (704) 338-6043
canderson@bradley.com
mdeantonio@bradley.com

*Counsel for Plaintiffs*

---

[14]     The legal principle relied upon by Defendants does not change this result. According to the North Carolina Court of Appeals, "[f]ailure to perform an independent promise does not excuse nonperformance on the part of the other party." *Williams v. Habul*, 219 N.C. App. 281, 293–94, 724 S.E.2d 104, 112 (2012) (quotations and citation omitted). Here, the franchise agreements expressly state that the Post-Termination Obligations "will be construed as independent of any other covenant or provision of this Agreement." (Franchise Agreements, § 16.08).

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing document on all parties of record by electronic filing, which will transmit copies of the same to all counsel of record.

September 7, 2016.

/s/ Matthew S. DeAntonio
Counsel for Plaintiffs