UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
ATLANTIC PINSTRIPING, LLC,     )
ET AL,                         )
                               )
          Plaintiffs,          )   No. 3:16-CV-547
                               )
      vs.                      )
                               )
ATLANTIC PINSTRIPING           )
TRIAD, LLC, ET AL,             )
                               )
          Defendants.          )
_____)
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GRAHAM C. MULLEN
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 20, 2016


<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

    MATTHEW S. DeANTONIO, ESQ.
    CORBY C. ANDERSON, ESQ.
    Bradley, Arant, Boult, Cummings, LLP
    100 North Tryon Street, Suite 2690
    Charlotte, North Carolina 28202

On Behalf of the Defendants:

    JEFFREY NEALE JACKSON, ESQ.
    MARK PETER HENRIQUES, ESQ.
    Womble, Carlyle, Sandridge & Rice, LLP
    301 South College Street
    Charlotte, North Carolina 28202


              Cheryl A. Nuccio, RMR-CRR
                Official Court Reporter
           United States District Court
             Charlotte, North Carolina

1                            I N D E X

2    PLAINTIFFS' WITNESSES                        PAGE

3    LAURA MONTEMURRO
       Direct Examination By Mr. DeAntonio           3
4      Cross Examination By Mr. Henriques           17

5

6    DEFENDANTS' WITNESSES                         PAGE

7    JERRY WAYNE PAKER
       Direct Examination By Mr. Henriques         23
8      Cross Examination By Mr. DeAntonio          43
       Redirect Examination By Mr. Henriques       48
9
     WILLIAM ERNEST HORNE
10     Direct Examination By Mr. Henriques         49
       Cross Examination By Mr. DeAntonio          66
11

12
     PLAINTIFF'S REBUTTAL WITNESSES               PAGE
13
     MIKE MONTEMURRO
14    Direct Examination By Mr. Deantonio          72

15   LAURA MONTEMURRO
       Direct Examination By Mr. DeAntonio         73
16     Cross Examination By Mr. Henriques          75
       Redirect Examination By Mr. DeAntonio       76

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2    TUESDAY MORNING, SEPTEMBER 20, 2016

3              (Court called to order at 10:30 a.m.)

4              THE COURT:  All right.  We have -- we are resuming

5    the hearing in the matter of Atlantic Pinstriping and Michael

6    Montemurro versus Atlantic Pinstriping and others.

7              Is there anything further for the plaintiff?

8              MR. DeANTONIO:  Yes, Your Honor.  We have one

9    witness that we'd like to call for about 20 minutes.

10             THE COURT:  All right.

11             MR. DeANTONIO:  We'd like to call Mrs. Laura

12   Montemurro.

13             THE COURT:  All right.  Come forward, please, and be

14   sworn.

15             LAURA MONTEMURRO, PLAINTIFFS' WITNESS, SWORN,

16                      DIRECT EXAMINATION

17   BY MR. DeANTONIO:

18   Q.   Good morning, Ms. Montemurro.

19   A.   Good morning.

20   Q.   Could you please state your full name for the record.

21   A.   Laura Montemurro.

22   Q.   Ms. Montemurro, are you married to the plaintiff, Michael

23   Montemurro?

24   A.   Yes, I am.

25   Q.   For how long?

1  A.    Twenty-five years.

2  Q.    Do you work for the other plaintiff, Atlantic

3  Pinstriping, LLC?

4  A.    Yes.

5  Q.    How long have you worked for Atlantic?

6  A.    Since its inception in 2003.

7  Q.    What is your title at Atlantic?

8  A.    I'm a member.

9  Q.    Do you have any responsibilities or duties at Atlantic?

10  A.    I do not pinstripe the vehicles, but I am involved in

11  monitoring franchise reports and their 1 percent marketing

12  fund accounts and overseeing some of the supply orders as

13  well.

14  Q.    Do you oversee the payment of royalties?

15  A.    Yes.

16  Q.    And you said marketing fund accounts?

17  A.    Yes.

18  Q.    And supply orders?

19  A.    Yes.

20  Q.    I want to touch on just a few of the issues that were

21  discussed at the first hearing in this matter.  Were you here

22  for the first hearing in this matter?

23  A.    Yes.

24  Q.    And did you see the testimony of Mr. Montemurro?

25  A.    Yes.

LAURA MONTEMURRO - DIRECT

1  Q.   Do you recall there was some testimony about how many of

2  the pinstriping applicators and head attachments were actually

3  leased to the defendants?

4  A.   Yes.

5  Q.   I'd like to nail down that number.  How many pinstriping

6  heads accompany each applicator?

7  A.   Eight.

8  Q.   Okay.  And just so we can understand what we're talking

9  about, is the head an attachment that goes on to the tool?

10 A.   Yes.

11 Q.   And does it have a wheel that applies the paint to the

12 vehicle?

13 A.   Yes.

14 Q.   Okay.  How do you know that eight heads accompany each

15 tool?

16 A.   Every -- every tool has eight heads that would go with

17 it.  Each franchisee per tool is given eight heads.

18 Q.   Okay.

19 A.   Per the lease.

20 Q.   Okay.  Are you aware of -- or have you witnessed the

21 tools and the heads being provided to other franchisees?

22 A.   Yes.

23 Q.   And is it always eight heads?

24 A.   Yes.

25 Q.   Ms. Montemurro, I'm going to ask you to look at a

LAURA MONTEMURRO - DIRECT

1    document.

2            MR. DeANTONIO:  Your Honor, may I approach the

3    witness?

4            THE COURT:  You may.

5    Q.    What I've done hopefully to speed things up today is I

6    have compiled all the documents that were introduced at the

7    last hearing and put exhibit numbers on them for ease of

8    reference.  So I'm going to hand you just a stack of those

9    exhibits.

10           So I'd like you to please look at Exhibit 2,

11   Ms. Montemurro.  Is this the equipment lease for the Colombia

12   franchise?

13   A.    I believe so.

14   Q.    Okay.  And if you look at the last page of this exhibit,

15   there is a list of equipment that was leased to the franchisee

16   pursuant to this agreement; is that right?

17   A.    Yes.

18   Q.    Does this reflect that eight heads were attached or given

19   or provided along with each tool?

20   A.    Yes.

21   Q.    How many tools and how many heads were provided to the

22   defendants in this case?

23   A.    Two tools each with eight heads.  So 2 tools and 16

24   heads.

25   Q.    And that would be under the Columbia lease, right?

LAURA MONTEMURRO - DIRECT

1   A.   Yes, I believe so.

2   Q.   So for all three franchises, Columbia, Coastal and

3   Charleston, how many tools and how many heads?

4   A.   I believe they had -- they had two for each.  At

5   Charleston they were given one and then -- at two separate

6   times.  So they had 6 -- 6 tools and would be 8 tools -- 8

7   heads per each tool, so 48.

8   Q.   So I'm trying to determine not how many tools the

9   franchisees have now but total provided over the course of the

10  franchise agreements.

11  A.   Over the course of the franchise between Triad Columbia,

12  Charleston, and Dealer Services Coastal, it would have been 10

13  tools --

14  Q.   Okay.

15  A.   -- and 80 heads.

16  Q.   Ten tools and 80 heads.

17  A.   Yes.

18  Q.   Were any of those tools and heads returned?

19  A.   Yes.

20  Q.   And --

21  A.   The Coastal ones, there were 2 tools and 16 heads were

22  returned.

23  Q.   Okay.  And so those were returned several years ago?

24  A.   No, they were returned this year.

25  Q.   They were returned this year?

LAURA MONTEMURRO - DIRECT

1  A.   Yes.

2  Q.   And when this year?

3  A.   I believe in March.

4  Q.   Okay.  So before this dispute happened -- or before this

5  lawsuit was filed at least, the Coastal franchisee returned 2

6  tools and 16 heads; is that right?

7  A.   Yes, uh-huh.

8  Q.   And the deposit that they paid for those tools and heads

9  was never cashed by Atlantic, was it?

10  A.   For Coastal, yes, it was.

11  Q.   Okay.  Was the money returned, then?

12  A.   It was not because there was another check for tool

13  deposits that had not been cashed.

14  Q.   In other words, the amount equal the deposit had not been

15  cashed by Atlantic?

16  A.   Correct.

17  Q.   So you just gave the check back?

18  A.   I gave them a copy.

19  Q.   And so that left the franchisees with 8 tools and 64

20  heads; is that correct?

21  A.   Yes.

22  Q.   Did Mr. Montemurro recover one of those tools?

23  A.   Yes.

24  Q.   And so did he recover three of those heads?

25  A.   Yes, only three of the heads.

LAURA MONTEMURRO - DIRECT

1   Q.   And so how many tools and how many heads remain
2   outstanding?
3   A.   He should have 7 tools, and I'm trying to do math in my
4   head.   Seven tools, it would -- that would have been 56 heads
5   and they returned 3.
6   Q.   Okay.   So 8 times 8 is 64, right?
7   A.   Correct.
8   Q.   And then --
9   A.   Sixty-one.   They should have 61 heads, then, because they
10   only returned 3 from that one -- we only recovered 3 from that
11   one tool.
12   Q.   Okay.   Thank you.
13        Do you recall at the last hearing that Mr. Montemurro was
14   questioned about whether or not Atlantic filled a paint order
15   that the defendants had requested?
16   A.   Yes.
17   Q.   And do you recall there was some testimony about one
18   large order was filled and then two subsequent orders were not
19   filled?
20   A.   Yes.
21   Q.   I'd like to ask you some questions about that initial
22   large order.
23           MR. DeANTONIO:   May I approach, Your Honor?
24           THE COURT:   You may.   You need not ask further
25   permission if you need to approach the witness.

1    MR. DeANTONIO:  Thank you.

2  Q.   Ms. Montemurro, is Exhibit 102 that initial large paint

3  request that the defendants made?

4  A.   Yes.

5  Q.   And looking at the numbers here, the quantities, do the

6  quantities reflect quarts of paint?

7  A.   Yes, they're quarts.

8  Q.   And I've added this up, and would you agree that this

9  equals 34 quarts?

10  A.   Yes.

11  Q.   Do you have an understanding of how many cars could be

12  striped with 34 quarts of paint?

13  A.   Yes.

14  Q.   And how many is that?

15  A.   Approximately 38,000 vehicles.

16  Q.   Okay.  And let's just quickly run through how you get

17  there.  You take the number of cubic centimeters that are in a

18  quart, and that's about 946, right?

19  A.   Correct.

20  Q.   And then you take the total number of cubic centimeters

21  in 34 quarts and you can determine that 10 cubic centimeters

22  is one -- can fit in one tool; is that correct?

23  A.   That's right.

24    MR. HENRIQUES:  I'm going to object to the leading,

25  Your Honor.

1       THE COURT:  Overruled.  Let's move on, please.

2  Q.   And one tool can stripe 12 cars.

3  A.   Approximately, yes.

4  Q.   And that's how you do the math to get to the number of

5  over 38,000 cars; is that right?

6  A.   Yes, that's correct.

7  Q.   What if paint thinner or hardener were added?

8  A.   You could probably get more vehicles out of that.

9  Q.   Did the defendants in this case ever order paint thinner

10 or hardener?

11 A.   Not directly from us but from the supplier, yes.

12 Q.   Is that a common practice for Atlantic franchisees?

13 A.   Normally they order through us.

14 Q.   Okay.  To use hardener or paint thinner --

15 A.   Oh, yes.

16 Q.   -- is that a common practice?

17 A.   Yes.

18 Q.   Do you have any idea of how much paint that was compared

19 to the volume that the defendants were producing over the

20 previous year?

21 A.   That's an enormous amount of paint.

22 Q.   Okay.

23 A.   It's an extremely large order of paint for that.

24 Q.   And how long could that paint last?

25 A.   At least a year and a half.

1  Q.   Okay.  But Atlantic filled this order; is that correct?

2  A.   Yes.

3  Q.   And this order was requested in February of 2016; is that

4  right?

5  A.   Yes.

6  Q.   So between February 3rd, 2016, and when this lawsuit was

7  filed in June of 2016, that's when the subsequent paint orders

8  were requested by the defendants; is that right?

9  A.   Yes.

10  Q.   And did --

11       THE COURT:  I want to interrupt.  When you say that

12  would last about a year, year and a half, are you talking

13  about paint life or the amount of time it would take to use it

14  up?

15       THE WITNESS:  The amount of time it would take to

16  use it to pinstripe.

17       THE COURT:  Okay.  Thank you.

18  Q.   And why did -- what did Atlantic do when it received

19  further paint orders in the four months after this request?

20  A.   This kind of sent a red flag and we were wondering why

21  such a large order had been placed.  It's not in the norm for

22  any of our franchisees or even for us to have ordered that

23  amount of paint.  So it was something that we were concerned

24  about.

25  Q.   And so what did you do when you received the next order

LAURA MONTEMURRO - DIRECT

1  of paint?

2  A.   We did not fill it.  We did express to Ernie, Ernie

3  Horne, that this was a really large order of paint and

4  expressed that it sent a red flag to us.

5  Q.   And did you request to see an inventory of what they had

6  before you would fill further orders?

7  A.   Yes, we did.

8  Q.   And was the -- did the franchise ultimately get

9  terminated right after -- right as this was going on?

10  A.   They were terminated after we tried to do an inspection

11  and inventory, yes.

12  Q.   Okay.  Ms. Montemurro, are you aware that Section 16.06

13  of the franchise agreement requires that upon termination, the

14  franchisee "transfer and assign to us or our designee all

15  telephone numbers"?

16  A.   Yes.

17  Q.   What is the purpose behind that requirement?

18  A.   The purpose would be that these numbers are advertised on

19  our website and they -- a customer would call that number

20  expecting to speak to an Atlantic Pinstriping franchisee.  And

21  this would have -- be able to have some control over what

22  would be expected by our customers on that end.

23  Q.   Would there be any harm to Atlantic if the clients

24  continued to associate those numbers with Atlantic?

25  A.   Yes, because the customers would be thinking that they

1  would be dealing with an Atlantic Pinstriping franchisee and

2  there would be some confusion as to who they are dealing with.

3  Q.    Okay.  Thank you.  I'm going to hand you two documents,

4  Ms. Montemurro, Exhibits 103 and 104.

5        Ms. Montemurro, do you recognize Exhibit 103?

6  A.    Yes.

7  Q.    What is Exhibit 103?

8  A.    They are business cards for the Atlantic franchisee, the

9  defendants' employees.

10  Q.    Okay.

11  A.    One is a former employee, one is a current.

12  Q.    And do these business cards each have phone numbers on

13  them?

14  A.    Yes.

15  Q.    Have those phone numbers been returned to Atlantic?

16  A.    No, they have not.

17  Q.    Let's compare this document to Exhibit 104 which is a

18  declaration that was submitted last night.  I'd like to ask

19  you to please look at the top of page 2 of this declaration.

20  And do you see where that paragraph states that an individual

21  named Shawnnah Blake called Lugoff Toyota and --

22            THE COURT:  Look, I can read.  Come on.  Move on.

23            MR. DeANTONIO:  Okay.

24  Q.    Was one of these phone numbers in the business card

25  provided to you by the manager of Lugoff Toyota?

LAURA MONTEMURRO - DIRECT

1  A.    I believe so.  I mean --

2  Q.    Or to Ms. Blake.  Is that what Ms. Blake is saying?

3  A.    Ms. Blake, yes.

4  Q.    And that's the same phone number that was listed here for

5  Mark Parker; is that correct?

6  A.    Yes.  But I believe Matt Bernard is the one who is using

7  that.

8  Q.    So a different employee of the defendants' is now using

9  this number.

10  A.    Yes.  Because Mark Parker no longer works for them.

11  Q.    And according to Ms. Blake, this number was described as

12  being -- belonging to somebody with Atlantic Dealer Services,

13  correct?

14        MR. HENRIQUES:  I'm going to object to his testimony

15  about the characterization of the affidavit which

16  characterizes the testimony of a third party.

17        THE COURT:  I will -- sustained.  Let's move on,

18  please.

19        MR. DeANTONIO:  Okay.

20  Q.    Looking at the second telephone number -- well, let's

21  just move on.

22        Ms. Montemurro, you are aware that the franchise

23  agreements and owner's agreements have a 25-mile radius

24  surrounding each franchisee's territory as part of the

25  covenant not to compete; is that correct?

LAURA MONTEMURRO - DIRECT

1  A.   Yes.

2  Q.   I want to ask you about that radius.  Do Atlantic

3  franchisees ever serve customers who live outside their

4  territory?

5  A.   Yes.

6  Q.   And could you explain how that happens.

7  A.   There may be a dealership that's close to the territory

8  that has a customer that wants a hand painted pinstriping so

9  there will be a little bit of overlap where they may need to

10 go outside their territory to service that customer.

11 Q.   And have you ever received phone calls --

12 A.   Yes.

13 Q.   -- when that situation happens?

14 A.   Requesting -- yes.

15 Q.   And what do you do when you receive those phone calls?

16 A.   I would either give the dealership or the customer the

17 phone number of the franchisees that would be closest to that

18 area or I would take their information and provide it to the

19 franchisee to contact them directly.

20 Q.   Okay.  Do the franchisees ever request permission to

21 serve customers outside of their territory?

22 A.   Yes.

23 Q.   And does Atlantic ever grant those requests?

24 A.   Yes, often.

25 Q.   Has Atlantic ever granted those requests for the

1  defendants in this case?

2  A.   Yes.

3  Q.   Were the defendants in this case given the opportunity to

4  expand their territory to Savannah, Georgia?

5  A.   Yes, they were.

6  Q.   How close is Savannah, Georgia, to the defendants'

7  territory as it was at the time of termination?

8  A.   They were operating in Charleston and they had approval

9  for Hilton Head.  So I think Savannah is within 25 miles of

10  Hilton Head.

11  Q.   Okay.  With the expansion territories, that does not

12  include permission to start a franchise, does it?

13  A.   No, it does not.

14  Q.   And so what does that involve?  What is the permission

15  that's granted?

16  A.   To service -- they would fill out an approval form,

17  request form to service for specific reasons for specific

18  dealerships.

19            MR. DeANTONIO:  Okay.  Thank you.

20            (Plaintiffs counsel conferred.)

21            MR. DeANTONIO:  No further questions, Your Honor.

22            THE COURT:  Cross exam.

23            MR. HENRIQUES:  Yes, Your Honor.

24                     CROSS EXAMINATION

25  BY MR. HENRIQUES:

1  Q.   Were the franchises involved here, the Charleston,

2  Columbia, and Coastal franchises, some of the most successful

3  franchises for Atlantic Pinstriping?

4  A.   In terms of the dollar amount?

5  Q.   In terms of dollars.

6  A.   Dollars, yes.

7  Q.   And were the franchises regularly recognized at company

8  events like the Christmas party for being high performing

9  franchises?

10  A.   In the dollar amount, yes.

11  Q.   All right.  You testified about these business cards,

12  Exhibit 103.

13  A.   Uh-huh.

14  Q.   No one gave these business cards to you, right?

15  A.   They were proofs that were in emails from Mike through

16  Tony, yes.

17  Q.   Okay.  Where did these come from?  Do you have any

18  personal knowledge about where the two business cards in

19  Exhibit 103 came from?

20  A.   Yes.  They were proofs that we had designed the business

21  cards for Tony that were emailed to Tony.

22  Q.   Okay.  So these were business cards that were designed

23  back when the franchise was in operation.  So these are

24  business card proofs.  You had designed business cards for

25  these employees.

1  A.   And then Tony would have ordered them through probably --

2  Q.   You don't know if anyone is using these business cards

3  now, right?

4  A.   I'm sure they are.

5  Q.   Okay.  You have no personal knowledge that anyone is

6  using these business cards.

7  A.   No, but I do know that they are using those phone

8  numbers, yes.

9  Q.   Okay.  And you have -- you have knowledge that they are

10  using these phone numbers now.  What personal knowledge do you

11  have that they're using these phone numbers?

12  A.   If you call the number, Brian Guggenbiller would answer

13  that.

14  Q.   Right.  This is actually Brian Guggenbiller's personal

15  cell phone number, right?  Isn't that that number, (843)412 --

16  A.   That would be the number that is for Atlantic

17  Pinstriping, yes, sir

18  Q.   Do you know whether that's Brian Guggenbiller's personal

19  cell phone number?

20  A.   I do not know if it's personal.  It's the one that he

21  uses to represent himself as a pinstriper.

22  Q.   Okay.  You testified there was some potential confusion

23  because the phone numbers were advertised on the website.

24  A.   Well, Tony's main -- Tony's number was, yes.

25  Q.   Okay.  Tony's number is advertised on the Atlantic

1   Pinstripe website.  Is that the --

2   A.   It was.

3   Q.   -- website you're talking about?

4   A.   It was.

5   Q.   Okay.  When was that number taken down?

6   A.   Post-termination.

7   Q.   So after termination you removed that number.  So no one

8   now -- if you go to your website now, you would not find

9   Tony's phone number on the Atlantic Pinstriping --

10  A.   You would not find it.  You would find the local

11  Charlotte number as well as the (800) number.

12  Q.   And there was no advertising like yellow pages or

13  anything else for the defendant franchises, were there?

14  A.   I do not know that answer.

15  Q.   Now, have you reviewed the -- you testified about the

16  equipment.  Have you reviewed each of the lease agreements

17  that are involved for these franchises?

18  A.   Not recently.

19  Q.   Do you know how many applicators are listed in the lease

20  agreement for the Charleston franchise?

21  A.   Do you want me to take a look at it?

22  Q.   I'm just asking you if you know how many were listed

23  there.

24  A.   I would have to look at the documents to be accurate.

25  Q.   All right.  And do you know how many are listed for

LAURA MONTEMURRO - CROSS

1  Coastal?

2  A.    There were two.

3  Q.    So you believe there was a lease agreement with Coastal

4  that listed two applicators?

5  A.    Yes, there were.

6  Q.    Did you personally deliver any applicators or heads to

7  the defendants in this case?

8  A.    I was in the office when Tony picked up the -- came in

9  and signed the agreements for the tool -- leases for Coastal.

10 Q.    Okay.  So you were in the office when Tony signed

11 agreements for Coastal.

12 A.    Yes, sir.

13 Q.    All right.  And how many -- did you see how many

14 applicators he picked up at that time?

15 A.    I don't recall if he picked them up that day.  There --

16 but there would have been two applicators and eight heads each

17 tool.

18 Q.    And are you the person that counts out those heads?

19 A.    No.

20 Q.    So how do you know eight heads were delivered?

21 A.    There are always eight heads that are delivered.

22 Q.    I'm asking specifically for the heads delivered to these

23 defendants.  Do you have any knowledge of how many heads these

24 defendants received?  Or is your testimony simply that's the

25 normal procedure is everybody gets eight?

1  A.    That is the absolute procedure that we do with every

2  franchisee.

3  Q.    You testified in connection with the paint that you made

4  a request to see their paint inventory; is that right?

5  A.    We asked -- I specifically asked him what he had in terms

6  of inventory for all of his locations, yes, I did.

7  Q.    Right.  You asked that to Tony.

8  A.    Yes.

9  Q.    In an email.

10 A.    Yes, sir.

11 Q.    And he provided you an email response back that listed

12 the current inventory?

13 A.    Some -- some of it, yes.  Specifically addressing

14 Florida, he did not respond to me regarding that.

15 Q.    But you asked for an inventory.  He emailed you an

16 inventory, but you still declined to ship any additional

17 paint.

18 A.    That's not correct.

19 Q.    Did you ship any additional paint after he provided an

20 inventory?

21 A.    No, we did not.

22         (Defense counsel conferred.)

23         MR. HENRIQUES:  Those are all I have, Your Honor.

24         THE COURT:  Redirect.

25         (Plaintiffs' counsel conferred.)

1    MR. DeANTONIO:  No, Your Honor.

2    THE COURT:  All right.  You may step down.

3    THE WITNESS:  Thank you.

4    (Witness stepped down.)

5    THE COURT:  Anything further for the plaintiff?

6    MR. DeANTONIO:  Nothing from the plaintiff at this

7  time, Your Honor.

8    THE COURT:  All right.  Mr. Henriques, do you have

9  any evidence you want to put on?

10    MR. HENRIQUES:  Yes, Your Honor.  We would call

11  Jerry Parker.

12    THE COURT:  Come forward and be sworn, Mr. Parker.

13    JERRY WAYNE PAKER, DEFENSE WITNESS, SWORN,

14    DIRECT EXAMINATION

15  BY MR. HENRIQUES:

16  Q.   Good morning, Mr. Parker.

17  A.   Good morning.

18  Q.   Could you please state your full name for the record.

19  A.   Jerry Wayne Parker.

20  Q.   All right.  Could you tell us a little bit about

21  yourself, Mr. Parker.

22  A.   Well, when I retired several years ago, I met both Tony

23  and Ernie at the golf course and worked there for a while.

24  And then they shared with me what they were doing with

25  pinstriping and at some point asked me to join them.  I tried,

JERRY PARKER - DIRECT

1   and essentially you couldn't buy into a franchise.  You had

2   to -- wouldn't do that, but essentially said you can buy

3   into -- you can be a part of the next franchise so...

4   Q.   And what did you do before you retired?

5   A.   Operated my own business for 25 years, commercial

6   cleaning and building services business.

7   Q.   I want to talk more about your ultimately signing the

8   franchise agreement.  I know there have been some questions

9   raised about service of process.  Were you ever served with

10  process in this lawsuit?

11  A.   No.

12  Q.   Okay.  Did you actually authorize me to accept service on

13  your behalf?

14  A.   I did.

15  Q.   Did you do anything to evade service of process?

16  A.   No.

17  Q.   You just weren't home when the package came?

18  A.   Well, I don't have any territory in indian land so I was

19  always working somewhere else.

20  Q.   So is it correct, did I hear you say that you started

21  working with Tony and folks before you signed the first

22  franchise agreement on Coastal?

23  A.   Yes.

24  Q.   Okay.  Had you talked to Mr. Montemurro about becoming a

25  franchisee?

1  A.   Yes.

2  Q.   Tell us about those conversations.

3  A.   Well, essentially we talked about what it would take to

4  do that.  When we talked about trying to buy into the two

5  franchises that they already owned, Mike said, You can't be a

6  part of that.  Or you can be a part of the LLC that runs it.

7  But in looking at the book for what you have and can't -- can

8  and can't do, I couldn't invest in an LLC that I couldn't get

9  anything from.  Essentially, if anything happened to either

10  one of them, I'd have been out in the cold.

11      So the next solution Mike offered was next one y'all buy,

12  you can be a part of that.

13  Q.   And did you specifically suggest that perhaps the

14  company, the LLC, Atlantic Triad -- sorry, Atlantic

15  Pinstriping Triad, LLC, could be named as the franchisee?

16  A.   Yes.

17  Q.   And that's what you wanted to protect your investment?

18  A.   Correct.

19  Q.   And Mr. Montemurro said that was not an option?

20  A.   Correct.

21  Q.   He specifically said he did not want any LLC as the

22  franchisee.

23  A.   Right.  It would have to be the individuals.  He was not

24  going to change the -- either of the two that they already

25  had.

JERRY PARKER - DIRECT

1  Q.   Okay.  So how was it that you ended up becoming a
2  franchisee?
3  A.   Well, we had -- Ron owned the Myrtle Beach/Wilmington
4  territory and wasn't working it.  Matter of fact, Mike
5  suggested that we buy it.  And we wound up doing that in
6  January of '15, I think it was.
7  Q.   All right.  And what was your financial contribution to
8  the Coastal franchise?
9  A.   A third.
10 Q.   Okay.  And are you personally a franchisee under that
11 Coastal franchise agreement?
12 A.   No -- I mean yes, I'm sorry.  Yeah.  As -- there's three
13 of us.
14 Q.   All right.  And who are the three franchisees for
15 Coastal?
16 A.   Myself, Tony, and Ernie.
17 Q.   Is there any company that is the Coastal franchisee?
18 A.   No.
19 Q.   Did any company sign on that -- sign the franchise
20 agreement?
21 A.   No.
22 Q.   Was window tinting part of the franchise agreement that
23 Coastal signed in 2015?
24 A.   No.
25 Q.   Did the -- did you perform window tinting services with

JERRY PARKER - DIRECT

1  customers of the Coastal franchise?

2  A.   Not until November of last year.

3  Q.   Okay.  November 2015?

4  A.   Yes.

5  Q.   Did Mr. Montemurro indicate he wanted to receive

6  royalties on window tinting?

7  A.   Yes.

8  Q.   What royalties was he demanding on window tinting

9  services?

10  A.   7 percent.

11  Q.   Was there any amendment to the franchise agreement to

12  bring window tinting services under that?

13  A.   No.

14  Q.   Was there ever any written agreement specifying what

15  percentage of amounts would be paid for window tinting

16  services?

17  A.   No.

18  Q.   There's been some discussion about a lawsuit filed by

19  Dentworks in South Carolina.  Are you familiar with that

20  lawsuit?

21  A.   I am.

22  Q.   Are you actually named as a defendant in that lawsuit?

23  A.   Yes.

24  Q.   Did you have a meeting with Mike Montemurro in April to

25  discuss the Dentworks situation?

JERRY PARKER - DIRECT

1    A.    I think that was it, in April.

2    Q.    Tell us about that meeting with Mr. Montemurro.

3    A.    We had had several.  The last one was at the end of the

4    week and said that if -- if Joey is owed money, pay him.  If

5    not, show me that it's not owed.  That was either Thursday or

6    Friday.

7         And I said be happy to put all -- you know, get all that

8    information for you.  Come down the first part of the week,

9    Monday, Tuesday, whatever is, you know, available to you,

10   which you prefer, and we'll have it ready.

11        Went down on Monday and Ernie was there and so was Tony,

12   and we had it in the office all -- every invoice, every

13   receipt, the whole nine yards, exactly what it was.

14        And Mike came in on Tuesday.  He walked in and I said,

15   Okay, here it is.

16        And he says, I don't need to see that.  He just took a

17   picture of it and went in a different direction.

18   Q.    Okay.  Now, I want to be clear.  Who did Dentworks

19   actually have an agreement with to perform some dent removal

20   and other body work?

21   A.    My understanding is Partners.

22   Q.    Partners.  Another company called Partners?

23   A.    Uh-huh.

24   Q.    And are you an owner in Partners?

25   A.    No.

1   Q.   Did Dentworks have any agreement with you personally --

2   A.   No.

3   Q.   -- to do any dent removal?

4        Did Dentworks have any agreement with the Atlantic Dealer

5   Services to do dent removal?

6   A.   No.

7   Q.   So what were the documentation that was pulled together

8   to demonstrate that no money was owed to Dentworks?  What did

9   that consist of?

10  A.   Essentially it was the invoices that were submitted by

11  Dentworks to Partners and the -- all the statements that went

12  to the customer, all of the receipts and exactly what was done

13  and exactly what was paid.

14  Q.   Okay.  So you were showing -- you assembled the paperwork

15  to show that Dentworks had been paid all the money they were

16  owed from Partners.

17  A.   That's correct.

18  Q.   But Mr. Montemurro didn't want to see that.

19  A.   Correct.

20  Q.   And was a lawsuit actually filed by Dentworks?

21  A.   I think -- yes, I think so.

22  Q.   Did Mr. Montemurro know about that lawsuit?

23  A.   I think so.

24  Q.   Did he indicate he had, in fact, met with Joey Williams

25  who is the principal of Dentworks?

JERRY PARKER - DIRECT

1  A.   Yes.  He -- on that day I think he said he saw him either

2  that day or yesterday -- the day before.

3  Q.   Were you present when Mr. Montemurro came to the

4  Charleston office on June 14th of 2016, the date of

5  termination?

6  A.   Yes.

7  Q.   Tell us about what happened that day when Mr. Montemurro

8  came.

9  A.   He asked us to bring all of our vehicles in and he wanted

10  to do an inspection of the vehicles and the tools.  And it was

11  set up for noon and we were there ready and --

12  Q.   Did he bring anybody with him?

13  A.   No.  Well, I mean, not his people.  He had two policemen

14  join him.

15  Q.   So two policemen showed up along with Mr. Montemurro.

16  A.   Correct.

17  Q.   And what happened after he arrived?

18  A.   He asked -- Matt, one of our pinstripers, drove in and he

19  was the first one to come in.  And he gave -- as soon as he

20  got there, he gave the keys to Tony.  And Mike asked -- went

21  over and asked Matt to open the truck.  He said, I don't have

22  the keys.  I gave them to Tony.

23       And he says, Okay.  Can you open the truck.  And he asked

24  him what for.  So I can do an inspection.

25       So Tony went over and opened the truck, pulled the

1  toolbox out, opened the toolbox.  And as soon as he got the

2  toolbox open, Mike reached in and grabbed the tool and head.

3  And Tony closed it back up and says, We're through here.

4      Mike asked the policeman, Can you you make him -- would

5  you tell him to let me have my stuff.

6      The policeman says, I can't do that.  That's his vehicle.

7      So he said okay and he went and pulled out a letter and

8  gave it to each one of us and says, you know, This is what you

9  get for that.

10  Q.  So he delivered the letter after he repossessed the tool?

11  A.  Correct.

12  Q.  Did you ever get a deposit back for the tool he

13  repossessed?

14  A.  Not that I know of.

15  Q.  Let's look at the letter.

16      MR. HENRIQUES:  And Your Honor, I put the exhibits

17  we intend to use into a notebook that we'll try to go through.

18  Q.  Would you look at Exhibit 1 in that notebook.

19      Is this the letter that was delivered to you on June 14,

20  2016?

21  A.  Correct.

22  Q.  Was this the first notice that you received of any

23  default by the Coastal franchise?

24  A.  Correct.

25  Q.  And that's the only franchise you're a member of, right,

1  is the Coastal franchise?

2  A.   Correct.

3  Q.   All right.  I want to ask about some of the specific

4  claims of default that are set forth in Exhibit 1.  The first

5  one appears at the bottom of page 1, that last paragraph.  And

6  it says, "APS," which is Atlantic Pinstriping, "has received

7  credible evidence that you are unable to pay your debts as

8  they become due."

9       First, let me ask you individually, do you have any debts

10 or obligations that you were unable to pay?

11 A.   No.

12 Q.   Let me ask about the Coastal franchise.  Did it have any

13 debts or obligations that it was unable to pay?

14 A.   No.

15 Q.   Did the Coastal franchise own trucks?

16 A.   I don't think so.  I don't --

17 Q.   Was the Coastal franchise behind or defunct on any debts

18 that it owed when you received this notice of termination on

19 June 13 -- June 14, 2016?

20 A.   None that I know of.

21 Q.   When you had met with Mr. Montemurro in April, had he

22 raised any concern that the Coastal franchise was unable to

23 pay its debts?

24 A.   No.

25 Q.   Had he ever raised that concern to you at any of the

1  meetings you had had leading up to June 14th?

2  A.  No.

3  Q.  All right.  Then let's turn the page and look at some of

4  the other alleged defaults that Coastal committed under the

5  franchise agreement.  The first one says, "Using the System

6  and/or Marks in connection with other businesses and business

7  activities."

8      Had Coastal ever used the system or marks in connection

9  with other activities?

10 A.  No.

11 Q.  The next says, "Using the System and/or Marks outside of

12 territories covered by the franchise agreements."

13     I understand Coastal had gotten approval to do work in

14 other franchises.  Other than the approvals given to it by

15 Atlantic Pinstriping, had it ever used the services or marks

16 outside the territories?

17 A.  No.

18 Q.  The third one says, "Failing to comply with APS System

19 Standards."

20     Do you know what that's referring to?

21 A.  No.

22 Q.  Okay.  Were you ever told that the Coastal franchise had

23 failed to comply with the APS system standards?

24 A.  Not that I recall.

25 Q.  And did you have a lawyer write a response to this

JERRY PARKER - DIRECT

1  termination letter a couple days later?

2  A.   Yes, we did.

3  Q.   Who was that lawyer?  Is that Brandon --

4  A.   Brandon.

5  Q.   -- Shelburn (phonetic)?

6       Is Brandon Shelburn a lawyer in South Carolina?

7  A.   Correct.

8  Q.   Did he ask for details about what Atlantic Pinstriping

9  actually meant by deficiencies with system standards and the

10 other alleged defaults?

11 A.   Yes.

12 Q.   Were any details ever provided for how the Coastal

13 franchise had somehow failed to comply with the standards?

14 A.   Not that I received.

15 Q.   So you've never been told how the Coastal franchise

16 failed to comply with APS systems.

17 A.   That's correct.

18 Q.   The next one says, "Failed to operate the franchise

19 diligently in a manner consistent with sound business

20 practices."

21      Had Coastal been operated diligently and consistent with

22 sound business practices?

23 A.   Correct.

24 Q.   The next says, "Failing to maintain working capital and

25 net worth sufficient to fulfill responsibilities."

1    Did you have adequate capital and net worth to fulfill

2  the operations?

3  A.    Correct.

4  Q.    Did you ever provide any personal financial statements

5  showing what your net worth was to Atlantic Pinstriping?

6  A.    No.

7  Q.    And they never asked for any of your financial

8  information?

9  A.    No.

10  Q.    The next is, "Failing to adhere to the highest standards

11  of honesty, integrity, fair dealing and ethical conduct."

12    Had Coastal ever violated those standards in its

13  dealings?

14  A.    No.

15  Q.    The next is, "Allowing your officers, directors" --

16  anyway, you can read it -- to damage the goodwill of APS?

17    Had you done any conduct that was damaging to goodwill?

18  A.    Never.

19  Q.    The next is failing to pay taxes.

20    Did either you personally or Coastal ever fail to pay

21  taxes?

22  A.    No.

23  Q.    The next is selling unapproved items without consent.

24    Did you or Coastal sell any unapproved items?

25  A.    No.

JERRY PARKER - DIRECT

1  Q.   The next is failing to affix on each vehicle any

2  pinstriping, lettering, or stenciling job the required

3  warranty label.

4       Were there -- tell me, what was the -- what was happening

5  with the warranty stickers?  Tell me what your understanding

6  is about those.

7  A.   Well, our customer, which is -- we only had one customer,

8  didn't want them so we didn't put them on.

9  Q.   All right.  So you were directed by the customer not to

10 put stickers on.

11 A.   Correct.

12 Q.   Mr. Montemurro in his declaration said, in fact, Coastal

13 never ordered any stickers.  Is that consistent with your

14 recollection?

15 A.   The only thing we had was back around the first of the

16 year is he decided to make up a thousand dollars worth of

17 stickers for each franchise and charged it to us.

18 Q.   Okay.  So you were charged for some stickers.

19 A.   Uh-huh.

20 Q.   Did Mr. Montemurro ever express concern to you that the

21 customer that you were working with did not want stickers on

22 those vehicles?

23 A.   I'm sorry, say that again.

24 Q.   Did Mr. Montemurro ever express concern or say I'm sorry,

25 I'm going to have to terminate the franchise because the

JERRY PARKER - DIRECT

1  customer is refusing to have stickers?

2  A.   No.

3  Q.   If you had been told that the franchise would be

4  terminated if you didn't put warranty stickers on, what would

5  you have done in that circumstance?

6  A.   We'd have had to have put them on there, but we'd have to

7  take them right back off.

8  Q.   All right.  The last item is failing to pay monthly fees

9  to APS by the 10th day of each month.

10      Did Coastal fail to pay fees?

11 A.   Sometimes they were late depending upon getting all the

12 info together to do it.

13 Q.   And did Coastal pay fees based on the billings or based

14 on the actual revenue received?

15 A.   It had to be on the actual billing.

16 Q.   Okay.

17 A.   Not what you received.

18 Q.   All right.  And how -- why was it like that?

19 A.   Because that's the way Mike wanted it.

20 Q.   Regardless of what the actual franchise agreement said.

21 A.   Correct.

22 Q.   So Coastal was never given an opportunity to either be

23 notified of these alleged defaults or an opportunity to cure

24 them.

25 A.   Correct.

JERRY PARKER - DIRECT

1  Q.   There's been some testimony about services in Florida.

2  Are you providing services in Florida under a different name

3  now?

4  A.   No.

5  Q.   Did you provide services in Florida under a different

6  name at some point?

7  A.   Yes.

8  Q.   What was that name?

9  A.   Custom Dealer Services.

10  Q.   Earlier there was an affidavit -- or declaration from a

11  Mr. Wayne Powell.  Do you know Mr. Powell?

12  A.   I do.

13  Q.   Who was he -- who was Mr. Powell working for in June,

14  July, and August of this year?

15  A.   Custom Dealer Services.

16  Q.   All right.  Can you go ahead and turn to Exhibit 3.

17  A.   Yes.

18  Q.   Can you tell -- tell the Court what Exhibit 3 is.

19  A.   Exhibit 3 is our electronic program that actually you

20  take a picture of the VIN number and it automatically puts in

21  what you did to the car and it bills the customer, sends it to

22  us, sends it to everybody.  And essentially it also lists the

23  tech's name, the actual vehicle, and the amount that was

24  charged.

25  Q.   So this is work that Wayne Powell was doing in Venice,

1  Florida?

2  A.   Correct.

3  Q.   Window tinting work.

4  A.   Uh-huh.

5  Q.   And it is being billed under the name Custom Dealer

6  Services.

7  A.   Custom Dealer Services.

8  Q.   Can you turn to Exhibit 4 and tell us what those

9  documents are.

10  A.   It's pay stubs for Wayne.

11  Q.   Okay.

12  A.   At Custom Dealer Services.

13  Q.   So Wayne was actually being paid by Customer Dealer

14  Services for the periods -- for the period of June 15th to

15  July 15th, July 16th through the 30th, and for the two pay

16  periods in August, right?

17  A.   Correct.

18  Q.   So when Mr. Powell said in his declaration he was working

19  for Atlantic Dealer Services, that's incorrect, right?

20  A.   That is incorrect.

21  Q.   And when he said that Atlantic Dealer Services was

22  providing services in Venice, Florida, in August, that's also

23  incorrect.

24  A.   Incorrect.

25  Q.   Actually, all that work was being done by Custom Dealer

1   Services.

2   A.   Correct.

3   Q.   And he was paid by Custom Dealer Services.

4   A.   That's correct.

5   Q.   Mr. Powell also said that you purchased a 3D printer.  Is

6   that accurate?

7   A.   3D printer was purchased on my credit card, but I didn't

8   do it.

9   Q.   What is the status of that 3D printer purchased with your

10  credit card?

11  A.   Still in the box.  Never been opened, my understanding.

12  Q.   All right.  The box has not been opened.  You've never

13  used the 3D printer?

14  A.   No.

15  Q.   Mr. Powell also said that you hired -- you enlisted the

16  assistance of an engineering student to do reverse engineering

17  and copying of Atlantic's patented applicator.  Is that true?

18  A.   No.

19  Q.   Have you asked anybody to copy or reverse engineer the

20  applicator?

21  A.   No.

22  Q.   So that's just false.

23  A.   That's false.

24  Q.   Are you still providing services like window tinting in

25  Venice, Florida?

1  A.   No.

2  Q.   Why not?

3  A.   Brian Allison, who's the manager over both those

4  locations, it's the same guy -- he's the guy who called us

5  when he got there because he was a customer from somewhere

6  else and called us to come down there.  We got permission from

7  Mike to go down and do that business and look at the

8  possibility of buying the Tampa franchise.  Brian called me

9  and essentially said, you know, I'm getting too much heat.

10  Mike is threatening to sue us and this is not going to work so

11  we're just going to have to bail out, and that's what we did.

12  Q.   So Mr. Montemurro was threatening to sue Brian Allison,

13  the customer, or get him involved in litigation?

14  A.   Get him involved, yes.

15  Q.   And that's true even though there's no franchise -- no

16  Atlantic Pinstripe franchise in Venice, Florida, right?

17  A.   That's correct.

18  Q.   And it's more than 25 miles from any existing franchise.

19  A.   I think.

20  Q.   How much money was the -- in terms of revenue, monthly

21  revenue, how much money was the Venice, Florida, operation

22  generating?

23  A.   In excess of 40,000 a month.

24  Q.   All right.  And so that 40,000 a month is revenue you've

25  lost as a result of Mr. Montemurro's threats to try to stop

1  business there in Florida.

2  A.    Uh-huh.

3  Q.    Lastly, in the prior hearing a piece of evidence was

4  introduced on a LinkedIn profile for you.  Tell us about your

5  LinkedIn profile.

6  A.    I'm not a tech person.  I think my son set it up,

7  LinkedIn, several years ago.  And essentially, if somebody

8  sends a request, it comes as an email.  I push the button to

9  accept.  Most of the time it doesn't work.  And actually, I

10 think it was either my son who helped put that on there.  I

11 never took -- I don't -- I don't deal with it.  I don't go to

12 LinkedIn.  So I just never considered it.  So I got

13 somebody -- actually got Tony to help me how do you delete it,

14 and deleted it off -- deleted it off of there.  I'm -- I'm

15 just not into LinkedIn.  It's just something one of my -- my

16 son got me into.

17 Q.    All right.  So -- but your LinkedIn profile has been

18 changed so it doesn't reference Atlantic Dealer Services.

19 A.    That's correct.

20 Q.    Are you holding yourself out as an Atlantic Pinstriping

21 franchisee?

22 A.    No.

23 Q.    Are you using the Atlantic trademarks in any manner?

24 A.    No.

25 Q.    Are you using the applicators in any manner?

JERRY PAKER - CROSS

1  A.    No.

2  Q.    The Atlantic Pinstriping applicators.

3          MR. HENRIQUES:  That's all I have, Your Honor.

4          THE COURT:  Cross exam.

5          MR. DeANTONIO:  Yes, Your Honor.

6                       CROSS EXAMINATION

7  BY MR. DeANTONIO:

8  Q.    Good morning, Mr. Parker.

9  A.    Good morning.

10  Q.    You mentioned, I believe, in your testimony that you had

11  never received any notice of any violations or defaults under

12  the franchise agreement; is that correct?

13  A.    Not that I know of.

14  Q.    Okay.  Could you please look in the stack that I handed

15  up before.  There's an Exhibit 12.  Could you please look at

16  that document.  I think it's been left up on the witness

17  stand.

18          MR. HENRIQUES:  If it's easier, I think our Exhibit

19  2 is actually the same as your Exhibit 12.  If it's easier to

20  look at the notebook, tab 2.  I believe it's the same email.

21          THE WITNESS:  Number what?

22          MR. HENRIQUES:  Number 2.

23  Q.    This is an email that you received; is that correct?

24  A.    It was addressed -- I...

25  Q.    On the "to" line is jerry@parkermail.biz.  Is that your

1   email address?

2   A.   That's me.

3   Q.   Okay.  And here Mr. Montemurro is listing a number of

4   defaults under the franchise agreement; is that correct?

5          THE COURT:  I can read.  Did you get this and did

6   you read it?

7          THE WITNESS:  I don't remember.

8          THE COURT:  Mr. Parker, did you get it and did you

9   read it?

10          THE WITNESS:  I don't remember it, but I...

11          THE COURT:  Okay.

12          MR. DeANTONIO:  Thank you.

13          THE WITNESS:  I'm sure I probably got it from

14   somebody.

15   Q.   And do you see where Mr. Montemurro, one of the things he

16   says is that there was an entity formed in a territory that

17   was not owned by the franchisee in this last line of the list

18   here; is that correct?

19   A.   Yes.

20   Q.   And in fact, the entity that he's talking about was

21   Atlantic Pinstriping Savannah, LLC; is that correct?

22   A.   Correct.

23   Q.   And that entity was formed without Atlantic's knowledge

24   or permission; is that correct?

25   A.   That is correct.

1  Q.   And you actually signed checks for that entity; is that
2  correct?
3  A.   That's correct.
4  Q.   Mr. Henriques asked you some questions about the
5  Coastal -- about Coastal.  What is Coastal to you?
6  A.   I'm one of the -- one-third of the franchisee.
7  Q.   Okay.  So is it an entity or is it people?  What is it to
8  you?
9  A.   It's people.
10  Q.   Okay.
11  A.   It's Ernie, Tony, and me.
12  Q.   The Coastal franchisee submitted monthly reports in the
13  name of Atlantic Dealer Services Coastal, LLC; is that
14  correct?
15  A.   That's correct.
16  Q.   And wrote checks in the name of Atlantic Dealer Services
17  Coastal, LLC.
18  A.   That's correct.
19  Q.   Did the Coastal franchisee pay royalties on window
20  tinting?
21  A.   Yes.
22  Q.   I want to ask you about the meeting that you testified
23  that you had with Mr. Montemurro about Dentworks.  Do you know
24  if that was before or after the Dentworks lawsuit was filed?
25  A.   Well, I think it was -- that was on a Tuesday.  When we

1   got the filing of the suit was a day or two after that, but it

2   was dated the day before.

3   Q.   Okay.  So the meeting happened before the lawsuit was

4   filed.

5   A.   No, the lawsuit was filed the day before.

6   Q.   Okay.

7   A.   I didn't know it --

8   Q.   Right.

9   A.   -- until we got it later -- later on.

10  Q.   At the time of the meeting, did you know that a lawsuit

11  had been filed?

12  A.   No.

13  Q.   And you testified that Atlantic was not involved in the

14  dispute that was the subject of the Dentworks lawsuit; is that

15  correct?

16  A.   That's correct.

17  Q.   Why is Atlantic Pinstriping Triad, LLC, why has it been

18  named as a party, then, to that lawsuit?

19  A.   I think it was because Joey decided to sue everybody and

20  get as many people on it that he could and so -- but Atlantic

21  or Coastal or me, either one of them, not a part of Partners.

22  Q.   You testified that you believe the Coastal franchisee had

23  sufficient working capital; is that correct?

24  A.   Correct.

25  Q.   But you acknowledge that the Atlantic Pinstriping Triad,

1  LLC, had been sued in South Carolina for failure to pay its

2  debts; is that correct?

3  A.    I'm not aware of that.

4  Q.    Okay.  Well, I'm talking about the Dentworks lawsuit.

5  A.    I must -- say that again.

6  Q.    Okay.  So you testified that the Coastal franchisee had

7  sufficient working capital and was able to pay its debts; is

8  that correct?

9  A.    Correct.

10  Q.    Yet all three of the individuals who you claim comprise

11  the Coastal franchisee had been sued in South Carolina in the

12  Dentworks lawsuit for failure to pay debts; is that correct?

13  A.    I guess.

14  Q.    Okay.

15  A.    I don't -- I don't --

16  Q.    And -- I'm sorry.

17  A.    I said I don't know that for...

18  Q.    Okay.  Are you aware that the Atlantic Dealer Services

19  Coastal submitted a profit and loss statement showing a net

20  income of negative $43,000 year to date as of March 31st,

21  2016?

22  A.    I saw that in something that came up, but I was not aware

23  of it at the time, no.

24  Q.    And you testified -- you admitted that you did not affix

25  stickers to the vehicles; is that right?

JERRY PARKER - REDIRECT

1   A.   That's correct.

2   Q.   And that you sometimes paid royalty fees late.

3   A.   When you say late, after the 10th?

4   Q.   After the due date.

5   A.   I'm sure, yeah.  Always paid them.

6   Q.   You discussed the client in Venice, Florida.  I think you

7   mentioned Mr. Brian Allison as an individual who works at that

8   client; is that right?

9   A.   Yes, he's part owner in both those dealerships.

10  Q.   Did the Coastal franchisee serve that client prior to the

11  termination?

12  A.   Correct.

13  Q.   Okay.  So that's a former client of the franchisee; is

14  that right?

15  A.   Correct.

16  Q.   And that former client would then be covered under the

17  non-solicitation provision of the franchise agreement; is that

18  correct?

19  A.   I guess, I don't know.

20           (Plaintiffs' counsel conferred.)

21           MR. DeANTONIO:  Nothing else, Your Honor.

22           THE COURT:  Redirect.

23           MR. HENRIQUES:  Just briefly.

24                      REDIRECT EXAMINATION

25  BY MR. HENRIQUES:

ERNIE HORNE - DIRECT

1   Q.   You were asked about Exhibit 2, this email.  This was

2   actually before Coastal was even created, right, before you

3   became a franchisee, the date of Exhibit 2?

4   A.   Correct.

5           MR. HENRIQUES:  That's all I have.

6           THE COURT:  All right.  You may step down.

7           (Witness stepped down.)

8           THE COURT:  Anything further?

9           MR. HENRIQUES:  Yes, Your Honor.  We would call

10  Mr. Ernie Horne.

11          THE COURT:  Mr. Horne, come forward and be sworn.

12          WILLIAM ERNEST HORNE, DEFENSE WITNESS, SWORN,

13                      DIRECT EXAMINATION

14  BY MR. HENRIQUES:

15  Q.   Good morning, Mr. Horne.

16  A.   Good morning.

17  Q.   Please state your full name for the record.

18  A.   William Ernest Horne.

19  Q.   All right.  Could you tell us a little bit about

20  yourself, Mr. Horne.

21  A.   I grew up in this area, in the Charlotte area.  Was in

22  the sales business for like 40 years.  Retired in 2008.  And

23  wanted something to do so was looking around for something and

24  got lucky and got into the pinstriping business.

25  Q.   All right.  Did you do anything to avoid service of

1  process in this case?

2  A.   No, sir.

3  Q.   All right.  Tell me how you first got involved with

4  Atlantic Pinstriping.

5  A.   Was working at the golf course that Tony was managing

6  after I retired.  And Ed Vogler was an employee there as well

7  and he was a franchisee and he talked about -- talked a lot

8  about it.  And so it was very interesting so Tony and I

9  decided to pursue the situation and got into the pinstriping

10 business.

11 Q.   What was the location of the first franchise that you and

12 Tony had?

13 A.   That was in 2010, September.  We bought the Greensboro

14 franchise.  And then 2011, in April I think it was, 2011, we

15 bought the Charleston franchise.  And then in 2012 we bought

16 the Columbia franchise.  And in 2013 we sold Greensboro to

17 another franchisee simply because of the logistics.  We wanted

18 to focus everything in that area, in the Columbia and

19 Charleston areas and so we sold the Greensboro franchise.

20 Q.   Who was listed as the franchisee on all those franchise

21 agreements you just told us about?

22 A.   That was myself and Tony.

23 Q.   Was there ever any company or entity listed as the

24 franchisee?

25 A.   No.

1   Q.   Why not?

2   A.   It's not allowed.  Has to be the individuals.

3   Q.   Who --

4   A.   No entity.

5   Q.   Who told you that you were not allowed to list an entity

6   as the franchisee?

7   A.   We never -- actually, it never came up until we wanted to

8   bring Jerry in as a partner because we can see some value in

9   having him as a partner in the business and what we wanted to

10  do is sell him a third, make him a third owner of the LLC.

11  And that was refused because the LLC could not be the owner of

12  a franchise.  It had to be the individuals.  And if Jerry

13  bought into the LLC we were operating, that if something

14  happened to Tony or I or both of us, then the franchise would

15  go back to -- Mike would have first option to buy the

16  franchise back and Jerry would be, you know, an owner of the

17  LLC but have nothing.

18  Q.   What was the percentage royalty that needed to be paid to

19  Atlantic Pinstripe for the -- under the franchise agreement?

20  A.   7 percent.

21  Q.   Okay.  And was there an initial franchise fee you also

22  had to pay for your first franchise?

23  A.   Yes.

24  Q.   What was that fee?

25  A.   35,000.

ERNIE HORNE - DIRECT

1    Q.   So you paid 35,000 and you had to pay royalties of

2    7 percent.

3    A.   Correct.

4    Q.   All right.  I wanted to ask about the royalty provision.

5    If you look at -- there's a stack here that's clipped

6    together.  The franchise agreement is the very first item in

7    there.  It's been marked as Exhibit 1 or Plaintiff's Exhibit

8    1.  If you could look at that.  And I'll direct your attention

9    to paragraph 7.02.  So the pages are numbered although they've

10   got two numbers so it's a little confusing.  It's 16 of the

11   document.  Or if it's easier, also at the very bottom it says

12   page 23 of 64.  If you will look at that.  It's two sided.

13   A.   Okay.  What's the number?

14   Q.   7.02, the royalty fee is what I would like to ask you

15   about.

16   A.   I'm looking.

17        There it is.  "7.02 Royalty Fee."  Got it.

18   Q.   And what does it say in terms of what that 7 percent is

19   paid on?

20   A.   You will pay monthly --

21             THE COURT:  I can read.

22             MR. HENRIQUES:  Okay.

23   Q.   So it is based on revenues, not billings, right?

24   A.   Yes, that's what it says.

25   Q.   Okay.  Was that an issue that came up early on in the

1  operation of the franchise?

2  A.   Yeah, our very first month we thought that we would be

3  paying franchise -- royalty fees on revenues, but that was not

4  the case.  We learned that it's on billings.  So we had to --

5  until we got paid, we had to put more money in to the company

6  to pay the royalty fees until -- you know, to cover that first

7  month until we got paid by our dealers, which our terms were

8  net 30 days and we were lucky if we got paid in 60 days.

9  Q.   So Mr. Montemurro was saying regardless of what the

10  language of the agreement was, he wanted you to pay based on

11  billings?

12  A.   Billings, correct.

13  Q.   And so you were actually paying a month or two ahead of

14  time.

15  A.   Ahead, yes.

16  Q.   Right.  You would not get that revenue for 30 to 60

17  days --

18  A.   Correct.

19  Q.   -- after doing that work.

20  A.   Correct.

21  Q.   So there's been some testimony about late payments.

22  Under the language of when the payments are actually due, you

23  were paying one to two months early, correct?

24  A.   Correct.

25  Q.   Tell me about how the business grew from 2010 until this

1  year.

2  A.   Well, like I said, we bought our first franchise in 2010

3  and another one in 2011, another one in 2012, sold one in

4  2013, and then received permission to do work in Florida in

5  2015.  And we had developed the territories that we were in

6  and got our business up to in excess of a million dollars a

7  year.

8  Q.   Okay.

9  A.   And we had 14 employees, 8 trucks on the road.  Lot of

10  investment.  A thriving business I would describe it as.

11  Q.   You mentioned trucks on the road.  Did those have -- were

12  you making payments on those trucks?

13  A.   Yes.

14  Q.   And were those payments -- were those kept current?

15  A.   Oh, yes.

16  Q.   And was -- were the franchises profitable?

17  A.   Yes.  Yes.

18  Q.   How were -- there's been some evidence about issues with

19  late payments and other problems.  Up until June of 2016, how

20  were those issues handled over the course of the relationship

21  between the franchises and Atlantic Pinstriping?

22  A.   Well, we would pay them.  Could have been late, but they

23  got paid.  I don't understand --

24  Q.   Sure.  Would they -- would you get an email or a phone

25  call if something was late?

ERNIE HORNE - DIRECT

1    A.    Yeah.

2    Q.    And then you would bring it current.

3    A.    Sure.  Yeah.

4    Q.    There was a reference to Exhibit 2 which is a notice

5    where at one point the franchise was put on a 90-day probation

6    period; is that right?

7    A.    Yes.

8    Q.    All right.  And did it successfully complete that 90-day

9    period?

10   A.    Apparently.

11   Q.    And in fact, the franchise was renewed in 2015, a little

12   more than a year after this, right?

13   A.    Yes, October.

14   Q.    So the -- so you were told the problems, you addressed

15   the problems, and the franchise was renewed.

16   A.    Correct.

17   Q.    Did you expect based on the six years of history to be

18   given notice of a deficiency and an opportunity to fix it?

19   A.    Yes, absolutely.

20   Q.    Did you have some meetings with Mike Montemurro in that

21   April time frame, April 2016?

22   A.    Yes, I did.

23   Q.    And were you present during the meeting that Mr. Parker

24   described when Mr. Montemurro visited the office to look at

25   paperwork and then didn't?

1  A.   I was.

2  Q.   From your meetings with him, what was -- what did

3  Mr. Montemurro want?  What was he after?

4  A.   Basically he wanted to get rid of Tony.  In that meeting

5  that Jerry talked about in April, he was -- he stated that he

6  was going to terminate us, and we talked -- discussed it some

7  more.  And he said, Come up with a plan just so it doesn't

8  involve Tony and we'll look at it.

9  Q.   And when he said he was going to terminate you, did he

10  give you any reason for the termination?

11  A.   No.

12  Q.   Did he indicate you were in breach of any obligation

13  under the franchise agreement?

14  A.   No.

15  Q.   Did you, in fact, put together a plan where you would

16  essentially be buying out Tony's interest?

17  A.   Yes, I did.

18  Q.   And is that what Exhibit 6 is in the notebook?

19  A.   Yes, that is.

20  Q.   So this was a proposal where you were going to purchase

21  Tony's interest in the franchise.

22  A.   Tony's and Jerry's.

23  Q.   All right.  And was that something Mr. Montemurro was

24  interested in?

25  A.   Yes.  Yes.  I delivered it to his office and we discussed

1  it and actually it was immediately changed.  Brought in

2  Mr. Vogler to be a partner and then Mike himself would be a

3  partner in the LLC that would be formed to operate the

4  franchises.

5  Q.   Okay.  And following your proposal, did Mr. Montemurro

6  then come up with a revised proposal that he thought would

7  work?

8  A.   Yes.  Yes, he would -- Mike would be a partner, Ed Vogler

9  would be a partner, and I would be a partner.  It would be a

10  three-way company.

11  Q.   And could you turn to Exhibit Number 7.

12  A.   Okay.

13  Q.   Is this an email Mike Montemurro sent to his Nevada

14  franchise lawyer Rob Vinson?

15  A.   Yes, that's -- that's what it looks -- yes.

16  Q.   And he has copied you, Tony, Jerry, and Ed Vogler on the

17  email --

18  A.   Yes.

19  Q.   -- right?

20  A.   Yes.

21  Q.   And he's asking his attorney to draft up paperwork to

22  effect this change.

23  A.   Yes.

24  Q.   All right.  Now, let's look at Exhibit 8 which is a

25  response from Rob Vinson to Mike Montemurro.  How did you get

1  Exhibit 8?

2  A.    It was handed to me when I was in Mike's office.

3  Q.    So you were in Mike's office and he handed you a copy of

4  this email from the franchise lawyer.

5  A.    Yes.

6  Q.    And does the email raise the possibility of simply

7  terminating the franchise?

8  A.    Yes.

9  Q.    All right.  And is that down on number 7?

10  A.    Number 7, yes.

11  Q.    And he points out that under this solution, Tony and

12  Jerry would not have rights and would not need to sign any

13  documents.

14  A.    Correct.

15  Q.    So the lawyer is saying that rather than do a mutual

16  transfer that everyone signs off on, he's telling Mike he can

17  simply do a termination.

18  A.    Terminate, yes.

19  Q.    And a month later a termination notice was delivered.

20  A.    Correct.

21  Q.    But there's nothing in the letter from the lawyer

22  indicating that there's any basis for terminating the

23  franchise agreement, is there?

24  A.    No.

25  Q.    It's simply another way to move forward with the creation

1  of a new franchise without needing signatures of Tony and

2  Jerry.

3  A.   Correct.

4  Q.   But in fact, after the termination, you were never given

5  an opportunity to become the franchisee for Columbia or

6  Charleston, were you?

7  A.   No.   The -- after the South Carolina lawsuit from Joey

8  Williamson suing Partners Detail and Atlantic Pinstriping

9  Triad, Mike told me that if Tony challenged him on this

10  termination, on this reorganization termination, that he would

11  fry us all, put us all in the grease, and I would be paying

12  him for the rest of my life.

13  Q.   Are those his exact words?

14  A.   Exact.

15  Q.   That he would fry you all.

16  A.   Yes.   And after there was a counter lawsuit and I

17  explained that the counter lawsuit against Joey Williamson

18  naming Mike as third party was necessary so that Mike could

19  confirm that there was a contract that was breached and that

20  was caused by Joey.

21  Q.   Let me ask you about -- I asked about termination of the

22  Coastal franchise with Mr. Parker on Exhibit 1.   Let me ask

23  you some of those same questions --

24  A.   Okay.

25  Q.   -- Mr. Horne.

ERNIE HORNE - DIRECT

1    If you could turn to the first exhibit in this notebook.

2    The first grounds for -- well, and let me ask you the

3 same question.  Had you received any notice of default prior

4 to being handed this on June 14, 2016?

5 A.    There had been emails when something was in default or

6 something was wrong, but those were -- in my opinion, those

7 were to cure.

8 Q.    Right.  So you would get told of an issue and given an

9 opportunity to cure it.

10 A.    Yes.

11 Q.    Let me ask about some of the specific allegations in this

12 letter.  The bottom paragraph of the first page says that you

13 are unable to pay debts as they become due.  Is that true?

14 A.    No.

15 Q.    Were both the Columbia and Charleston franchises paying

16 debts as they became due?

17 A.    Yes.

18 Q.    There's been some testimony about this South Carolina

19 lawsuit.  Dentworks wasn't owed any money by you or Tony or

20 Atlantic Pinstriping Triad, right?

21 A.    That is correct.  It was a frivolous lawsuit.

22 Q.    So the allegation that you were unable to pay your debts

23 was a false allegation.

24 A.    Correct.

25 Q.    And had that ever been brought up before?  Had Mike ever

ERNIE HORNE - DIRECT

1  said you guys don't have sufficient money to pay your debts or

2  you're insolvent?

3  A.    No.   There was an issue with a window film vendor that

4  kept saying we owed them money and we kept asking for invoices

5  and didn't get invoices.   And he called Mike.   I think Mike

6  had done business with him as well.   And finally we got -- all

7  we would get was a spreadsheet which we had never seen an

8  invoice.   And finally we got invoices.   And I don't have

9  firsthand knowledge that we did get invoices.   I don't have

10  firsthand knowledge that they were paid.   But Tony can address

11  that.

12  Q.    Okay.   So you may have had disputes with some vendors

13  like the window film vendor, but that didn't mean --

14  A.    Sure.

15  Q.    -- that you were insolvent, that you personally were

16  insolvent or that Atlantic --

17  A.    Oh, no.   No, sir.

18  Q.    And you're not insolvent.

19  A.    No.

20  Q.    All right.   Let's look, then, at this laundry list of

21  defaults on page 2.   And we'll just go through them quickly.

22  Had Coastal or -- I'm sorry, had Columbia or the Charleston

23  franchises ever used the system or marks in connection with

24  some other business activity?

25  A.    No, sir.

ERNIE HORNE - DIRECT

1  Q.   Had they used them outside the covered territories

2  without permission?

3  A.   No, sir.

4  Q.   Had they failed to comply with APS system standards?

5  A.   Not to my knowledge.

6  Q.   In fact, did you ever get any explanation about what

7  system standards were supposedly not being complied with?

8  A.   No, sir.

9  Q.   All right.  How about failed to operate it diligently or

10  consistent with sound business practices?

11  A.   No.

12  Q.   In fact, those franchises had been very successful from a

13  business standpoint, right?

14  A.   Yes.  Relative to the other franchises it was very

15  successful.

16  Q.   All right.  The next one is maintain working capital and

17  sufficient net worth.  Was there sufficient capital and net

18  worth to continue operations?

19  A.   Yes.

20  Q.   The next is adhering to the standards of honesty,

21  integrity, and fair dealing.  Had the franchises done -- the

22  Columbia and Charleston franchises done anything in violation

23  of those standards?

24  A.   No, sir.

25  Q.   The next is allowing officers, et cetera, to engage in

ERNIE HORNE - DIRECT

1    unlawful conduct or something damaging goodwill.  Had that

2    taken place?

3    A.    No.

4    Q.    Did those -- did Columbia and Charleston franchises have

5    any control over what Dentworks said in its lawsuit?

6    A.    None.  No.  You know, I've never met the guy.  I don't

7    know anything about him.

8    Q.    Failing to pay taxes when due.  Had the franchise paid

9    taxes when due?

10   A.    Except twice.

11   Q.    Tell us about -- you're talking about tax liens?

12   A.    Yes, tax liens.

13   Q.    Tell us about those.

14   A.    One of those was proved -- right away was proved to be

15   false and was dismissed.  And the other is -- we reached an

16   agreement to pay it.

17   Q.    Okay.

18   A.    And the lien was released.  We just paid it off.

19   Q.    All right.  So you made -- reached an agreement -- one

20   was an improper lien --

21   A.    Yes.

22   Q.    -- that got dismissed.

23   A.    Correct.

24   Q.    The other one you reached an agreement sometime ago to

25   pay it off and the lien has been dismissed.

1  A.   Correct.

2  Q.   So both of those -- that's not an issue.

3  A.   No.

4  Q.   The next one is offering and selling unapproved items

5  without consent.  Has -- have the franchises done that?

6  A.   No.

7  Q.   The next is failing to affix window -- warranty labels.

8  Tell us about the warranty labels.

9  A.   We have used them in the past; but where our dealers

10  didn't allow us to put them on the cars, we didn't put them on

11  the cars.

12  Q.   And did you ever get -- has that been going on for some

13  time?

14  A.   Yes.

15  Q.   Did you have discussions --

16  A.   For a long time.

17  Q.   Did you have discussions with Mike Montemurro about the

18  window stickers?

19  A.   Yes.

20  Q.   What did you tell him about the window stickers?

21  A.   Well, I think they're a valuable marketing tool.  I do

22  see the value in them.  I always have.  And I would use them

23  if I could.  But it's a waste to put them on there and have

24  them pulled right back off.

25  Q.   That's what some dealers were saying is --

ERNIE HORNE - DIRECT

1   A.   Correct.

2   Q.   -- you got to pull them back off?

3   A.   Yes.

4   Q.   You can comply, but just turn around and take them right

5   back off because they didn't want them on there.

6        All right.  And then the last is failing to pay monthly

7   fees by the 10th of the month.  Tell us about that.

8   A.   Yeah, we -- we paid them in the current month.  They were

9   always paid in the current month.  Might not have been paid by

10  the 10th, but they were always paid in the current month.

11  They were never -- never later than 30 days to my knowledge.

12  Q.   All right.

13  A.   Or 20 days actually.

14  Q.   And had Mr. Montemurro ever told you that he was going to

15  terminate the franchise agreements if items that are listed

16  here on page 2 were not fixed?  Did he ever say your franchise

17  agreement will be terminated if you, for example, you know,

18  fail to pay -- don't resolve those tax liens or --

19  A.   No.

20  Q.   -- failed to maintain --

21  A.   No.

22  Q.   So you were given no opportunity to cure or address these

23  items; is that right?

24  A.   Correct.

25            (Defense counsel conferred.)

1        MR. HENRIQUES:  That's all I have, Your Honor.

2        THE COURT:  Cross.

3        MR. DeANTONIO:  Thank you, Your Honor.

4                    CROSS EXAMINATION

5   BY MR. DeANTONIO:

6   Q.   Mr. Horne, good morning.

7   A.   Good morning.

8   Q.   Could you please look at the stack of exhibits that I

9   handed up to Ms. Montemurro earlier and find Exhibit 13.  And

10  just let me know when you have it.

11  A.   13.

12  Q.   Okay.  Exhibit 13 is a continuation of that -- of the

13  email chain from Exhibit 12 which was the email that

14  Mr. Montemurro sent listing a number of defaults; is that

15  right?

16  A.   Yeah, I believe so.

17  Q.   And you did not dispute that any of those defaults had

18  occurred, did you?

19  A.   No.

20  Q.   And you acknowledge that they actually did occur.

21  A.   Sure.  Yes.

22  Q.   Let's look next at the letter that you sent to

23  Mr. Montemurro, the letter of intent, which is in the binder

24  at Exhibit 6.

25  A.   Okay.

ERNIE HORNE - CROSS

1   Q.   Was it your understanding that Mr. Montemurro requested a
2   change in ownership of the Charleston and Columbia and Coastal
3   franchises so that the defaults would stop occurring?
4   A.   I don't -- I don't know that that was the reason that he
5   wanted a change.  I can't -- I can't say yes or no to that
6   because I don't know.
7   Q.   Okay.  Had this agreement been consummated, there would
8   have been no need for termination of the franchise agreements;
9   is that correct?
10  A.   Correct.
11  Q.   Okay.  So was this an effort by Mr. Montemurro to reach a
12  resolution without need for termination of the franchise
13  agreements?
14  A.   It was an effort by me to reach a resolution.
15  Q.   And there were continued negotiations for at least a
16  month; is that right?
17  A.   That's right.
18  Q.   And then on May the 13th, 2016, Atlantic Pinstriping
19  Triad, LLC, sued Atlantic Pinstriping and Mr. Montemurro; is
20  that correct?
21  A.   Yes.
22  Q.   And did the negotiations fall apart after Atlantic
23  Pinstriping Triad and Mr. Tony Horne sued the plaintiffs in
24  this case?
25  A.   Yes.

1  Q.   Mr. Horne, you read the franchise agreement before you

2  signed it; is that correct?

3  A.   Yes.

4  Q.   And did you intend to comply with that agreement?

5  A.   Certainly.

6  Q.   And if there's a provision in that agreement that

7  provides that no notice or intent to cure is required upon a

8  certain event of default, would you think that that provision

9  should be enforced?

10 A.   Well, if you want my opinion, we had a thriving business

11 going.  Fourteen employees, eight vehicles on the road.  And

12 at the time of threatened termination, my mindset was I have

13 to do something to protect these employees, to protect our

14 investment in time and money into this company --

15          THE COURT:  Okay.  Stop the narrative.  It's

16 unresponsive to the question.  Let's go.

17 Q.   Mr. Horne, are you aware that a judgment had been filed

18 in South Carolina against Atlantic Pinstriping Triad?

19 A.   A judgment?  No.

20 Q.   Okay.  Could you please look at Exhibit 23 that's in the

21 stack of papers that I handed up to Ms. Montemurro.

22 A.   23?

23 Q.   23.

24 A.   Oh, yes.  Okay.

25 Q.   And that's a judgment for $38,000.

1  A.   I don't know.  I wasn't aware of this.

2  Q.   Okay.  It was filed, looks like August 15th, 2016; is

3  that right?

4  A.   Um...

5  Q.   There's a stamp on the right near the top on the first

6  page.

7  A.   Yes.  Well, on the 9th of May 2016.

8  Q.   Okay.  That's the --

9  A.   July 29, '16, on the bottom left.

10 Q.   Okay.  I'll just represent that it's file stamped

11 August 15th.  But you already --

12 A.   Oh, yeah, I see that now.

13 Q.   You already stated that there had been tax -- at least

14 one -- two tax liens, at least one you acknowledge a

15 settlement was reached; is that correct?

16 A.   Correct.

17 Q.   And are you aware that the Atlantic Pinstriping Triad

18 entity submitted profit and loss statements showing negative

19 net income?

20 A.   Yes.

21 Q.   Yet you claim that the franchisee had sufficient working

22 capital?

23 A.   Well, that was one P and L statement.

24 Q.   You mentioned that the Charleston and Columbia

25 franchisees had never operated outside of their territories;

1  is that correct?

2  A.  Correct.

3  Q.  Didn't the Charleston and Columbia franchisees operate in

4  Savannah, Georgia, without authorization?

5  A.  No, we had permission to do due diligence in that area to

6  see if we wanted to buy it.

7  Q.  When was that permission requested?

8  A.  I don't remember exactly, but there should be a document

9  because any time we're looking at a territory, new territory,

10  we have to get permission, which there is a form for that.

11  Q.  Mr. Horne, I'm going to hand you Exhibit Number 108.

12     Is Exhibit 108 the request for permission to serve

13  Savannah, Georgia?

14  A.  Yes, it is.

15  Q.  And it's dated July 15, 2015, right?

16  A.  Yes, sir.

17  Q.  And in fact, the Charleston and Columbia franchisees had

18  served Savannah prior to making this request.

19  A.  I think there was -- I seem to -- well, I'm pretty sure

20  there was a request prior to this to do due diligence in the

21  Savannah area to see if we wanted to buy that territory and we

22  decided against it, and then we had body shops calling from

23  Savannah wanting us to do repairs there.  So this would cover

24  that type of business, allowing us to go to Savannah to make

25  body shop repairs.

ERNIE HORNE - CROSS

1  Q.   Okay.  Just looking back at Exhibit 13, please.

2  A.   13?

3  Q.   Yes.

4       And can you please look at page 5 of that document when

5  you get there.

6  A.   13, okay.  Page 5?

7  Q.   Yes, sir.

8  A.   Okay.

9  Q.   This is about a month and a half before the approval

10 request that we just looked at, right?

11 A.   Yes.

12 Q.   And you were telling Mr. Montemurro that you will cease

13 and desist all activity in the Savannah market; is that

14 correct?

15 A.   Yes.

16 Q.   And you did not dispute his statement in the email to

17 which you were responding that he was assured that there would

18 not be an entity created in Savannah.  You did not dispute

19 that, did you?

20 A.   No.

21            (Plaintiffs' counsel conferred.)

22            MR. DeANTONIO:  No further questions at this time,

23 Your Honor.

24            THE COURT:  Any redirect?

25            MR. HENRIQUES:  No redirect, Your Honor.

MICHAEL MONTEMURRO - DIRECT

1    THE COURT:  You may step down.

2    (Witness stepped down.)

3    THE COURT:  All right.  We'll take a 15 minute

4  recess.

5    (Brief recess at 12:07 p.m.)

6    THE COURT:  All right.  Do you have another witness?

7    MR. HENRIQUES:  No, Your Honor.  That would conclude

8  defendants' evidence.

9    THE COURT:  All right.  Do you have any rebuttal?

10    MR. DeANTONIO:  Yes, Your Honor.  We have very brief

11  questions for Mr. Montemurro and Mrs. Montemurro.

12    THE COURT:  All right.  You may recall them.

13    MR. DeANTONIO:  We would first call Mr. Montemurro,

14  Your Honor.

15    THE COURT:  All right.  Of course, you're under

16  oath.  You may take the stand.  You remain under oath,

17  Mr. Montemurro.

18    THE WITNESS:  Thank you.

19    MICHAEL MONTEMURRO, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

20    DIRECT EXAMINATION

21  BY MR. DeANTONIO:

22  Q.   Mr. Montemurro, did you hear some testimony today

23  accusing you of saying something along the lines of "I will

24  fry you"?

25  A.   Yes, I did.

1  Q.   Did you ever say anything like that?

2  A.   No, I did not.

3          MR. DeANTONIO:  No further questions, Your Honor.

4          THE COURT:  Step down.  Next.

5          (Witness stepped down.)

6          MR. DeANTONIO:  We would like to briefly call

7  Mrs. Montemurro back to the stand.

8          THE COURT:  All right.  Mrs. Montemurro, you remain

9  under oath.  You may assume your seat at the witness stand.

10  LAURA MONTEMURRO, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

11                  DIRECT EXAMINATION

12  BY MR. DeANTONIO:

13  Q.   Mrs. Montemurro, do you recall some testimony about

14  whether Atlantic required franchisees to pay royalties on

15  billings versus receipts?

16  A.   Yes.

17  Q.   What is your understanding of what Atlantic required

18  franchisees to pay?

19  A.   That the royalties were to be paid on gross sales.

20  Q.   Okay.  Do you recall some testimony about whether the

21  dealership operated by Mr. Brian Allison preferred to have

22  stickers on the cars or not stickers on the cars?

23  A.   Yes.

24  Q.   Do you know whether that dealership is currently

25  utilizing pinstriping services?

1   A.   Yes, they are.

2   Q.   Who is providing those services?

3   A.   The Atlantic Pinstriping Southwest Florida franchisee.

4   Q.   And are stickers applied to cars, if you know?

5   A.   Yes, they are putting them on every vehicle as well as

6   putting a warranty card and a brochure in every vehicle that

7   is striped.

8   Q.   Including the dealership for Mr. Allison?

9   A.   Yes.

10  Q.   Did you meet with Mr. Allison last week?

11  A.   Yes.

12  Q.   Did you have any -- did you or anybody else threaten him

13  at all regarding the conduct of who he chose to do --

14  A.   Absolutely not.

15  Q.   -- Pinstriping services?

16  A.   Absolutely not.

17  Q.   Okay.  Why did -- what did he say about his decision to

18  utilize the Atlantic Pinstriping franchisee in southwest

19  Florida?

20  A.   He spoke very highly of him and he was looking forward to

21  continuing the relationship and using his services for the

22  pinstripe.

23  Q.   Has anybody that you are aware of ever threatened

24  Mr. Allison?

25  A.   No.

1    MR. DeANTONIO:  No further questions.

2    THE COURT:  Any cross?

3              CROSS EXAMINATION

4  BY MR. HENRIQUES:

5  Q.   So have you been down to Venice, Florida?

6  A.   Yes, we were there last week.

7  Q.   So you went and visited Brian Allison there --

8  A.   We did.

9  Q.   -- at the dealership?

10  A.   Yes, sir.

11  Q.   Who is doing the work for Atlantic Pinstriping now in

12  Venice?

13  A.   It would be Atlantic Pinstriping Southwest Florida.

14  Q.   So they're doing work outside of their territory.

15  A.   Correct.

16  Q.   And who is the actual technician that's supplying the --

17  A.   It's Mark Coffers (phonetic).

18  Q.   And did you actually see stickers applied to the cars?

19  A.   Yes.

20  Q.   Did you have a discussion about the stickers?

21  A.   With Mr. Allison, I don't recall.  But they're on the

22  showroom floor with stickers and brochures and warranty cards

23  in every vehicle, as well as on the lot.

24  Q.   And you don't know -- do you know when you started --

25  Mr. Allison started using the southwest Florida franchise for

LAURA MONTEMURRO - CROSS

1   services?

2   A.   I'm not positive the exact date, but he did call Mark and

3   ask him to come and service his territory.

4   Q.   So Mr. Allison called Mark who is the person in charge of

5   the --

6   A.   I believe he texted him actually.

7   Q.   But do you know what month that was?

8   A.   I'm sorry, I don't have an exact date for you.

9   Q.   Okay.

10  A.   I can find out for you.

11          MR. HENRIQUES:  That's all the questions I have.

12                  REDIRECT EXAMINATION

13  BY MR. DeANTONIO:

14  Q.   Did the Naples -- or southwest Florida franchisee obtain

15  permission to work outside of the territory?

16  A.   Yes.

17          MR. DeANTONIO:  Nothing further.

18          THE COURT:  All right.  You may step down, ma'am.

19          (Witness stepped down.)

20          THE COURT:  All right.  That concludes the evidence.

21  How long do you folks need on oral argument?

22          MS. ANDERSON:  Your Honor, 20 minutes.

23          THE COURT:  Total.  Split it or whatever you want to

24  do with it.  You go first and last.

25          Can you go 20 minutes?

1        MR. HENRIQUES:  I think I can do -- I was thinking

2   30, but I think I can probably make 20 happen, Your Honor.

3        THE COURT:  Twenty.  It's getting late.  Lunchtime

4   beckons.

5        Go ahead, Ms. Anderson.

6        MS. ANDERSON:  Go ahead now?

7        THE COURT:  You have the burden of proof.  You may

8   proceed.

9        MS. ANDERSON:  Understood.

10       Your Honor, you always hear that an injunction is an

11  extraordinary remedy in cases like this.  I want the Court to

12  understand what an extraordinary step this has been for

13  Atlantic and Mr. Montemurro.  They have never done anything

14  like this.  They wouldn't do it without a compelling reason.

15       I'd like to talk about two things:  One, the reasons

16  we're here today, the harm to their intellectual property that

17  brought us here; and the second, why we should win under this

18  standard for getting an injunction.

19       First, the first of these is the harms.  So Atlantic

20  and Mr. Montemurro built a successful system based on three

21  pieces of intellectual property, and each one of those is

22  being harmed every day by the defendants.

23       The first one is the Atlantic technology, the

24  patented invention that Mr. Montemurro invented.  And that

25  includes the applicators, the heads, and the method.  He

1    licenses this to Atlantic and Atlantic licenses it to the
2    franchisee, but only during the term of the agreement. When
3    the franchise terminates, the franchisees must return the
4    equipment.

5         That hasn't happened here. Laura Montemurro
6    testified that the defendants have 7 pinstriping applicators
7    and 61 heads that have not been returned and they -- and that
8    is a violation of the agreement.

9         Now, the defendants had claimed in the last hearing
10   that they're eager to return this equipment, at least a
11   portion of it. So why the change of heart? Wayne Powell, the
12   gentleman who worked for defendants, submitted a sworn
13   statement that they've copied the technology and that they are
14   using it in their illegitimate pinstriping business.

15        Now, we heard from Mr. Parker that, yes, he bought a
16   3D printer. Someone charged it to his credit card. We have
17   no idea who. It's just sitting in the box unopened. Why
18   would someone spend tens of thousands of dollars on a printer
19   and never use it? We think the answer is that they have used
20   it and that that's why they don't mind returning the tools now
21   because they have what they need from them. We haven't heard
22   anything to refute that.

23        It would also explain why they ordered an enormous
24   stockpile of paint because they would be ready when they have
25   a copied tool, either an entire tool or part of it, to

1 continue with their business.

2 We heard Ed Vogler at the last hearing talk about
3 what a game changer this technology is. He talked about how
4 it's something that no one else has. It helps them work more
5 quickly, more profitably, and it was the first thing he
6 mentioned when he talked about the benefits to the franchise
7 system.

8 We believe that the defendants have taken this
9 technology and we ask the Court to stop them from continuing
10 to use it for their own benefit.

11 The second piece of intellectual property that is at
12 risk here is the defendants' brand. And Your Honor, you've
13 handled many cases like this. You understand about the
14 trademark and the value of it. Mr. Montemurro testified about
15 that. Mr. Vogler testified about how valuable this is to the
16 system.

17 I'm not going to go through the litany of examples
18 of evidence of damage to the brand. I'd like to mention just
19 two, though.

20 One is the email that's Exhibit 22, our Exhibit 22
21 from Scott Clark Toyota's service director, David Blackburn.
22 And Mr. Blackburn had dealt with the defendants when they were
23 in business in Columbia. And at the first hearing Mr.
24 Montemurro testified about how Mr. Blackburn just looked at
25 him with contempt and said, "I've dealt with your company

1  before," when they were first introduced.  And so he
2  memorialized his issues with the defendants in an email.  In
3  that email he said that the defendants' work ethic, their work
4  quality, their attitude were, quote, horrible.  His
5  experiences with them made him decide he would never use
6  Atlantic Pinstriping again.  They had absolutely no concern
7  for customer satisfaction.

8          Now, Mr. Montemurro testified that he had been at
9  Scott Clark Toyota for 20 years and despite that long
10 relationship, once Mr. Blackburn came in, it took him months
11 to get Mr. Blackburn's trust.

12         So that's just one of many examples of how our
13 clients are being hurt by what the defendants are doing.

14         You also heard Mr. Montemurro and others today talk
15 about tax liens, talk about unpaid vendors and the lawsuits
16 that result from that.  And each of those is in the name of an
17 Atlantic Pinstriping entity, which hurts the brand.  There can
18 be no question that this hurts the brand.  So we ask also that
19 the Court stop this harm from continuing to occur.

20         The third part of intellectual property that is
21 being damaged here is the Atlantic Pinstriping system.  Now,
22 the defendants have maintained that they've returned the
23 operating manual so that should be the end of the story.
24 There's nothing else at issue.  But the fact is, you can't,
25 just by returning an operations manual, erase everything that

1  the defendants learned about the Atlantic system.  They still

2  have all the information about how to start this kind of

3  franchise, what kind of specifications and standards they

4  need, how to market this service.

5          You've heard testimony about the defendants' use of

6  this system.  They started two unauthorized franchises.  One

7  we heard about, the Montemurros learned about from their

8  Florida franchisee where they offered to set someone up as an

9  Atlantic Pinstriping franchisee with no authorization or even

10 information to the Montemurros about that.

11         You also heard that they are -- they set up a bank

12 account and are writing checks for Atlantic Pinstriping

13 Savannah and Mrs. Montemurro learned that when she was handed

14 a check by Jerry Parker.

15         In addition to that, they've posed as the franchisee

16 with their software vendor to try to get the vendor to cancel

17 Atlantic's account.  Atlantic's agreements were written to

18 protect against just this kind of harm and that is, at least

19 in part, in the non-competes and the exclusive territory that

20 are a key part of the agreement.  And the defendants signed

21 these agreements.  They committed to respect their terms, both

22 during their terms and after their terms.  They've utterly

23 failed to do that.

24         I'm not going to go into the exact terms of the

25 non-compete because I know Your Honor has read the materials.

1  I will if you want, but it seems like something I don't need
2  to talk about now.
3          The point is that we know that from both Wayne
4  Powell and from Travis Gordon, the private investigator, that
5  the defendants have continued to operate in their former
6  territories.  They have continued to use the trademarks.
7  They've continued to use the telephone numbers.  They've
8  continued to use the business names.  Mr. Gordon and Barefoot
9  Investigation made an appointment this past week with
10  defendants' employees to have a car pinstriped because we
11  intended for them to see whether the pinstriping service was
12  going on, but also to get a look at the tool they were using.
13          They were told that Matt Bernard -- they were told
14  by the dealer, who is the franchisee's customer, that Atlantic
15  Pinstriping is doing pinstriping through Atlantic Dealer
16  Services, the same franchisee that had been there before, and
17  they gave -- they were given a number to call.  That was one
18  of the numbers that Laura Montemurro testified is an Atlantic
19  Pinstriping number.
20          They eventually connected with Brian Guggenbiller
21  through another Atlantic Pinstriping number and he actually
22  set up -- made the arrangements for the appointment.  As it
23  turns out, Mr. Guggenbiller tracked down the investigator
24  through LinkedIn and when the investigator got a LinkedIn
25  notice that somebody has been visiting your account, it was

1   from Brian Guggenbiller who lists himself as director of

2   operations at Atlantic Dealer Services.

3         Now, we provided a voicemail where he responded that

4   this was Custom Dealer Services. And there was other

5   testimony about the defendants operating as Custom Dealer

6   Services. Whether they're operating as one or the other, the

7   fact is they're still operating. They're still operating in

8   the territory where they agreed they would not compete after

9   the termination. And Your Honor, defendants are going to

10   continue to do this unless the Court orders them to stop and

11   we ask the Court to do that.

12         The next thing I want to talk about is why we meet

13   the test for getting an injunction. And before we talk about

14   why we meet it, I just want to clarify what the test is. And

15   again, we covered this extensively in our briefing and I don't

16   want to go into it more than the Court wants. But the point

17   is we believe there is no threshold burden as the plaintiffs

18   argued. And the *Blackwelder* standard that they call for does

19   not apply anymore. And this Court has recognized that that's

20   been overruled and has applied the new standard in *Bica*. I

21   could go on about that, but I won't unless you have any

22   particular questions about it, about that standard.

23         THE COURT: *The Real Truth About Obama* is the case,

24   I believe.

25         MS. ANDERSON: Exactly. Exactly.

1    MR. HENRIQUES:  We agree that's the standard, Your

2  Honor.

3    MS. ANDERSON:  So under this -- under the test of

4  *Bica*, which is the test that's applicable here, we have to

5  show four things.  We have to show we're likely to succeed on

6  the merits, we're likely to suffer irreparable harm, the

7  balance of hardships tips in our favor, and an injunction is

8  in the public interest.  This seems like one of the clearest

9  cases I've ever seen for showing that those standards are met.

10    Success on the merits.  We had valid rights in

11  intellectual property and the defendants have breached

12  those -- and infringed those rights.  We had valid contracts

13  and the defendants breached those contracts.  They -- we

14  counted 48 defaults in the last year alone.  So -- and over

15  the years there's been ample evidence of Mr. Montemurro and

16  Atlantic trying to work with the defendants trying to get them

17  in compliance and it never worked out.  Finally it got to the

18  point that they were getting sued.  They were getting calls

19  from vendors saying your franchisee owes us money, refuses to

20  pay, and so we're going to bring you into a lawsuit.  It got

21  to the point that Atlantic had no choice but to terminate

22  these defendants.  And it did that and it had the right to do

23  that.  So there was harm there.

24    And that didn't stop after the termination because

25  then the defendants violated their post-termination

non-compete. Now, a question on likelihood of success on the merits will be was this -- is this non-compete enforceable? And Your Honor, we would submit that this -- courts in this jurisdiction enforce covenants like this every -- all the time, routinely. *Bica* is a very close example to this. A 2-year period of non-compete with a 25-mile radius is less restrictive than many covenants that this Court has enforced.

And more to the point, Your Honor, we've shown that there is a legitimate business reason for the enforcement of this covenant. Ms. Montemurro testified that they often allow their franchisees to expand into neighboring areas and that sometimes when dealers are on the periphery of a territory, their customers could easily travel 25 miles or more to get service. So this 25-mile restriction allows a franchisee to service the dealers -- the customers of the dealers who are their clients.

Enforcing this non-compete is not only well within the law of this jurisdiction, but it's also in the public interest. This is a reasonable restriction and it comports with a legitimate business purpose.

Irreparable harm. Atlantic and the Montemurros are being harmed in ways that can't be measured by money. They've lost and they continue to lose value in the brand. Their technology is at risk. Their operating system is at risk. And more to the point, their franchisees are harmed. Their

whole system is harmed when someone who takes their system and stops paying royalties on it but continues to use it is able to compete with them when they're paying royalties.  So this hurts not only Atlantic, but it hurts the franchisees.  And *Bica* is a perfect illustration in which the Court recognized the kind of harms when a holdover franchisee is allowed to continue operation.  This is exactly that kind of case.

The balance of the hardships.  We believe that given the egregious conduct of the defendants, the severity of their defaults and the sheer number of their defaults and the reasonableness of the non-competes, we believe that for all these reasons, there is an extremely low probability that this injunction would be deemed improvidently granted.  And on the other side of the scale, there's ample case law in which courts recognize that self-inflicted harm by a holdover franchisee is not something that should weigh on the former franchisee's favor.

The public interest.  Your Honor, we believe that franchises such as Atlantic do a great public service in that they train entrepreneurs, they develop new businesses, and franchise systems such as this are particularly beneficial when they operate on the premise that if individual franchisees follow the system and thrive, then the whole system thrives.  But on the other side of the scale, the public is also hurt by allowing bad actors to come into a

1  franchise system, misappropriate the value of it and use that
2  value to compete unfairly with the existing franchisees.  So
3  for both of those reasons, Your Honor, we believe that the
4  public interest weighs --

5          THE COURT:  Time is up.  I have one question.  How
6  will all of this relate to the arbitration provision in the
7  contract?

8          MS. ANDERSON:  We believe that once the injunction
9  is in place, the matter could either continue to be litigated
10 here or go to arbitration.  But we have every right to get an
11 injunction here, Your Honor.

12         THE COURT:  That's not an issue.  I understand the
13 ability to get an injunction even when there's an arbitration
14 clause.  What I need to know is as a result of all this, is
15 this case going to arbitration or are you guys going to
16 litigate here?

17         MS. ANDERSON:  We believe it should be litigated
18 here.

19         THE COURT:  All right.  We'll let Mr. Henriques
20 respond.  Go ahead, sir.

21         MR. HENRIQUES:  I believe it needs to go to
22 arbitration.  There's a binding arbitration clause that
23 clearly --

24         THE COURT:  And you can invoke it.

25         MR. HENRIQUES:  So I think that's the answer.

1        THE COURT:  All right.  It's your turn to argue.

2        MR. HENRIQUES:  All right.  Thank you, Your Honor.

3        This is really a wrongful termination case and the

4 evidence that you've heard clearly establishes that this

5 fran -- these franchises were terminated for one reason,

6 because Mr. Montemurro decided he didn't want Tony Horne

7 involved in the franchise anymore.

8        I asked him at our first hearing, What was it that

9 led you to the decision to terminate in June of 2016 for the

10 very same infractions that had been going on for five years?

11 Undisputed testimony occasionally they'd miss a payment or

12 whatever.  And he says, The phone call from another counsel,

13 Teddy Mathis, that stated he was naming Atlantic Pinstripe or

14 considering naming Atlantic Pinstripe in a lawsuit.  That's

15 what he said.

16        I asked him again, Isn't it true you wanted Tony

17 Horne out?  And on page 65 of our rough transcript, the

18 question was, "You made it clear you wanted Mr. Horne out of

19 the franchise, right?

20        "Answer:  I made it clear to his partners I would

21 like to disassociate myself with everyone in that room before

22 I wound up getting named in a lawsuit and I needed to break to

23 myself and other franchises, yes, I did."

24        He wanted out.

25        What's really unique and remarkable here, Your

1  Honor, is we not only have his testimony, we have testimony
2  from the meetings with my clients where he said he wanted Tony
3  out, but we have correspondence with his lawyer which he
4  waived privilege on where they were originally working on a
5  cooperative transfer deal and his lawyer says you may have a
6  hard time getting signatures from Mr. Horne and Mr. Parker;
7  and so therefore, you don't have to worry about that if you
8  just go ahead and terminate.  And I think that --
9          THE COURT:  I read it.
10          MR. HENRIQUES:  Huh?
11          THE COURT:  I read it.
12          MR. HENRIQUES:  All right.  So that's the
13  separation.  He says we'll just terminate and we're not going
14  to worry about it.
15          And so the question the jury is going to have to
16  decide -- or the arbitrator.  We think it goes to arbitration.
17  But the ultimate question is, was the termination valid or was
18  it wrongful?  And here I think on the success of the merits,
19  the clear indication is it wasn't validly terminated for any
20  of the reasons listed in that termination notice.  That's why
21  I had each of my clients go through it.  The only one they can
22  terminate without notice is insolvency, inability to pay debts
23  when due.  There's been evidence of a couple of disputed
24  vendors that they didn't pay and one frivolous lawsuit filed
25  in South Carolina that did business with a company called

1    Partners but decided to do the kitchen sink and throw in each
2    of the three named defendants and Atlantic Pinstripe.  That
3    does not provide clear evidence that there's a valid grounds
4    for termination.  All the other laundry list are small
5    violations.  Most of them are unexplained.  And the contract
6    says for those items they have to give notice and an
7    opportunity to cure.

8            I found it interesting that in their reply brief
9    that they filed, they point out correctly, Your Honor, that
10   under North Carolina law, a written contract can be modified
11   by the course of dealings.  They argue that to say, well, it
12   was modified to make the companies a party.  But I agree it
13   can be modified by course of dealings.  Here you've got six
14   years where something is received late, they give notice and
15   it gets fixed.  They had a series of problems.  They put them
16   on probation.  They had 90 days to improve.  They did.

17           They renewed them in 2015 after these alleged
18   incidents with Savannah, after the other incidents.  There's
19   no indication of any new occurrence in 2016.  The only thing
20   that changes in 2016 is he's decided -- he hears about this
21   lawsuit.  He gets scared.  He does an internet search and
22   finds something about Tony he doesn't like and decides I'm
23   done.  That's what happened.  And if the jury concludes that
24   has happened, that's a wrongful termination.  There's no valid
25   basis for termination.  And they have not made --

1        THE COURT:  You said there won't be a jury.  There
2   won't be a jury according to you.
3        MR. HENRIQUES:  I'm sorry, I'm used to talking about
4   a fact -- it would be the fact finder.  The arbitrator would
5   make that determination.  That's really what this case is
6   about.
7        THE COURT:  Quick question.
8        MR. HENRIQUES:  Yes.
9        THE COURT:  What's frivolous about a $38,000
10  judgment against Mr. Montemurro?
11       MR. HENRIQUES:  Thank you, Your Honor.  That's a
12  different -- that's not the same Mr. Williamson.  That's not
13  this case.  If you look at the case caption, that -- the item
14  they've introduced is a separate rent dispute from a -- it's a
15  different party and a different case caption.  So I at first
16  was confused thinking that that was in the Dentworks lawsuit,
17  but it is not.  It's a separate -- it's a --
18       THE COURT:  It's against Atlantic Pinstriping Triad,
19  LLC.
20       MR. HENRIQUES:  It is, Your Honor.
21       THE COURT:  And Tony Horne who is a defendant here.
22       MR. HENRIQUES:  That's correct.
23       THE COURT:  Okay.  Go ahead.
24       MR. HENRIQUES:  That was a -- my understanding,
25  that's a default judgment that my clients found out about for

1   the first time when they saw that notice here.  They were

2   never served with process.  But that's -- but more importantly

3   for Your Honor's purposes for default, that was entered on

4   August 18th so it's two months after the termination.  It

5   can't serve as grounds for terminating the franchise because

6   it happened two months later.

7            THE COURT:  Okay.

8            MR. HENRIQUES:  But it -- I thought it was the

9   Dentworks case.  That case is still going forward, the one in

10  South Carolina.  So it is -- it's different.

11           But that's really what the case is about:  Is the

12  termination proper or is it not?  There's obviously factual

13  disputes surrounding that.  But under *The Real Truth About*

14  *Obama*, which we agree is the standard.  And I apologize for

15  citing *Blackwelder*.  It was an older brief.  I agree that's

16  not the standard.

17           What I'm not sure plaintiffs appreciate is *The Real*

18  *Truth Obama* made it clear that the bar has been raised

19  considerably by *Winter* and now, unlike in *Blackwelder*, there

20  has to be a clear showing of likelihood of success as a

21  threshold matter.  And so it's not simply do they have a

22  chance of success or are there substantial questions which is

23  the old threshold.  Now it's clear likelihood.  They have not

24  done that.

25           The evidence from the witnesses you heard clearly

1  indicates that there was no valid basis for termination, that
2  this is a trumped up termination notice.  He really wanted to
3  get rid of Tony and this was the way he was going about doing
4  it.  And if that's the conclusion, then the answer is they
5  should be reinstated as franchisees.  There's uncontested
6  evidence that they were among the most financially successful,
7  bringing in over a million dollars.  So the idea that they're
8  somehow insolvent or having problems, it simply doesn't jive
9  with the evidence you've heard about the history and success
10 of these franchises.

11        So if the termination is wrongful, that casts the
12 whole -- the whole termination provisions into doubt and
13 there's no basis to think that a wrongful -- after a wrongful
14 termination you're going to get enforcement of the
15 non-competes or the other provisions.

16        So I think on the likelihood of success, they simply
17 have not met their burden to show they're going to prevail on
18 the contract claims.

19        I notice that they start with the intellectual
20 property claims.  It's really a nonissue and I'm surprised we
21 keep arguing about it.  We have not violated that patent.  We
22 offered to return the applicators early on before I got
23 involved in the case.  I brought them with me to court.  I
24 asked him if we return it, can we get our deposit back.

25        THE COURT:  The contract says you can't.

1          MR. HENRIQUES:  Huh?

2          THE COURT:  The contract says you can't.  You don't.

3          MR. HENRIQUES:  Well, the contract says that we're

4  supposed to turn it in within 14 days so --

5          THE COURT:  And you haven't.

6          MR. HENRIQUES:  And we didn't turn it in within 14

7  days because after he took the first one and refused to return

8  it -- a deposit within 14 days and violated the contract, our

9  guys were reasonably fearful that if we just hand over the

10  other seven, we're never going to see our security deposit

11  back.

12          THE COURT:  And then you fight about that, right?

13          MR. HENRIQUES:  Right.  Now, I think -- you know, I

14  delivered -- I brought the equipment to plaintiffs' office.  I

15  said here it is.  Photograph it.  Confirm we've got it.  My

16  clients aren't using it.  They can't.  It's in my physical

17  possession.  There's no issue.  If your order wants to

18  enter --

19          THE COURT:  Why don't you give it back to them.

20  Give them their equipment and then fight about the darn

21  deposit.  Why are you all keeping their equipment?

22          MR. HENRIQUES:  Well, because we're not sure we'll

23  ever see the deposit back.

24          THE COURT:  That is probably subject to the issue

25  that you're going to bring up with the arbitrator, isn't it?

1          MR. HENRIQUES:  Well, the arbitrator is going --

2          THE COURT:  Isn't it one of the things you could

3     talk about there?

4          MR. HENRIQUES:  Definitely -- both sides have claims

5     for damages the arbitrator would decide.  But it seems to

6     me --

7          THE COURT:  He has a patent.  You guys are using it.

8     Give him his equipment back for God's sake.

9          MR. HENRIQUES:  Again, I don't think that's -- and

10    obviously Your Honor can order that.  We'll do that.  I've got

11    the equipment so my folks aren't using it.

12         I think -- I think it's interesting that when I

13    asked him on examination, he said I'll never see that

14    equipment.  I said, If we give it to you, will you give the

15    $2,500 back, and he said yes.

16         Then his lawyer points out, well, there's 14 days

17    under the contract.  It's a security deposit, Your Honor.  To

18    me that's an unreasonable position to say, yeah, you gave me

19    the security deposit.  I took that money, but you can't have

20    it back.  Obviously Your Honor can address that however you

21    want.

22         But there's no -- there's been no evidence of

23    continued infringement.  What they've tried to come up with is

24    this double hearsay affidavit of Mr. Powell.  I refuted that

25    directly from my client.  We're not -- we haven't copied it.

1   We're not infringing.  So I think that's a non-issue.  We're
2   not using their technology.  We went and bought another
3   applicator.  So that's not an issue and they haven't put that
4   in issue.

5           And the same thing is true with trademarks.  We're
6   not using that name.  We're doing Custom Dealer Services.  She
7   says it doesn't matter that that's how they're now answering
8   or that's how it's being invoiced.  It sure does because we
9   had said, and we said in the declaration Mr. Horne filed,
10  we're not using it.  Now, they did come forward with that
11  LinkedIn page that Mr. Parker failed to switch.  You heard
12  from him that he doesn't use LinkedIn and had forgotten that
13  that's listed that way and it's been fixed.  I tried to find
14  this other one their investigator found.  I can't find any
15  LinkedIn page for that employee so I don't know if that popped
16  up as some legacy identification.

17          But there's no evidence that we're marketing
18  ourselves as Atlantic anymore.  We're not doing that.  We're
19  sending invoices that are Custom Dealer Services.  So I don't
20  think they've proven some irreparable harm from that
21  marketing.  I listened closely for the evidence of, you know,
22  irreparable harm because that is the second requirement under
23  *Real Truth About Obama*, irreparably harmed absent preliminary
24  relief.  And I listened hard.  I don't see how they're being
25  irreparably harmed.

1    She said there are three reasons.  One is our

2 equipment, which we're not using.  There's no evidence we're

3 continuing to use it.  The other is their trademark, which

4 there is no evidence that we are continuing to make use of.

5 And then she said damage to the franchise.  And that's why we

6 cited in our brief cases you can -- if you're showing that

7 you're losing lots of customers and goodwill is being

8 destroyed, you may be able to show irreparable harm, but we

9 heard no evidence of any customers that were actually lost.

10 In fact, the evidence we heard here at the end is they took

11 the Florida -- Venice, Florida customer that we had been

12 serving, $40,000 a month, and now they've taken him back we

13 think with threat of litigation.  But that's a customer that

14 they have even though it's not in their territory.

15    Where is the evidence of all the damage that they

16 are suffering because we have somehow stolen or competed with

17 customers that they aren't doing?  It's totally absent, zero,

18 on the evidence of lost customers.

19    And that's why I cited the case where the Court

20 actually found that it was going to enforce a non-infringement

21 restriction.  I'll get Your Honor the citation in a moment

22 because I think it's an important case on the irreparable harm

23 piece, Your Honor.  I think it's the *Olympus* -- yeah, the

24 *Olympus* case, you know, and *Static Control* saying that in a

25 customer case you have to show the following:  Identity of

1   specific customers it has lost or will permanently lose.  And

2   if it's shown, how an award of monetary damages would be

3   inadequate.

4        They haven't done either of those.  If they lost

5   some business and a customer comes forward and says I've been

6   solicited or I've decided not to use Atlantic Pinstripe,

7   that's something the arbitrator can award in terms of monetary

8   damage.  There's no need for any kind of preliminary

9   injunction on that.  And they simply haven't met the burden

10  under *Olympus* and *Static Control* to show actual customer

11  damage.  So that simply is not there.

12       I think that -- so when we look at the test, they

13  haven't shown irreparable harm.  There's no damage being done.

14  And they haven't shown likelihood of success on the merits.

15  And so -- and they have high burdens under both of those under

16  *Real Truth About Obama*.  So I don't think there's a basis for

17  Your Honor to enter a preliminary injunction here because the

18  harm simply has not been shown.

19            THE COURT:  Okay.

20            MR. HENRIQUES:  The last --

21            THE COURT:  Five minutes of rebuttal.

22            MS. ANDERSON:  Yes, Your Honor.

23       I'm not -- starting with the end of Mr. Henriques'

24  argument, I'm not going to go through, because you're going to

25  cut me off before I could finish, the issue of whether we've

1   met the standard under *Olympus* and *Static Control*.  That's not

2   the standard we have to meet in any event.  I stand by our

3   reply brief on what the appropriate standard is.  It's not the

4   standard for employer/employee cases.  It's the standard

5   that's applied every day in courts around the country and in

6   this jurisdiction for franchisor/franchisee cases.  Two

7   independent business parties that are contracting and they

8   agree on what the relationship will be and they're held to

9   that agreement.

10          In terms of irreparable harm, I think it's ludicrous

11  to say that the things that have happened to Atlantic at the

12  hands of these defendants don't constitute irreparable harm.

13  When you've got your trade name appearing in lawsuits for

14  unpaid bills, for tax liens; when you've got people who have

15  dealt with your franchisee saying I will never deal with you

16  because I've dealt with you before, confusing them for the

17  other legitimate Atlantic Pinstriping.

18          And in terms of the wrongful termination, I do want

19  to address that because I think it's so critical.  In one

20  year -- in the space of one year we provided evidence that

21  there were 48 separate defaults.  Now, you could go with a no

22  good deed goes unpunished theory and say that a franchisor --

23  if a franchisor tries to work with a franchisee, then he has

24  to do that forever.  That's not the law, and particularly when

25  the contract says you don't waive your right to enforce simply

1  by trying to work things out, which is what they did. But the
2  defaults got more and more serious. And they got to be things
3  such as trying to sell franchises, posing as the franchisor,
4  posing as the franchisor with a vendor. Just things that
5  involved dishonesty. Things that involved businesses calling
6  Mr. Montemurro and saying you are stiffing us and we're going
7  to bring you in because your franchisor is doing that.

8          Now, I always think of something I talk to clients
9  about which is a saying from Ambrose Bierce in The Devil's
10  Dictionary: A litigant is someone about to give up his skin
11  in hopes of keeping his bones.

12          I don't think a franchisor can disregard the fact
13  of, you know, this bad behavior that's leading to all this
14  litigation that the franchisor is being drawn into. I think
15  that's a legitimate concern, a legitimate grounds for
16  termination, particularly on top of all the others.

17          THE COURT: Okay. We'll see you folks back in here
18  in -- at 2:00.

19          (Lunch recess at 1:09 p.m.)

20          (Court back in session at 2:12 p.m.)

21          THE COURT: All right. Counsel, thank you for all
22  the good work you've done on this matter. I have read all the
23  briefs. I've heard the evidence, the oral argument, and I'm
24  prepared to make a ruling at this time subject to further
25  elaboration with written order.

1            But in order to obtain a preliminary injunction, the
2    plaintiffs must establish, one, that they're likely to succeed
3    on the merits; two, that they are likely to suffer irreparable
4    harm in the absence of preliminary relief; three, that the
5    balance of equities tips in plaintiffs' favor; and four, that
6    an injunction is in the public interest.  These are
7    established after *Winter* and *The Real Truth About Obama versus*
8    *Federal Election Commission* in the Fourth Circuit.
9            First I will address the likelihood of success on
10   the merits.
11           Plaintiffs have demonstrated a history of a
12   multitude of defaults on the part of defendants under the
13   franchise agreements; specifically, evidence of 48 separate
14   defaults within a year.  These defaults became increasingly
15   serious to the point of exposing plaintiffs to lawsuits due to
16   plaintiffs' bad behavior -- due to defendants' bad behavior.
17   Moreover, there is convincing evidence of the defendants'
18   failure to comply with their post-termination obligations,
19   including the obligation to return licensed property and
20   thereby a violation of valid non-compete provisions.  The
21   Court finds the plaintiffs have met their burden of a clear
22   showing of a likelihood of success on the merits.
23           The Court further finds that the plaintiffs have
24   demonstrated they are likely to suffer irreparable harm due to
25   defendants' violation of their post-termination obligations.

1    Plaintiffs have presented evidence that their goodwill and

2    reputation with customers and vendors will be damaged if

3    defendants continue to violate the covenant not to compete and

4    use the intellectual property of the plaintiffs.

5           The Court also finds that the balance of harms tips

6    in plaintiffs' favor.  Any alleged potential harm to

7    defendants is a result of defendants' own conduct.  Such

8    self-inflicted harm is far outweighed by the damage done to

9    the plaintiffs.

10          Lastly, the issuance of a preliminary injunction

11   will serve the public interest first because it will encourage

12   franchisors like Atlantic Pinstriping, LLC, to continue to

13   invest substantial assets in providing franchisees with

14   training, skills and promotional advantages of a recognized

15   trade name which enable them to establish their own businesses

16   at reduced costs.  Also, it will protect the investments

17   franchisors make in developing those systems and prohibit a

18   third party from taking advantage of the skills and goodwill

19   they were provided without paying what they agreed in

20   exchange.  Moreover, there is a strong public interest in

21   honoring the sanctity of a contractual relationship.

22          The Court finds the plaintiffs have met their burden

23   for issuance of a preliminary injunction.  The Court grants

24   the motion.

25          Plaintiffs are to prepare a proposed written order,

1  serve it on the defense counsel and on the Court.  Counsel may

2  have one day thereafter to file written short briefs

3  addressing any proposed such written injunction.  And then the

4  Court will sign an order consistent with these bench rulings

5  today.

6          And then if you are going to go forward with your

7  arbitration, you should proceed in that regard subject,

8  however, to the injunction.  And then you can go -- for what

9  it's worth, I strongly urge all of you to sit down, take a

10 deep breath and see if there is some negotiated way out of

11 this morass.  Even with the sums of money that have been

12 testified to, none of you can afford to litigate this thing

13 out this much, this crazy.  There's just not that much money

14 involved.  So you all ought to be able to sit down.  You've

15 been in business.  Take a good hard look at this and see how

16 to get out of this mess without spending millions in

17 attorney's fees.

18          That's the ruling of the Court today.  So thank you

19 very much, counsel.  I greatly appreciate the professionalism

20 that you have both -- have both exhibited in this matter.  And

21 let me know what your plans are.  Thank you very much.

22          MR. HENRIQUES:  Your Honor, can I just for

23 clarification on arbitration, because our answer is currently

24 due on Thursday, are you indicating that you're --

25          THE COURT:  If you want to file an answer, you

1  certainly may do so.  If you wish to ask for an extension so

2  you can file the arbitration, have at it.

3          MR. HENRIQUES:  Thank you.

4          THE COURT:  Whatever you want to do in that regard,

5  just let us know.

6          (End of proceedings at 2:17 p.m.)

7                          *****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF REPORTER

4

5

6           I, Cheryl A. Nuccio, Federal Official Realtime Court

7   Reporter, in and for the United States District Court for the

8   Western District of North Carolina, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 26th day of April 2017.

17

18

19                          s/Cheryl A. Nuccio

20                          _____
                            Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter

21

22

23

24

25