IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTTE DIVISION
CIVIL ACTION NO. 3:16-CV-547-GCM

| | | |
|---|---|---|
| ATLANIC PINSTRIPING LLC, AND MICHEAL MONTEMURRO, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| ATLANTIC PINSTRIPING TRIAD, LLC, ATLANTIC DEALER SERVICES COASTAL, LLC, TONY HORNE, WILLIAM E. HORNE, AND JERRY W. PARKER, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court on the motion of Plaintiffs Atlantic Pinstriping, LLC ("Atlantic") and Michael Montemurro to hold Defendants Tony Horne, William E. "Ernie" Horne, and Jerry Parker in civil contempt of this Court's September 28, 2016 Preliminary Injunction Order. The Court held a hearing on this motion on May 30, 2018. In response to oral argument by Defendants' counsel, the Court then conducted a bench trial on June 13, 2018. Based on the pleadings, filings, testimony, documentary evidence, and arguments submitted by the parties, the Court makes the following findings of fact and conclusions of law.

1

# FINDINGS OF FACT

### A. Procedural History

1. This action arises out of three franchisees' breaches of their franchise agreements.

2. Plaintiffs filed this action on July 13, 2016. (Doc. No. 1). They alleged that after franchisor Atlantic terminated franchisee Defendants' three franchise agreements and other related agreements on June 14, 2016, Defendants continued to operate as holdover franchisees and refused to comply with their post-termination obligations, which included non-competition and non-solicitation covenants.

3. On August 12, 2016, Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction, which sought to enjoin Defendants from violating their non-competition and non-solicitation covenants. (Doc. No. 5).

4. On August 22, 2016 the Court scheduled a hearing on the Injunction Motion for August 26, 2016.

5. On August 25, 2016—the day before the hearing was scheduled—Defendants moved to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6), or in the alternative, to stay the matter. (Doc. No. 18)

6. On August 26, 2016, the Court conducted an evidentiary hearing on the Injunction Motion. Given the pending First Motion to Dismiss, the Court reserved ruling on the Injunction Motion.

7. On September 1, 2016, Plaintiffs filed a First Amended Complaint alleging the same causes of action but adding factual allegations regarding their claim for patent infringement. (Doc. No. 24).

8. On September 12, 2016, the Court denied Defendants' First Motion to Dismiss. (Doc. No. 28)

9. On September 20, 2016, the Court conducted a second evidentiary hearing on the Injunction Motion. At the conclusion of the hearing, and with all Defendants present in the Courtroom, the Court issued an oral ruling granting the Injunction Motion.

10. On September 23, 2016, the Court entered a written Preliminary Injunction Order. (Doc. No. 32). The Preliminary Injunction Order required Defendants:

> To comply with the post-termination covenant not to compete, more specifically, for a period of two years following entry of this order, Defendants may not:
>
> a. Engage in or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend their names or any similar name to, or render services or advice to any business that offers vehicle pin striping services within 25 miles of Defendants' territories;
>
> b. Engage in or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend their names or any similar name to, or render services or advice to any business that offers vehicle pin striping services within 25 miles of any business owned or operated by Atlantic or any of its affiliates or franchisees;
>
> c. Solicit or attempt to solicit any of Defendants' customers during the period when they were Atlantic Pinstriping® franchisees or any of Atlantic's customers or any of Atlantic's affiliates' or franchisees' customers;

(*Id*. at pp. 13–14).

11. On November 9, 2016, Defendants submitted an Amended Affidavit of Compliance (Doc. No. 36) in which they represented to the Court that, among other things, they

3

had complied with their non-competition and non-solicitation covenants. Specifically, Defendants represented that they "are not soliciting Atlantic's customers or hiring the employees of Atlantic or Atlantic's affiliates or franchisees, or interfering with Atlantic's relationships with other persons." (Doc. No. 36, ¶ 3).

12. After the Preliminary Injunction was entered, the parties jointly agreed to arbitrate the case as required by the franchise agreements. (Doc. No. 34). The parties' arbitration agreement stated, "The parties consent to the continuing jurisdiction of the Western District of North Carolina for any action or proceeding brought to enforce the Preliminary Injunction." (Tr. Ex. 15, ¶ 5).

13. On November 2, 2016, the Court entered an Order staying this matter pending arbitration. (Doc. No. 35). This Order likewise stated that: "The Parties consent to the continuing jurisdiction of this Court for any motions or other proceedings brought to enforce the Preliminary Injunction." (*Id.* at ¶ 2).

14. On January 17, 2017, the arbitrator entered a Report of Preliminary Hearing and Scheduling Order that permitted discovery to commence immediately. (Doc. No. 43-1)

15. On February 7, 2017, Plaintiffs requested that Defendants produce invoices they sent to customers before and after termination of the franchise agreements. (Doc. No. 43-2, p. 5). Defendants objected. (Doc. No. 43-3).

16. On April 12, 2017, Plaintiffs requested that Defendants produce their communications with customers from April 11, 2016 to present. (Tr. Ex. 19, Req. No. 10). Defendants objected. (Tr. Ex. 20, Resp. No. 10).

17. On May 28, 2017, the arbitrator issued an order compelling Defendants to produce the requested invoices and communications on or before June 27, 2017. (Doc. No. 43-4).

18. After Defendants refused to comply with that order, on August 3, 2017 the arbitrator issued another order requiring Defendants to explain their failure to comply. (Doc. No. 43-5).

19. Defendants have not produced any written communications in which any customer initiated contact with them to request that they provide services.

20. On August 9, 2017, more than six months after Atlantic requested the Defendants' invoices, they produced invoices dated June 13, 2016 to June 30, 2017. (Doc. No. 44-1).

21. On September 27, 2017, Plaintiffs filed with this Court a Motion for Order to Show Cause, which sought to hold Tony Horne, William E. Horne, and Jerry Parker in civil contempt of the Preliminary Injunction. (Doc. No. 41).

22. In response, Defendants argued that they did not violate the non-solicitation covenant because they did not "initiate contact with" former customers. (*See* Doc. No. 51, at pp. 4–5).

23. In reply, Plaintiffs argued that solicitation does not require the initiation of contact and that, in any event, Defendants did initiate contact with their customers. (Doc. No. 52).

24. Defendants moved to strike Plaintiffs' reply on the basis that it was not limited to matters newly raised in Defendants' response, in violation of LCvR 7.1(e). (Doc. No. 60). Defendants did not comply with the consultation requirement of Local Civil Rule 7.1(b). (*See*

*id.*; Doc. No. 69 at p. 6). The Court summarily denied Defendants' Motion to Strike. (*See* Text-Only Order, 11/29/2017).

25. Plaintiffs incurred substantial expense to defend against the Motion to Strike. (*See* Doc. No. 69).

26. The parties conducted a final arbitration hearing from January 9–12, 2018. (Tr. Ex. 1, at 1). The parties presented live testimony and documentary evidence at the hearing. (*Id.*).

27. Meanwhile, on January 31, 2018, the Court granted the Show Cause Motion and ordered Tony Horne, William E. Horne, and Jerry Parker to appear in court on February 15, 2018 (the "Show Cause Hearing") to show why they should not be held in civil contempt of the Preliminary Injunction. (Doc. No. 78).

28. Arguing that the impending arbitration award would "directly impact, and may completely moot, the issues presented by" the Show Cause Motion, Defendants twice moved to continue the Show Cause Hearing on February 5, 2018 and March 6, 2018. (Doc. Nos. 79, 82). The Court granted both requests and moved the Show Cause Hearing first to March 7, 2018 (Doc. No. 81), and then to March 28, 2018 (Text-Only Order, 3/6/2018).

29. On March 12, 2018, the arbitrator issued an arbitration award. The parties notified the Court of the award and indicated the arbitrator was considering requests from the parties for clarification.

30. On March 26, 2018—two days before the rescheduled Show Cause Hearing— Defendants filed a Motion to Dismiss the Show Cause Motion. (Doc. No. 83). Defendants argued that (i) this Court no longer had subject matter jurisdiction to decide this case, and (ii) the arbitration award mooted all remaining issues. (Doc. No. 84). In filing the Second Motion to

Dismiss, Defendants once again did not comply with the consultation requirement of Local Civil Rule 7.1(b). (*See id.*; Doc. No. 86 at 11–12). After receiving the Motion, the Court continued the Show Cause Hearing for a third time to allow Plaintiffs an opportunity to submit a response. (Doc. No. 85).

31. On April 9, 2018 the Court denied the Second Motion to Dismiss, ruling that (i) "this Court clearly has the discretion to exercise supplemental jurisdiction over this matter;" and (ii) "the arbitrator's decision did not entirely moot the relief requested by Plaintiffs." (Doc. No. 88).

32. Plaintiffs incurred substantial expense to defend against the Second Motion to Dismiss. (See Doc. 86).

33. On April 19, 2018 the arbitrator issued the final Arbitration Award. (Doc. No. 91-1).

34. The arbitrator concluded that Plaintiffs properly terminated all three of Defendants' franchise agreements. (*Id.* at pp.7–8, ¶¶ 3, 5).

35. The arbitrator concluded the franchise agreements' non-competition and non-solicitation covenants were enforceable (*Id.* at pp.7–8, ¶¶ 4, 6) and would run for two years from the date of termination, that is, from June 14, 2016 until June 14, 2018. (*Id.* at pp. 11–12, ¶ 1).

36. The arbitrator found:

> After termination of the franchises in question, ***it is uncontested*** that without the knowledge or permission of Atlantic some (if not all) the [Defendants] continued to solicit and complete sales for both pinstriping and non-pinstriping services in their former territories.

(*Id.* at p.4, ¶ 13 (emphasis added)). Addressing Defendants' argument that solicitation requires initiating contact, the arbitrator concluded:

7

> The [Defendants] (excluding ADSC) solicited former Atlantic customers for services provided after they were terminated Atlantic franchisees. While [Defendants] contend they did not initiate contact with former customers in fact, **the record is clear that they did in fact initiate contact individually, through their S.C. counsel on one occasion, or through CDS on more than one occasion**.

(*Id.* at p. 9, ¶ 8 (emphasis added)).

37. The arbitrator found Defendants produced invoices "in the name of Custom Dealer Services, LLC, an LLC formed by [Defendant] Tony Horne." (*Id.* at p. 4, ¶ 13). However, at the final hearing, Defendants admitted that the invoices they actually sent to customers contained "the Atlantic trademark." (*Id.* at p. 5, ¶ 18). Defendants admitted this only after being confronted with invoices that had been "produced by third parties" bearing the Atlantic trademark. (*Id.*). Defendants told the arbitrator that they "did not retain their original post-termination invoices." (*Id.*).

38. The arbitrator found Defendants violated their non-competition covenant from the date of termination to September 28, 2016, which yielded them revenue of $98,101.00. (*Id.* at pp. 4–5, ¶ 17; *id.* at p. 8, ¶¶ 6–7; *see also* Tr. Ex. 24). The arbitrator also found Defendants violated their non-solicitation covenant from the date of termination to May 30, 2017, which yielded them revenue of $312,239.99. (*Id.* at pp. 4–5, ¶ 17; *id.* at p. 9, ¶ 10; *see also* Tr. Ex. 14).

39. The arbitrator awarded Plaintiffs a 7% royalty on the revenue resulting from Defendants' violations of the non-competition and non-solicitation covenants, resulting in a monetary award of $28,723.87. (*Id.* at p. 9, ¶ 10).

40. As a sanction for Defendants' "failure to abide by their discovery obligations," the arbitrator awarded Plaintiffs attorneys' fees incurred between June 15, 2017 and August 18, 2017, in the amount of $26,853.00. (*Id.* at p. 13, ¶ 7).

41. The arbitrator concluded, "Nothing in this award shall bar or otherwise preclude any existing claims or defenses regarding the pending contempt of Judge Mullen's Order by Respondents." (*Id.* at p. 10, ¶ 15).

42. On April 30, 2018, Plaintiffs filed an unopposed motion to confirm the Arbitration Award. (Doc. No. 89). The Court granted that motion on May 14, 2018. (Doc. No. 96).

43. On May 16, 2018, the Court then rescheduled the Show Cause Hearing for May 30, 2018.

44. On May 29, 2018—the day before the hearing—Defendants filed another motion to continue the Show Cause Hearing. (Doc. No. 97). That same day, the Court denied the request for continuance. (*See* Text-Only Order, 5/29/2018).

45. Plaintiffs incurred expense in defending against this motion. (*See* Doc. No. 98).

46. On May 30, 2018, the Court held a Show Cause Hearing. Plaintiffs presented oral argument and relied on documents previously submitted to the Court, namely, the arbitration award, four declarations, 19 exhibits submitted on the Court docket, and 14 exhibits submitted at the hearing.

47. Defendants' counsel, who appeared in the case for the first time on the morning of the hearing (Doc. No. 99), insisted, in an argument never made before in the case, that pursuant to *United States v. Lonnen*, No. 1:15MC44, 2016 WL 4194243 (M.D.N.C. August 8, 2016), the Court was required to conduct a trial with live witnesses. Without ratifying Defendant's suggestion that a trial was necessary, the Court adjourned the Show Cause Hearing and set a bench trial for June 13, 2018. (Doc. No. 101).

48. On June 12, 2018, the bench trial was postponed until further notice. On June 22, 2018, the bench trial was rescheduled for July 19, 2018.

49. On July 19, 2018, the Court conducted a bench trial on the issue of whether Tony Horne, Ernie Horne, and Jerry Parker should be held in civil contempt of the Preliminary Injunction. The Court received live testimony and exhibits from Plaintiffs and Defendants.

**B. Evidence of Civil Contempt by Tony Horne, Ernie Horne, and Jerry Parker.**

50. Defendant Tony Horne incorporated Custom Dealer Services, LLC ("CDS") on May 3, 2016. (Doc. No. 43-8).

51. Ernie Horne testified that CDS was incorporated to perform work in Florida that Defendant Atlantic Dealer Services Coastal, LLC ("ADSC") was not permitted to perform. (Doc. No. 43-9, pp. 4–5).

52. Ernie Horne testified that after the franchise terminations, Atlantic Pinstriping Triad, LLC ("Triad") gave all its assets to CDS and received nothing in return. (*Id.* at pp. 8–10)

53. Defendants produced invoices showing that between September 23, 2016 and May 30, 2017, CDS performed services for Defendants' former customers. Comparing Defendants' post-termination invoices (Tr. Ex. 23) to the monthly reports they submitted for their franchises prior to termination (Tr. Ex. 26) shows CDS invoiced at least 16 of Defendants' former customers. CDS began serving these customers on the same day the Preliminary Injunction was entered and continued serving them at least through May 30, 2017. The invoices show that CDS charged these customers at least $197,548.00 for its services. (Tr. Ex. 27).

54. At least some of these services were actually provided by Defendant Triad. Although Defendants produced copies of invoices in the arbitration bearing the CDS name,

third-party productions show that the invoices Defendants actually sent to customers bore the Triad name. (Compare Tr. Ex. 12, *with* Tr. Ex. 13; *compare* Tr. Ex. 28, *with* Tr. Ex. 29).

55. The Court finds that Defendants either failed to preserve authentic invoices or altered the authentic invoices—in either case, removing the Triad name and substituting the name of CDS before finally producing the invoices in discovery.

56. Defendants provided the same services they previously provided as franchisees of Atlantic with the exception of pinstriping. Under the Atlantic franchise system, "approved items for sale in the franchise system" included hand-painted pinstriping; window tint; paint protection film; body side moldings wings, spoilers, and trim accessories; and graphics. (Tr. Exs. 30–32 at § 4.14; Tr. Ex. 33).

57. Tony Horne, Ernie Horne, and Jerry Parker hired attorney P. Brandt Shelbourne to represent them in South Carolina in legal matters related to their failure to pay vendors and the termination of their franchise agreements.

58. On June 16, 2016, Mr. Shelbourne wrote a letter to Plaintiffs' transactional counsel stating, "My clients intend to continue to operate pursuant to the franchise agreement." (Tr. Ex. 35).

59. On June 23, 2016, Mr. Shelbourne wrote a letter to Fred Anderson Toyota stating:

> It has come to our attention that Mike Montemurro with Atlantic Pinstriping is sending out letters or otherwise attempting to communicate with various customers alleging that Tony Horne's franchise with him has somehow been terminated. Please disregard Montemurro's communications whether from him or from his Nevada attorney. . . . We have a written Franchise Agreement that he must follow. He is refusing to follow that Agreement and has no grounds to terminate the franchise **or stop Tony, Ernie and Jerry from continuing to provide service to your business.**

(Tr. Ex. 2 (emphasis added)). Fred Anderson is one of Defendants' former customers.

60. In response to a third-party subpoena, Fred Anderson Toyota produced a separate letter from Tony Horne, written after termination of the franchises, stating, "We will continue to provide the business and services to you that we have always done." (Tr. Ex. 3).

61. In response to a third-party subpoena, Lugoff Toyota, another customer of Defendants prior to their termination, produced a similar letter that stated, "We will continue to provide the business and service to you that we have always done." (Tr. Ex. 4).

62. Defendants delivered similar letters to other dealerships. (*See, e.g.*, Tr. Ex. 5).

63. On October 7, 2016, Tony Horne sent a text message to Mark Mason, the owner of four dealerships in Lugoff, South Carolina that were Defendants' customers prior to termination. Tony Horne texted to Mark Mason: "I would rather come meet you this week rather than emails." (Tr. Ex. 6).

64. On October 20, 2016, Tony Horne sent a text message to Mark Mason stating, "I'm hearing good reports on progress in Lugoff … is tint and paint protection something we can start in November at VW and Mazda?" (*Id.*).

65. On November 2, 2016, Tony Horne sent a text message to Mark Mason stating, "Can we set up and start tint at Mazda and VW on Monday?" (*Id.*).

66. On May 11, 2017, Tony Horne sent a text message to Chris Fitzgerald, another of Defendants' former customers, stating, "[I] know you are just getting settled and I could really use your help, maybe you would consider meeting me next week for a tint program." (Tr. Ex. 7).

67. Tony Horne represented to Chris Fitzgerald that both Ernie Horne and Jerry Parker would co-sign documents for CDS. (Tr. Ex. 10).

68. Tony Horne claimed in a sworn declaration that he "explained the terms of the injunction to [his] employees." (Tr. Ex. 37).

69. However, Preston Lee Finney, a former employee of Defendants, submitted a sworn declaration stating, "like APT before it, CDS actively pursued the work by showing up at the dealership and performing the work in accordance with the dealership's preferences." He further stated that he traveled to Lugoff, South Carolina to install paint protection film on new vehicles at the Carolina Chrysler Jeep Dodge dealership, another of Defendants' former customers. He stated that none of the Defendants ever informed him of the terms of any Preliminary Injunction. (Doc. No. 54).

70. Brian Gugenbiller, Defendants' employee, testified that he understood that the injunction permitted Defendants to continue to perform non-pinstriping work in their former territories. (Tr. Ex. 36, at 18:15–19, 35:4–12, 123:9–25).

71. Jerry Parker was knowledgeable about the business of CDS and helped broker the sale of CDS's assets to Fineline Pinstriping, LLC. (Tr. Ex. 9). Jerry Parker also purchased a 3D printer that was intended to be used after termination to manufacture a pinstriping tool. (Tr. Exs. 11, 39).

72. Ernie Horne has earned $52,000 in wages from CDS and has performed office management and accounting services for CDS. (Tr. Ex. 8, at 172:15–24; 173:7–174:14).

73. Defendants' former employee, Jason Ward, submitted a sworn declaration stating that Jerry Parker and Ernie Horne routinely helped him set up equipment to perform services at dealerships up until he left Defendants' employment in November of 2017. (Doc. No. 104). Jerry Parker testified that after the injunction was entered he built equipment for window tinting at customers' dealerships.

### C. Damages Incurred by Plaintiffs

74. Atlantic has incurred substantial expense to bring and enforce the Preliminary Injunction, including the costs and fees associated with litigating the ancillary motions.

75. As a result of Defendants' conduct, Plaintiffs did not receive the intended protection of the Preliminary Injunction.

76. As a result of Defendants' conduct, Plaintiffs have suffered substantial reputational harm, including but not limited to the inability to refranchise Defendants' former territories.

77. At the Court's request, Plaintiffs have submitted a petition setting forth their attorneys' fees and costs incurred in connection with their attempts to enforce this Court's Preliminary Injunction Order, from their preparation and filing of their Motion for Show Cause Order through the bench trial. The total attorneys' fees sought in the fee petition is $98,971.00 and the total costs sought is $350.75.

## **CONCLUSIONS OF LAW**

### A. Requirement of Trial

78. While the Court has the discretion to conduct a bench trial on the issue of Defendants' contempt, the Court is not required to constrain its decision to the live testimony presented at trial. Instead, the court may consider, and indeed has considered the entirety of the record in this case.

### B. Standard for Civil Contempt

79. This Court has the inherent authority to enforce the Preliminary Injunction through its contempt power. *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (citing *United States v. United Mine Workers*, 330 U.S. 258, 330-332 (1947)).

80. To establish civil contempt, Plaintiffs must prove: (1) a valid decree existed, of which the contemnor had actual or constructive knowledge; (2) the decree was in the movant's favor; (3) the alleged contemnor by its conduct violated the terms of the decree and had at least constructive knowledge of the violations; and (4) the movant suffered harm as a result. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). These elements must be proved by clear and convincing evidence. *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004). Plaintiffs need not prove that Defendants' actions were willful. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).

**C. Analysis**

81. The first two elements of civil contempt are uncontested and therefore satisfied. The Court concludes that the Preliminary Injunction is a valid decree of which Defendants had actual notice, and that the Preliminary Injunction was decided in Plaintiffs' favor.

82. The Court concludes the third element of civil contempt is satisfied because Plaintiffs have shown by clear and convincing evidence that Defendants violated the preliminary injunction by soliciting former customers and at least had constructive knowledge of their violations.

83. The Court finds that Defendants solicited former clients in violation of ¶ 3(c) of the Preliminary Injunction. (Doc. No. 32 at p. 14). Defendants solicited and provided non-pinstriping services to at least 16 of their former customers as late as May 30, 2017, eight months after entry of the Preliminary Injunction. These non-pinstriping services were approved services under the parties' franchise agreements and were the same services Defendants had provided to their customers prior to termination.

84. The Court rejects Defendants' argument that a finding of solicitation requires proof that Defendants initiated contact with the customers. The only case applying North Carolina law cited by either party, *S. Bldg. Maint., Inc. v. Osborne*, 489 S.E.2d 892 (1997), does not require a finding of an initiation of contact to prove solicitation. *See id.* at 896. However, even if solicitation does require the initiation of contact, the record contains clear and convincing evidence that Defendants initiated contact with their former customers. This is evidenced by:

    a. Tony Horne's email asking for a personal meeting with Mark Mason sent on October 7, 2016;

    b. Tony Horne's text messages to Mark Mason inquiring about new business sent on October 20, 2016 and November 2, 2016 (Tr. Ex. 6);

    c. Tony Horne's text message to Chris Fitzgerald asking to meet in order to advance a new tint program sent on May 11, 2017 (Doc. No. 53);

    d. The sworn affidavits from Defendants' former employees stating that CDS "actively pursued" work from former clients. (Doc. No. 54); and

    e. Tony Horne's characterization at trial of his technicians as "salespeople" and "sales force."

85. The Court rejects Defendants' argument that a footnote in a proposed draft of the Injunction Order misled Defendants into believing they could perform non-pinstriping work for former clients. The footnote was removed in the final version of the Injunction Order and is therefore irrelevant. Furthermore, it would make no sense for the non-solicitation clause to be constrained to pinstriping services, as Defendants were already enjoined from performing pinstriping work for anyone within 25 miles of any business owned or operated by Atlantic or any

of its affiliates or franchisees. Under Defendants interpretation, the non-solicitation clause would, for practical purposes, be superfluous.

86. The Court also rejects Defendants' argument that Ernie Horne and Jerry Parker should not be held in civil contempt because they had no role in CDS after termination. The record contains ample clear and convincing evidence that Ernie Horne and Jerry Parker participated in the business of CDS, and therefore violated the Preliminary Injunction, including but not limited to:

   a. Tony Horne's representation that Ernie Horne and Jerry Parker would co-sign documents for CDS (Doc. No. 43–12);

   b. Ernie Horne's admission that he received a salary from and performed bookkeeping and accounting functions for CDS;

   c. The deposition of Alan Rosenberg, which describes Ernie Horne and Jerry Parker's active roles in the sale of CDS's assets;

   d. Jason Ward's sworn declaration stating that Jerry Parker and Ernie Horne routinely helped him set up equipment to perform services at dealerships up until he left Defendants' employment in November of 2017;

   e. Jerry Parker's admission that he built a frame to be used for window tinting purposes; and

   f. CDS's use of Jerry Parker's credit card for business purposes.

87. The Defendants had at least constructive knowledge of these violations of the Preliminary Injunction, even though they each submitted an affidavit that represented that they were in compliance. The record contains ample clear and convincing evidence of Defendants' knowledge.

88. The Court also finds that Tony Horne had actual knowledge he was in violation of the Injunction Order as evidenced by his attempt to conceal the violations by:

   a. Requesting via text message that Mark Mason no longer contact him by email;

   b. Instructing Preston Lee Finny to make sure that no one saw him performing pinstriping work (Doc. No. 54, p. 3); and

   c. Refusing to keep genuine copies of the actual invoices sent to customers.

89. The Court concludes that the fourth element of civil contempt is satisfied because the record contains clear and convincing evidence that Plaintiffs suffered harm as a result of Defendants' conduct. Specifically, the Court recognized that Atlantic's "goodwill and reputation with customers and vendors have been and will continue to be damaged if Defendants continue to violate their covenants not to compete." (Doc. No. 32 at p. 10). Additionally, Atlantic has been unable to refranchise Defendants' former territory because the individual Defendants have continued to operate there.

90. The arbitrator's award ordered Defendants to compensate Plaintiffs for monetary harm resulting from Defendants' violations of their non-compete and non-solicitation covenants. Here, Plaintiffs have not sought duplicative monetary damages. Instead, Defendants' violation of the Injunction Order has caused further damages of the kind identified by the Court in entering the Preliminary Injunction.

91. The Court also concludes that Atlantic is entitled to recover its reasonable attorneys' fees and costs incurred to enforce the Preliminary Injunction Order through this Motion. *See In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995) (finding that the "appropriate remedy for civil contempt" includes "reasonable attorney's fees"). The

Preliminary Injunction was entered to protect Plaintiffs during the pendency of the lawsuit. Defendants' conduct has deprived Plaintiffs of the benefit of the Preliminary Injunction.

92. The Court concludes that Defendants' litigation conduct has needlessly multiplied the costs associated with enforcement of the Preliminary Injunction Order.

93. The Court therefore concludes that Plaintiffs are entitled to recover their reasonable attorneys' fees incurred in bringing and enforcing the Motion for Order to Show Cause. This award does not include any fees and costs already awarded by the arbitrator.

94. The Court also has the discretion to extend the term of the permanent injunction. *See Cricket Commc'ns, Inc. v. Talk Til You Drop Wireless, Inc.*, No. CIV.3:09-0128, 2009 WL 2850687, at *5 (M.D. Tenn. Sept. 1, 2009). This relief is necessary to ensure Plaintiffs receive the full benefit of the injunction to which they were entitled, and to ensure Defendants do not benefit from their violations. Accordingly, the Court concludes Atlantic is entitled to a one year extension of the Permanent Injunction prohibiting Defendants from violating the non-solicitation covenant.

95. The Court also concludes that any further violation of the Permanent Injunction shall result in a fine of $1,000.00 per day until such default is cured.

## CONCLUSION

96. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs incurred in bringing and enforcing the Show Cause Motion in the amount of $98,971.00 in fees and $350.75 in costs.

97. The term of the Permanent Injunction relating to the non-solicitation covenant is hereby extended for one year. Accordingly, for one year from entry of these Findings of Fact

and Conclusions of Law, Defendants must comply with the non-solicitation covenant found within § 16.08(c) of the franchise agreement.

Signed: September 6, 2018

Graham C. Mullen
United States District Judge